Larry J. Wulkan (021404)
**STINSON LLP**
Firm Identification Number 00462400
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Telephone: (602) 279-1600
Fax: (602) 240-6925
Email: larry.wulkan@stinson.com

Counsel for Plaintiffs
*Additional counsel listed on following page*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

Jason Fenty, Brian Stepter, Douglas Crough, Edward Reason, Jesus Tequida, Ramon Avenenti, Anthony Scroggins, Dale Perez, and Tamara Ochoa on behalf of themselves and those similarly situated,

Plaintiff-Petitioners,

Puente Human Rights Movement,

Plaintiff,

v.

Sheriff Paul Penzone, in his official capacity, and Maricopa County, a municipal entity,

Defendants.

No. 2:20-cv-01192-SPL-JZB

**PLAINTIFF-PETITIONERS' *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**

Ethan J. Sanders**\*** (MO 71151)
**STINSON LLP**
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone: (816) 691-2628
ethan.sanders@stinson.com

Brian Raphel\* (NY 5592308)
Pat Andriola\* (NY 5406327)
Timothy Ly\* (NY 5478540)
**DECHERT LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
brian.raphel@dechert.com
pat.andriola@dechert.com
timonty.ly@dechert.com

Jared G. Keenan (AZ 027068)
Victoria Lopez\*\* (AZ 330042)
Casey Arellano (AZ 031242)
**ACLU FOUNDATION OF ARIZONA**
P.O. Box 17148
Phoenix, AZ 85011
Telephone: (602) 650-1854
jkeenan@acluaz.org
vlopez@acluaz.org
casey.arellano@acluaz.org

Olga Akselrod (NY 4132825) *Pro Hac Vice*
Hugh Handeyside (NY 5394002)
*Pro Hac Vice*
Clara Spera (NY 5590229) *Pro Hac Vice*
Somil Trivedi\* (NY 4834495)
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10014
Telephone: (212) 549-2569
oakselrod@aclu.org
hhandeyside@aclu.org
cspera@aclu.org
strivedi@aclu.org

Shari Ross Lahlou **\*** (DC 476630)
**DECHERT LLP**
1900 K Street, N.W.
Washington, DC 20006 - 1110
Telephone: (202) 261-3300
shari_lahlou@dechert.com

Benjamin M. Sadun\* (CA 287533)
Allison Ozurovich\* (CA 312797)
**DECHERT LLP**
633 West 5th Street. Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5700
benjamin.sadun@dechert.com
allie.ozurovich@dechert.com

Eric Balaban (Admitted to Maryland Bar)
*Pro Hac Vice*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
915 15th St. NW, 7th Floor
Washington, DC 20005
Telephone: (202) 393-4930
ebalaban@aclu.org

Zoe Brennan-Krohn (CA 324912)
*Pro Hac Vice*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0769
Zbrennan-krohn@aclu.org

*Application for *pro hac vice* forthcoming
**Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

# TABLE OF CONTENTS

**Page**

MOTION ................................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................... 1

I.    STATEMENT OF FACTS ...................................................................... 3

    A.    COVID-19 Poses a Significant Risk of Serious Illness and Death. ........................................................................................... 3

    B.    People in Congregate Environments—Like the Maricopa County Jails—Are Particularly Vulnerable to COVID-19. ............. 5

    C.    The Maricopa County Jails Have Not Implemented Adequate Measures to Protect Incarcerated Persons from the Risk of Infection. ......................................................................................... 6

II.    ARGUMENT ........................................................................................ 16

    A.    Absent Relief, Plaintiffs are Certain to Suffer Irreparable Harm. ............................................................................................ 17

    B.    Plaintiffs Have a Substantial Likelihood of Success on the Merits Under 42 U.S.C. Section 1983 ............................................ 18

        1.    Defendants' Unconstitutional Punishment of Pretrial Detainees Violates Due Process Rights. ................................ 18

        2.    Defendants' Deliberate Indifference to the Risks of COVID-19 Also Violates The Right to Constitutional Conditions of Confinement. ................................................. 20

        3.    Defendants Have a Policy, Custom, and Practice of Violating Plaintiffs' Rights. ................................................ 26

    C.    The Medically Vulnerable Subclasses Are Likely To Succeed on Their Habeas Claims. ................................................................ 27

        1.    No Set of Conditions Will Reduce the Risk of Serious Harm for the Medically Vulnerable Subclass. ..................... 28

        2.    The Medically Vulnerable Subclass Members Are Also Entitled to Release or Enlargement Under § 1983 ............... 29

    D.    Defendants Have A Substantial Likelihood of Success on the Merits of Their ADA and Section 504 Claims ............................... 29

    E.    The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor ............................................................................ 33

III.    CONCLUSION ..................................................................................... 34

CORE/3502877.0004/160200868.1

Pursuant to Federal Rule of Civil Procedure 65, Petitioners-Plaintiffs ("Plaintiffs") hereby apply for a temporary restraining order, commanding Respondents-Defendants ("Defendants") to (1) immediately improve conditions at the Maricopa County jails, including through social distancing, educate the incarcerated about COVID-19, administer universal testing, develop protocols for intake cohorting, testing, and monitoring, develop protocols for quarantine, testing, and monitoring people who are suspected to have been exposed to COVID-19, develop protocols for protecting incarcerated medically vulnerable people, develop protocols for housing people who have tested positive for COVID-19, distribute meals safely, require PPE, and distribute cleaning supplies and PPE to Plaintiffs; (2) immediately release or enlarge custody of the members of the Pretrial Medically Vulnerable and Pretrial Disability Subclasses who are incarcerated solely due to their inability to afford a financial condition of release, or whose release Defendants do not object to; and (3) engage in the process set forth in the proposed order to evaluate for release other members of the Medically Vulnerable and Disability Subclasses from the Maricopa County jails. This Application is based upon Plaintiffs' Memorandum of Points and Authorities; Petitioners' Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief (Dkt. 1); and all supporting documents filed concurrently herewith. Plaintiffs have also lodged a proposed Order with the Court. Due to the immediate and irreparable injury to Plaintiffs as described below, Plaintiffs are not required to provide notice. *See* Fed. R. Civ. P. 65(b)(1)(A), (B). Plaintiffs also request that the Court waive any security requirement. *See* Fed. R. Civ. P. 65(c).

## MEMORANDUM OF POINTS AND AUTHORITIES

In one month, the number of COVID-19-positive cases at the Maricopa County jails has skyrocketed from four to 565—a more than 14,000 percent increase. Though Defendants have adopted a plan purportedly designed to ameliorate the spread of COVID-19, including SOP J-02-023, the policy and its implementation are woefully lacking. Chief among the many shortcomings of Defendants' response to COVID-19 is that they altogether fail to adopt any measures targeted at preventing the medically vulnerable and disabled

from getting infected, placing them at acute risk of physical harm.

By any measure, the conditions at the Maricopa County jails—4th Avenue, Saguaro, Estrella, Lower Buckeye, and Towers—are dangerous. As Plaintiffs' declarations show, the jails' practices and procedures have made it all but impossible for detainees to practice the requisite social distancing or personal hygiene necessary to minimize the threat of the virus. Plaintiffs and others cannot maintain six-foot distance from other individuals: they sleep, eat, shower, and engage in other activities in close proximity with each other. Cleaning standards are inadequate, and cleaning supplies are frequently insufficient. Nor have Defendants implemented universal testing—a key measure to help ensure that infected incarcerated persons and jail staff do not infect the remaining jail population, and that timely monitoring and treatment is initiated for infected persons. In sum, the current conditions at the Maricopa County jails are "so grave"—especially for the medically vulnerable and disabled—that they "violate[] contemporary standards of decency to expose anyone unwillingly to such a risk" and therefore violate Plaintiffs' constitutional rights. *See Helling v. McKinney*, 509 U.S. 25, 36 (1993). The jails' failure to take reasonable measures to protect people with disabilities at high risk of COVID-19 complications or death is also a violation of their rights under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (Section 504).

This Court has already recognized the need to protect incarcerated people from COVID-19. *See generally Urdaneta, et al. v. Keeton, et. al.*, 2020 WL 2319980 (D. Ariz. May 11, 2020). In *Urdaneta*, this Court held that the plaintiffs, detainees at two federal immigration detention facilities, established a likelihood of success on the merits and irreparable harm for the same reason Plaintiffs seek relief here: the facilities "fostered conditions that pose an objectively unreasonable risk of transmission of COVID-19 and a resulting substantial risk of serious harm to Petitioner's health and ultimate safety." *Id.* at *12. Critically, at the time of the Court's order, neither facility at issue had ***any new cases***— and one facility had ***none at all***. At this point, the explosion of cases currently plaguing the Maricopa County jails presents a significantly more dangerous situation than was the case

- 2 -

at the time of this Court's order.

Accordingly, Plaintiffs ask this Court to certify the classes and subclasses described in the Complaint[1] and issue an order requiring Defendants to: (1) immediately improve conditions at the Maricopa County jails, including through those measures identified in the proposed Order; (2) immediately release or enlarge custody of the members of the Pretrial Medically Vulnerable and Pretrial Disability Subclasses who are incarcerated solely due to their inability to afford a financial condition of release, or whose release Defendants do not object to; and (3) engage in the process set forth in the proposed Order to evaluate for release and/or enlargement other members of the Medically Vulnerable and Disability Subclasses from the Maricopa County jails.

## I.  STATEMENT OF FACTS

### A.  COVID-19 Poses a Significant Risk of Serious Illness and Death.

COVID-19 is a deadly and rapidly spreading global pandemic. As of June 26, 2020, the outbreak has resulted in over 9 million confirmed cases worldwide, with more than 484,000 deaths.[2] These numbers are growing exponentially; on June 26, 2020, the World Health Organization reported more than 177,000 new infections worldwide in the preceding 24 hours.[3] The United States has seen more than 2 million cases to date and more than 121,000 deaths.[4]

The consequences of contracting COVID-19 can be severe. COVID-19 can result in respiratory failure, kidney failure, and death. To date, 5.1% of people in the United States with a confirmed COVID-19 diagnosis died from the virus.[5] Infected individuals who do

---

[1] The parties, classes, and subclasses identified herein refer to those classes and subclasses set forth in the Complaint. *See* Dkt No. 1, ¶¶ 22-41. In support of their request for certification of the classes or provisional certification in the alternative, Plaintiff-Petitioners respectfully refer the Court to their motion for class certification, filed concurrently herewith.

[2] *Coronavirus disease 2019 (COVID-19) Situation Report - 92*, WHO, June 26, 2020, *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200626-covid-19-sitrep-158.pdf?sfvrsn=1d1aae8a_2.

[3] *Id.*

[4] *Id.*

[5] *Coronavirus Resource Center, Mortality Analysis*, Johns Hopkins Univ. (June 27, 2020), *available at* https://coronavirus.jhu.edu/data/mortality.

not die from the disease can face serious damage to the lungs, heart, liver, or other organs, resulting in prolonged recovery periods, or, in the most severe cases, acute respiratory disease syndrome ("ARDS"), which has a 30% mortality rate even under ideal medical care.[6] The risk posed by COVID-19 is especially grave to persons 50 years of age and over, as well as persons of any age with certain underlying medical conditions, including chronic diseases and health conditions, such as lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), developmental disability, severe obesity, and moderate to severe asthma. Ex. 15 (Cohen Decl.) ¶ 4.[7] People with all of these risk factors (except age or obesity alone) are people with disabilities as defined under federal law.

COVID-19 is highly contagious, spreading from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[8] There is no vaccine against COVID-19, nor is there any known medication to prevent or cure infection. Ex. 15 (Cohen Decl.) ¶ 16. A large percentage of COVID-19-infected persons are asymptomatic, or only display certain of the associated symptoms, and yet are still contagious. *Id.* ¶ 18. Thus, the most effective measures to prevent infection are through social distancing—that is, keeping at least six feet between persons to avoid transmission—comprehensive testing, the wearing of masks, and vigilant hygiene.[9] Ex. 15

---

[6] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, Mar. 25, 2020, *available at* https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf.

[7] WORLD HEALTH ORGANIZATION, *Coronavirus disease (COVID-19) advice for the public: Myth busters,* https://cutt.ly/dtEiCyc ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus."); CDC, *Groups at Higher Risk of Severe Illness,* https://cutt.ly/AtJDxSv; CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://cutt.ly/8uzZfqC ("Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.").

[8] *Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings,* CDC, Apr. 13, 2020, *available at* https://cutt.ly/ztRAo0X.

[9] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in*

- 4 -

(Cohen Decl.) ¶¶ 16, 19.

**B.      People in Congregate Environments—Like the Maricopa County Jails—Are Particularly Vulnerable to COVID-19.**

Scientists estimate that, under normal circumstances, one person with COVID-19 will typically infect between two and three people without social distancing, and about one person if maintaining strong social distancing and quarantining.[10] By contrast, scientists estimate that, in confined settings like prisons and cruise ships, one person with COVID-19 will infect about 11 people, each of whom will in turn infect up to 11 other people.[11] As a result, the Legal Aid Society in New York has reported that the infection rate for COVID-19 at local jails is more than seven times higher than the rate citywide and 87 times higher than the country at large.[12]

The current COVID-19 crisis in Maricopa County tracks this pattern. Maricopa County has reported more than 42,000 confirmed COVID-19 cases as of June 26, 2020.[13] Close to 750 Maricopa County residents have died from COVID-19.[14] But the county-wide emergency comes nowhere close to the crisis within the Maricopa County jails. Indeed, the rate of cases amongst the tested population at the jails is more than three times higher than the rate across the County: whereas county-wide 9.5 percent of those tested for COVID-19

---

*Correctional and Detention Facilities*, supra note 7.

[10] Adam J. Kucharski et al., *Early dynamics of transmission and control of COVID-19: a mathematical modelling study*, The Lancet, Mar. 11, 2020, *available at* https://doi.org/10.1016/S1473-3099(20)30144-4.

[11] Kenji Mizumoto & Gerardo Chowell, *Transmission potential of the novel coronavirus (COVID-19) onboard the Diamond Princess Cruises Ship, 2020*, 5 Infectious Disease Modelling 264, Feb. 2, 2020 (evaluating the transmission rate on a cruise ship, and comparing that infection rate to similarly confined spaces like hospitals, prisons, and churches), *available at* https://www.sciencedirect.com/science/article/pii/S2468042720300063.

[12] *Coronavirus Update: Rikers Island Rate of Infection 7 Times Higher than Citywide, Legal Aid Says*, CBS New York, Mar. 26, 2020, *available at* https://newyork.cbslocal.com/2020/03/26/coronavirus-rikers-island/.

[13] *Data Dashboard: Summary*, ARIZONA DEPARTMENT OF HEALTH SERVICES (accessed June 26, 2020), https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php.

[14] *Data Dashboard: COVID-19 Deaths*, ARIZONA DEPARTMENT OF HEALTH SERVICES (accessed June 26, 2020), https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php.

- 5 -

have tested positive,[15] 28.9 percent of those tested for COVID-19 among the Maricopa County jail population have tested positive as of June 25, 2020.[16] Moreover, the number of COVID-19-positive cases at the Maricopa County jails has skyrocketed in the past month. Though the Maricopa County jails have seen a reduction in the incarcerated population, the number of cases nevertheless continues to rise. As of June 25, 565 incarcerated persons at the Maricopa County jails have tested positive—up from just four cases one month prior.[17] That number does not include the 65 patients awaiting their test results.[18] Despite this exponential increase, Defendants have not sufficiently changed their policies or practices to stop the spread of the virus. Ex. 15 (Cohen Decl.) ¶ 36.

### C. The Maricopa County Jails Have Not Implemented Adequate Measures to Protect Incarcerated Persons from the Risk of Infection.

A litany of conditions at the Maricopa County jails place the incarcerated population at a heightened and growing risk of contracting COVID-19, including:

***Inadequate Testing.*** Originally, Defendants only provided testing to some "symptomatic patients, at provider discretion."[19] The Maricopa County jails' Medical Director has now stated that they are testing asymptomatic people who have had contact with COVID-positive people.[20] Despite these changes, Defendants' customs and practices are inadequate by all accounts. First, Defendants' new policy has not been implemented consistently, as some persons were not tested even after being housed in a pod that was quarantined due to direct contact with a COVID-19-positive person. Ex. 2 (Boykins Decl.)

---

[15] *Data Dashboard: Deaths*, ARIZONA DEPARTMENT OF HEALTH SERVICES (accessed June 26, 2020), https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php; Ex. 18 (MCSO Testing Data).

[16] *COVID-19 in County Jails*, MARICOPA COUNTY (accessed June 28, 2020), https://www.maricopa.gov/5574/COVID-19-in-County-Jails.

[17] *See id.*; *see also* Ex. 18 (MCSO Testing Data).

[18] *Id.*

[19] Ex. 17 SOP J-B-02-23, Management Plan for Novel/Coronavirus Disease (COVID-19), C(f)(iii).

[20] Lauren Castle, *ACLU demands Maricopa County test all inmates for COVID-19, release results*, AZ CENTRAL (June 5, 2020), https://cutt.ly/SuxGROn; *see also* Press Statement of Grant Phillips (June 5, 2020), https://www.youtube.com/watch?v=GzogmTMA8mA (containing video clip of statement made by Dr. Phillips).

CORE/3502877.0004/160200868.1

¶¶ 7-11; Ex. 9 (Player Decl.) ¶ 4. Defendants are also not testing people in some housing units that went to recreation with other housing units in which someone appears to have tested positive for COVID-19. Ex. 2 (Boykins Decl.) ¶ 12; Ex. 8 (Perez Decl.) ¶ 9. Moreover, other asymptomatic or pre-symptomatic incarcerated persons who unknowingly had contact with a COVID-19-positive person can carry the virus but would not be accounted for in Defendants' testing regime. Ex. 15 (Cohen Decl.) ¶¶ 67. Thus, absent universal testing, Defendants cannot identify those who are infected and timely initiate isolation, medical monitoring, and treatment for them. *Id.* Defendants' limited testing is also problematic in light of Defendants' failure to consider the full scope of COVID-19 symptoms. *Id.* ¶ 72. Incarcerated persons have informed staff they were suffering from known symptoms of COVID-19, but were not tested, is an outcome of Defendants' limited criteria. Ex. 2 (Boykins Decl.) ¶ 6; Ex. 5 (Fenty Decl.) ¶¶ 5-6; Ex. 7 (Ochoa Decl.) ¶ 5; Ex. 8 (Perez Decl.) ¶ 5; Ex. 10 (Reason Decl.) ¶¶ 5-6; *see also* Ex. 4 (Dupont Decl.) ¶ 4. There are other reports of exposure to incarcerated persons with COVID-19 symptoms or known cases of COVID-19, and yet likewise not being tested. Ex. 2 (Boykins Decl.) ¶ 6; Ex. 8 (Perez Decl.) ¶¶ 5, 9; Ex. 14 (Tequida Decl.) ¶ 8; Ex. 11 (Scroggins Decl.) ¶ 6; Ex. 12 (Stepter Decl.) ¶ 7. Finally, the failure to conduct universal testing is problematic because the jails' symptoms-based testing program fails to take into account that incarcerated people are deterred from coming forward and reporting symptoms due to fear of being placed into medical isolation, which at the Maricopa County jails is a punitive setting akin to disciplinary segregation. Ex. 15 (Cohen Decl.) ¶ 112.

***No Protections for the Medically Vulnerable.*** Despite clear guidance from public health authorities about the risks of COVID-19 for the medically vulnerable, *see* Ex. 15 (Cohen Decl.) ¶ 82, most of whom are people with disabilities under the ADA and Section 504, Defendants have taken no specific steps targeting the medically vulnerable population to reduce the potential for their infection. Ex. 15 (Cohen Decl.) ¶ 86. Defendants continue to cohort people who are medically vulnerable with persons who were in direct contact with COVID-19-positive persons and with insufficient measures to abate the risk of

- 7 -

transmission. Ex. 6 (Lewis Decl.) ¶¶ 4-6, 15-20; Ex. 10 (Reason Decl.) ¶¶ 7, 15; Ex. 5 (Fenty Decl.) ¶¶ 17-18. Medically vulnerable persons are also housed in the same units and under the same conditions as non-medically vulnerable people, including the same lack of social distancing, proper cleaning and hygiene, and PPE. Ex. 6 (Lewis Decl.) ¶¶ 6-14; Ex. 5 (Fenty Decl.) ¶¶ 8-14; Ex. 10 (Reason Decl.) ¶¶ 6-12, 17; Ex. 12 (Stepter Decl.) ¶¶ 8-17; Ex. 14 (Tequida Decl.) ¶¶ 11-23; *see also* Ex. 7 (Ochoa Decl.) ¶ 6. Medically vulnerable persons have also been denied testing notwithstanding displaying symptoms consistent with COVID-19. Ex. 5 (Fenty Decl.) ¶¶ 5-7; Ex. 10 (Reason Decl.) ¶ 4. Further, Defendants have not regularly screened medically vulnerable persons for symptoms, even after exposure to someone with COVID-19. Ex. 14 (Tequida Decl.) ¶¶ 7-8. And even when housed in the infirmary, medically vulnerable persons endure conditions similar to those constitutionally inadequate conditions in the general population units, including a lack of social distancing, lack of sufficient hygiene and cleaning supplies, insufficient PPE for incarcerated people, and inconsistency in detention officers wearing masks. Crough Decl. ¶¶ 11-17.

*No Social Distancing.* Even with a recent reduction of the incarcerated population, social distancing has not been noticeably implemented in the Maricopa County jails. Ex. 2 (Boykins Decl.) ¶ 14; Ex. 3 (Crough Decl.) ¶¶ 13-14; Ex. 5 (Fenty Decl.) ¶ 8; Ex. 7 (Ochoa Decl.) ¶¶ 7-8. At each jail, anywhere between 40-100 persons are housed in pods or open dormitories. Ex. 5 (Fenty Decl.) ¶ 8; Ex. 1 (Avenenti Decl.) ¶ 12; Ex. 7 (Ochoa Decl.) ¶¶ 7-8; Ex. 8 (Perez Decl.) ¶ 16; Ex. 11 (Scroggins Decl.) ¶¶ 7-8; Ex. 12 (Stepter Decl.) ¶ 8; Ex. 14 (Tequida Decl.) ¶ 11. Some incarcerated persons continue to sleep in units that are nearly full. *See* Ex. 2 (Boykins Decl.) ¶ 16; Ex. 5 (Fenty Decl.) ¶ 8; Ex. 8 (Perez Decl.) ¶ 21; Ex. 12 (Stepter Decl.) ¶ 8; Ex. 13 (Suggs Decl.) ¶ 12. The pods at each jail house individuals in close quarters, well under six feet apart, with two to three persons in each cell or in large open dorms with dozens of others on beds inches apart. Ex. 2 (Boykins Decl.) ¶ 15; Ex. 9 (Player Decl.) ¶ 10; Ex. 6 (Lewis Decl.) ¶ 8; Ex. 4 (Dupont Decl.) ¶ 7; Ex. 5 (Fenty Decl.) ¶ 8; Ex. 7 (Ochoa Decl.) ¶ 8; Ex. 8 (Perez Decl.) ¶ 21; Ex. 11 (Scroggins Decl.) ¶ 8; Ex. 12 (Stepter Decl.) ¶ 8; Ex. 13 (Suggs Decl.) ¶ 12. Some units are increasingly placed on

lockdown, some for security overrides due to staffing shortages, which means that persons housed there are then stuck in their sleeping area without social distancing. Ex. 12 (Stepter Decl.) ¶ 14; Ex. 13 (Suggs Decl.) ¶ 12; Ex. 8 (Perez Decl.) ¶ 12; Ex. 11 (Scroggins Decl.) ¶ 13. Despite all this, there is no policy for social distancing.

Defendants do not operate common areas such as dining rooms and recreational spaces such that persons can practice social distancing. *See* Ex. 2 (Boykins Decl.) ¶¶ 16, 18; Ex. 9 (Player Decl.) ¶ 8; Ex. 6 (Lewis Decl.) ¶¶ 6, 8; Ex. 4 (Dupont Decl.) ¶ 7; Ex. 5 (Fenty Decl.) ¶¶ 9, 10; Ex. 7 (Ochoa Decl.) ¶¶ 9-12; Ex. 8 (Perez Decl.) ¶¶ 16-18, 20; Ex. 10 (Reason Decl.) ¶¶ 7, 9-10; Ex. 11 (Scroggins Decl.) ¶¶ 8-10; Ex. 14 (Tequida Decl.) ¶¶ 14-15; Ex. 13 (Suggs Decl.) ¶¶ 11, 15. Defendants do not stagger mealtimes, so persons frequently stand close together in lines and sit at tables elbow-to-elbow. Ex. 2 (Boykins Decl.) ¶¶ 15, 17; Ex. 9 (Player Decl.) ¶¶ 8, 9; Ex. 6 (Lewis Decl.) ¶ 9; Ex. 4 (Dupont Decl.) ¶¶ 6, 7; Ex. 5 (Fenty Decl.) ¶¶ 9, 11; Ex. 7 (Ochoa Decl.) ¶¶ 9, 12; Ex. 8 (Perez Decl.) ¶¶ 11, 17, 20; Ex. 10 (Reason Decl.) ¶¶ 8, 9; Ex. 11 (Scroggins Decl.) ¶ 9; Ex. 12 (Stepter Decl.) ¶ 9; Ex. 14 (Tequida Decl.) ¶¶ 13-15; Ex. 13 (Suggs Decl.) ¶¶ 13-14. Defendants have meals delivered by incarcerated persons who travel from pod to pod, furthering the risk of spreading the virus. Ex. 2 (Boykins Decl.) ¶ 17. In some circumstances, Defendants have incarcerated people take food out of bins themselves with bare hands and return unwanted items to those bins, which results in multiple persons touching the same food. Ex. 2 (Boykins Decl.) ¶ 17; Ex. 9 (Player Decl.) ¶ 8; Ex. 7 (Ochoa Decl.) ¶ 9; Ex. 8 (Perez Decl.) ¶ 17; Ex. 11 (Scroggins Decl.) ¶ 9; Ex. 14 (Tequida Decl.) ¶ 14. Defendants keep recreation spaces packed, with multiple units sometimes sharing the facilities at the same time, allowing for quicker transmission of the virus among different housing units. Ex. 2 (Boykins Decl.) ¶ 18; Ex. 9 (Player Decl.) ¶ 8; Ex. 4 (Dupont Decl.) ¶ 6; Ex. 6 (Lewis Decl.) ¶ 8; Ex. 5 (Fenty Decl.) ¶ 10; Ex. 8 (Perez Decl.) ¶ 19; Ex. 11 (Scroggins Decl.) ¶ 9; Ex. 12 (Stepter Decl.) ¶ 10. When receiving medication, incarcerated persons are required to line up side-by-side in their housing units. Ex. 9 (Player Decl.) ¶ 5; Ex. 1 (Avententi Decl.) ¶ 20; Ex. 4 (Dupont Decl.) ¶ 6; Ex. 12 (Stepter Decl.) ¶ 12; Ex. 14 (Tequida Decl.) ¶ 13.

***Inadequate Sanitization.*** The Maricopa County jails rely heavily on incarcerated persons to clean facilities. Ex. 2 (Boykins Decl.) ¶ 20; Ex. 9 (Player Decl.) ¶ 11; Ex. 1 (Avenenti Decl.) ¶ 18; Ex. 6 (Lewis Decl.) ¶ 11; Ex. 4 (Dupont Decl.) ¶ 8; Ex. 5 (Fenty Decl.) ¶ 13; Ex. 8 (Perez Decl.) ¶ 23; Ex. 10 (Reason Decl.) ¶ 7; Ex. 11 (Scroggins Decl.) ¶ 15; Ex. 12 (Stepter Decl.) ¶ 15; Ex. 14 (Tequida Decl.) ¶ 17; Ex. 13 (Suggs Decl.) ¶ 17. Critically, the post-COVID-19 cleaning routine appears nearly identical to the pre-COVID-19 routine. Ex. 8 (Perez Decl.) ¶ 23; Ex. 14 (Tequida Decl.) ¶ 17; Ex. 7 (Ochoa Decl.) ¶ 13. Jail staff generally do not ensure that cleaning is done at all, let alone that it is done safely and adequately to kill the virus. Ex. 2 (Boykins Decl.) ¶ 21; Ex. 7 (Ochoa Decl.) ¶¶ 11-12; Ex. 8 (Perez Decl.) ¶ 22. Defendants do not normally provide incarcerated persons with gloves or other sufficient protective equipment to conduct such cleaning. Ex. 5 (Fenty Decl.) ¶ 13; Ex. 12 (Stepter Decl.) ¶ 16. Defendants task incarcerated persons with cleaning cells where infected persons or persons quarantined at intake were located, and without any gloves. Ex. 2 (Boykins Decl.) ¶¶ 7-8; Ex. 9 (Player Decl.) ¶ 4; Ex. 1 (Avenenti Decl.) ¶ 5; Ex. 6 (Lewis Decl.) ¶ 10; Ex. 10 (Reason Decl.) ¶ 13. Incarcerated persons share numerous high-touch surfaces, such as telephones, tablets, tables, chairs, and railings, for which the jails have not implemented any system to ensure that they are properly cleaned. Ex. 3 (Crough Decl.) ¶ 16; Ex. 5 (Fenty Decl.) ¶¶ 11, 13; Ex. 7 (Ochoa Decl.) ¶¶ 10, 12; Ex. 8 (Perez Decl.) ¶¶ 17-19; Ex. 12 (Stepter Decl.) ¶¶ 11, 15. Some persons wrap socks or a personal bathing towel around phones to protect themselves against catching COVID-19. Ex. 2 (Boykins Decl.) ¶ 25; Ex. 13 (Suggs Decl.) ¶ 22*; see also* Ex. 11 (Scroggins Decl.) ¶ 14.

Twice a day, Defendants provide entire housing units one bottle each of watered-down disinfectant and glass cleaner and potentially one other substance to clean the common surfaces and individual cells. Ex. 2 (Boykins Decl.) ¶ 21; Ex. 9 (Player Decl.) ¶ 11; Ex. 6 (Lewis Decl.) ¶ 11; Ex. 5 (Fenty Decl.) ¶ 13; Ex. 8 (Perez Decl.) ¶ 22; Ex. 11 (Scroggins Decl.) ¶¶ 14, 15; Ex. 12 (Stepter Decl.) ¶ 15; Ex. 14 (Tequida Decl.) ¶ 18; Ex. 13 (Suggs Decl.) ¶ 18. The supplies often run out, and the staff oftentimes refuse additional

- 10 -

supplies. Ex. 2 (Boykins Decl.) ¶ 21; Ex. 9 (Player Decl.) ¶ 11; Ex. 1 (Avenenti Decl.) ¶ 18; Ex. 6 (Lewis Decl.) ¶ 11; Ex. 4 (Dupont Decl.) ¶ 8; Ex. 5 (Fenty Decl.) ¶ 13; Ex. 8 (Perez Decl.) ¶ 22; Ex. 11 (Scroggins Decl.) ¶ 14; Ex. 12 (Stepter Decl.) ¶ 15; Ex. 14 (Tequida Decl.) ¶ 18; Ex. 13 (Suggs Decl.) ¶ 18. Defendants generally do not provide individuals with access to personal hygiene products such as paper towels or hand sanitizer. Ex. 2 (Boykins Decl.) ¶ 23; Ex. 7 (Ochoa Decl.) ¶¶ 12, 14-15. Having no paper towels, incarcerated persons are forced to use bathing towels Defendants provide only once per week to wipe down surfaces and dry their hands. Ex. 2 (Boykins Decl.) ¶ 23; Ex. 9 (Player Decl.) ¶ 11; Ex. 6 (Lewis Decl.) ¶¶ 11-12; Ex. 7 (Ochoa Decl.) ¶¶ 13-15; Ex. 8 (Perez Decl.) ¶¶ 23-24; Ex. 11 (Scroggins Decl.) ¶ 15; Ex. 14 (Tequida Decl.) ¶¶ 18-20; Ex. 13 (Suggs Decl.) ¶ 20. No incarcerated person is required to wear a mask, but incarcerated persons who do want masks generally only get one or perhaps two disposable paper masks over a period of months, even if this mask is subsequently lost, soiled, or broken and even if the person is housed in a unit that has been quarantined due to exposure to COVID-19. Ex. 2 (Boykins Decl.) ¶ 24; Ex. 9 (Player Decl.) ¶ 12; Ex. 1 (Avenenti Decl.) ¶ 19; Ex. 6 (Lewis Decl.) ¶ 13; Ex. 5 (Fenty Decl.) ¶ 14; Ex. 7 (Ochoa Decl.) ¶ 16; Ex. 8 (Perez Decl.) ¶ 25; Ex. 11 (Scroggins Decl.) ¶ 17; Ex. 12 (Stepter Decl.) ¶ 16; Ex. 14 (Tequida Decl.) ¶ 22; Ex. 13 (Suggs Decl.) ¶ 21.

*Inadequate Quarantining and Isolation.* Where a person is symptomatic (at least with the limited subset of symptoms for which Defendants screen), Defendants' policy is to remove such people from their housing units, test them for COVID-19, and place them in isolation while they await test results.[21] For those asymptomatic people who are in the housing unit where the COVID-19-positive person was housed or who otherwise had close contact with a confirmed COVID-19-positive person, Defendants' policy is to place the entire housing unit on quarantine status.[22] As discussed above, Defendants recently

---

[21] *See* Ex. 17 (SOP J-02-023), §§ C(b), (g)(i).
[22] *COVID-19 in County Jails*, MARICOPA COUNTY (accessed June 28, 2020), https://www.maricopa.gov/5574/COVID-19-in-County-Jails.

CORE/3502877.0004/160200868.1

announced a policy to test asymptomatic people who were exposed to or housed with people with COVID-19, which has been implemented inconsistently. *See supra* at 6. Defendants have not taken other protective measures to ensure that infected people do not transmit the virus to uninfected people with whom they are quarantined together, which are necessary because COVID-19 testing has a significant false negative rate as high as 29%. Ex. 15 (Cohen Decl.) ¶ 77. Medical staff generally do not visit quarantined pods to check people for symptoms indicative of COVID-19 in order to remove symptomatic people from the unit, and on the rare occasions they do visit, fail to take basic precautions to limit the spread of the virus such as changing gloves between each person they examine and sterilizing oral thermometers between uses. Ex. 2 (Boykins Decl.) ¶¶ 8-9; Ex. 9 (Player Decl.) ¶ 5. There is no social distancing in the quarantined units. Ex. 2 (Boykins Decl.) ¶ 28; Ex. 9 (Player Decl.) ¶¶ 7, 16. There are no specific cleaning procedures or PPE for quarantined units, and Defendants do not take steps to ensure that cells or bed spaces are cleaned—let alone properly or safely—after removal of people with confirmed or suspected COVID-19. Ex. 2 (Boykins Decl.) ¶¶ 7-8, 19-24; Ex. 9 (Player Decl.) ¶¶ 12-13. Finally, some quarantine units are directly across from non-quarantined units, allowing for the virus to potentially transmit through air flowing freely between the units. Ex. 4 (Dupont Decl.) ¶¶ 3-4; Ex. 14 (Tequida Decl.) ¶ 11; *see also* Ex. 5 (Fenty Decl.) ¶ 19.

Defendants also have created and maintain punitive conditions in the units that house those who are removed from their general population housing due to suspected or known COVID-19 infection. These conditions deter those with symptoms of COVID-19 from reporting those symptoms to staff out of fear that they will then end up in housing akin to disciplinary segregation (called "the hole") without proper medical care. Ex. 2 (Boykins Decl.) ¶ 5; Ex. 6 (Lewis Decl.) ¶ 4; Ex. 13 (Suggs Decl.) ¶¶ 6-9. As a result, symptomatic people will potentially remain in general population units, thus risking the further spread of the disease. Ex. 15 (Cohen Decl.) ¶ 116. For people who test positive, the only difference between these punitive isolation units and punitive segregation units at the jails is that, unlike the hole, COVID-19-positive persons were placed in cells together. Ex. 6 (Lewis

Decl.) ¶ 19. Defendants house people who have tested positive for COVID-19 in filthy, uncleaned cells in which they are locked 24 hours per day, except for minimal shower time (one hour every three days for one person and once in a week for another) and for legal video visits. *Id.*; Ex. 1 (Avenenti Decl.) ¶ 14. The staff have taken all of their property, and require persons to wear the same clothes, despite being sick with the virus. Ex. 6 (Lewis Decl.) ¶ 19; Ex. 1 (Avenenti Decl.) ¶ 14. Access to commissary to supplement the two meals served per day is denied. Ex. 6 (Lewis Decl.) ¶ 19. Incarcerated persons who are awaiting test results are housed in isolation but encounter otherwise similar conditions while awaiting the results of their COVID test. Ex. 13 (Suggs Decl.) ¶¶ 6-7. This stands in contrast to Defendants' written policy for housing people who test positive or who are in medical observation while awaiting test results, which states that they will be housed individually, that they will have ample cleaning supplies, that cells will be cleaned before use (by incarcerated people as they are leaving medical isolation), that the incarcerated persons' property in their possession will be cleaned on their departure, and that they will be provided with clean clothing when departing isolation. Ex. 21 (4/7/2020 Email re Medical Observation).

The medical care for prisoners who test positive for COVID-19 is also inadequate—staff who are not necessarily medically trained visit once per day for a symptom and temperature check, normally do not conduct pulse oximeter testing necessary to monitor the impact that COVID-19 is having on oxygen intake, and when medicine is requested, it can take up to three and a half days to receive even the most basic of medications like Tylenol. Ex. 15 (Cohen Decl.) ¶ 113; Ex. 1 (Avenenti Decl.) ¶¶ 8-13; Ex. 6 (Lewis Decl.) ¶¶ 19, 20, 22. But all patients with known or suspected COVID-19 diagnoses require close clinical monitoring of their condition twice daily to assess whether they are clinically deteriorating and require more assertive treatment. Ex. 15 (Cohen Decl.) ¶¶ 16, 111. Defendants are also failing to provide sufficient medical monitoring to the medically vulnerable who have contracted COVID-19, notwithstanding that the medically vulnerable face higher hospitalization and death rates and that adequate medical monitoring is particularly critical

for this population. Ex. 15 (Cohen Decl.) ¶ 88; Ex. 6 (Lewis Decl.) ¶ 20.[23]

***Hazardous Intake Processes.*** Defendants currently process 100-150 new individuals every day.[24] This is in stark contrast to detention facilities—like those at issue in *Urdaneta*—that have discontinued accepting new detainees. Ex. 20 (*Urdaneta* Opp.) at 8. According to Defendants' policy, individuals are only isolated and tested for COVID-19 during booking if they exhibit certain symptoms or report direct contact with someone COVID-positive. *See* Ex. 17 (SOP J-02-023). Non-tested individuals then go through booking procedures and a court appearance, and are held throughout that time in various holding "tanks" with between 10-20 people in each with no ability to socially distance. Ex. 8 (Perez Decl.) ¶¶ 30-31. Masks are the exception, not the rule. *Id.* People who are not tested are then placed directly into a housing pod and are then supposed to begin a 14-day cohorting period once the pod reaches a certain capacity. Ex. 19 (Ltr. from Penzone to Keenan). But in practice, that has not happened consistently and some new intakes who have not gone through the 14-day cohorting process are placed directly into the general population. Ex. 4 (Dupont Decl.) ¶ 15; Ex. 7 (Ochoa Decl.) ¶ 7; Ex. 11 (Scroggins Decl.) ¶ 7; Ex. 1 (Avenenti Decl.) ¶ 6. Several people incarcerated in their general population dorm have been rebooked on new charges and taken to the 4th Avenue booking facility, where they spent about 24 hours in a holding cell with new intakes who were recently arrested, before they were returned back to their original dorm. Ex. 4 (Dupont Decl.) ¶ 15; Ex. 7 (Ochoa Decl.) ¶ 7. Even for those who are placed into the 14-day intake cohort, the process is not sufficient to stop the spread of the virus. Ex. 15 (Cohen Decl.) ¶¶ 92-93. As a result of Defendants' failure to test all persons at intake, they do not identify pre-symptomatic or asymptomatic people who may have COVID-19 and who can then unknowingly infect other

---

[23] Defendants have also failed to waive fees associated with seeking care or diagnosis for COVID-19 symptoms. Suggs Decl. ¶ 10. Especially in light of the failure to provide adequate medical care for persons who become infected, failure to waive medical fees can deter people from reporting symptoms and decrease the ability of the jails to identify people who have been infected with COVID-19. Fenty Decl. ¶ 5; Reason Decl. ¶ 5.

[24] Lauren Castle, *Maricopa County considers mass testing in jails after confirmed COVID-19 cases spike*, AZ CENTRAL (June 10, 2020), https://cutt.ly/luxS6Gk.

incarcerated persons or staff. *Id.* By placing untested new intakes in housing cohorts, Defendants combine people who may be asymptomatic carriers of COVID-19 with individuals who may not yet be infected, thereby furthering the risk. *Id.* Pre-symptomatic or asymptomatic people with COVID-19 may infect others at any point during that 14-day period, and people who are infected during the intake cohort may remain asymptomatic yet infectious at the time that they are placed into the general population. *Id.* Moreover, persons in the 14-day intake cohort are sometimes in contact with people from units that have been quarantined due to exposure to COVID-19, wholly undermining any benefit from the 14-day cohorting. Ex. 9 (Player Decl.) ¶ 17. Indeed, this is in direct contravention to CDC guidance, which states to "avoid mixing individuals quarantined due to exposure to a COVID-19 case with individuals undergoing routine intake quarantine."[25]

*No Information.* Defendants have also failed to provide incarcerated persons with basic information about COVID-19. Ex. 2 (Boykins Decl.) ¶ 27; Ex. 9 (Player Decl.) ¶ 14; Ex. 1 (Avenenti Decl.) ¶ 4; Ex. 5 (Fenty Decl.) ¶ 20; Ex. 3 (Crough Decl.) ¶ 25; Ex. 7 (Ochoa Decl.) ¶ 18; Ex. 8 (Perez Decl.) ¶¶ 14, 27; Ex. 10 (Reason Decl.) ¶ 18; Ex. 11 (Scroggins Decl.) ¶ 19; Ex. 12 (Stepter Decl.) ¶ 18; Ex. 14 (Tequida Decl.) ¶ 24. Incarcerated persons have not been provided with information on what symptoms to look for or instructions on social distancing. *Id.*[26] Defendants have not taken steps to ensure that incarcerated persons with psychiatric or intellectual disabilities are educated about the disease and able to take the steps necessary to protect themselves. Cohen Decl. ¶¶ 4 n.3; 133. Aside from basic hand washing and instructions on how to preserve single use, paper masks, individuals have learned about the coronavirus through their attorneys, families, or persons other than Defendants' employees. Ex. 2 (Boykins Decl.) ¶ 27; Ex. 9 (Player Decl.) ¶ 14; Ex. 1 (Avenenti Decl.) ¶ 4; Ex. 5 (Fenty Decl.) ¶ 20; Ex. 3 (Crough Decl.) ¶ 25; Ex. 7

---

[25] CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, *supra* note 7, at 19.

[26] Since the filing of this lawsuit, Defendants appear to have now provided information on tablets distributed to some incarcerated people on the symptoms of COVID-19. Suggs Decl. ¶ 24. There is still no information provided regarding the need for social distancing. *Id.*

CORE/3502877.0004/160200868.1

(Ochoa Decl.) ¶ 18; Ex. 8 (Perez Decl.) ¶¶ 14, 27; Ex. 10 (Reason Decl.) ¶ 18; Ex. 11 (Scroggins Decl.) ¶ 19; Ex. 12 (Stepter Decl.) ¶ 18; Ex. 14 (Tequida Decl.) ¶ 24. This is despite the fact that Defendants publicly claim to have posted information on COVID-19 in the jails.

***Lack of Testing or Screening of Staff.*** Finally, staff who work at the Maricopa County jails, who travel to and from their homes and communities for work, are at risk of contracting the virus and further transmitting it to people incarcerated in the jails, to fellow staff, and to persons in their communities. Ex. 15 (Cohen Decl.) ¶ 73. There is no policy to test all staff or to even check staff for symptoms upon entering the facility. Instead, staff continue to be "instructed to stay home if they are sick with fever, cough, or difficulty breathing and contact their healthcare provider."[27] Staff who are unknowingly infected but are not symptomatic will not be identified and can spread the virus. Ex. 15 (Cohen Decl.) ¶ 73. This is especially problematic as staff at the jails do not consistently wear masks or wear their masks below their chin—defeating the purpose of a mask in the first instance. Ex. 2 (Boykins Decl.) ¶ 26; Ex. 9 (Player Decl.) ¶ 13; Ex. 1 (Avenenti Decl.) ¶ 20; Ex. 6 (Lewis Decl.) ¶ 14; Ex. 4 (Dupont Decl.) ¶ 11; Ex. 7 (Ochoa Decl.) ¶ 17; Ex. 8 (Perez Decl.) ¶ 26; Ex. 11 (Scroggins Decl.) ¶ 18; Ex. 13 (Suggs Decl.) ¶ 23.[28] They also do not change gloves between inspecting individual incarcerated persons. Ex. 9 (Player Decl.) ¶ 13; Ex. 1 (Avenenti Decl.) ¶ 20; Ex. 5 (Fenty Decl.) ¶ 10; Ex. 7 (Ochoa Decl.) ¶ 17; Ex. 8 (Perez Decl.) ¶ 26; Ex. 10 (Reason Decl.) ¶ 16; Ex. 11 (Scroggins Decl.) ¶¶ 11, 18; Ex. 14 (Tequida Decl.) ¶ 23.

## II.  ARGUMENT

A movant is entitled to a temporary restraining order when (1) they are likely to suffer irreparable harm; (2) they are likely to succeed on the merits; (3) the balance of equities favors them; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def.*

---

[27] *COVID-19 FAQ,* MARICOPA COUNTY SHERIFF'S OFFICE (June 15, 2020), https://www.mcso.org/Multimedia/PressRelease/FAQ%20Covid-19-6.15.20.pdf.

[28] Defendants appear to have altered their policy to require staff to wear masks, but there is no evidence that this policy has been enforced. Cohen Decl. ¶ 121.

CORE/3502877.0004/160200868.1

*Council, Inc.*, 555 U.S. 7, 20 (2008).[29] The Ninth Circuit applies a sliding scale approach, under which a stronger showing of one element may offset a weaker showing of another. *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Plaintiffs plainly meet each element.

This Court has already granted preliminary relief in analogous circumstances. In *Urdaneta*, this Court held that people detained at a federal immigration detention facility with similar conditions to those present at the Maricopa County jails established a likelihood of success on the merits and irreparable harm for the same reasons that Plaintiffs seek relief here: that the facility "fostered conditions that pose an objectively unreasonable risk of transmission of COVID-19 and a resulting substantial risk of serious harm to Petitioner's health and ultimate safety." *Urdaneta*, at *12. Importantly, the Court made this determination at a time in which the detention facilities had **no new cases**. Ex. 20 (*Urdaneta* Opp.). Indeed, one facility had **no cases at all**. *Id.* Here, in contrast, cases are rapidly increasing. Thus, judicial action is especially warranted and needed.

Because Plaintiffs meet the requirements for a temporary restraining order, Plaintiffs seek the same remedy this Court has already required, *i.e.* "constitutionally adequate conditions"[30] for all class members, including social distancing measures and improved cleaning practices. Additionally, Plaintiffs seek the limited release of individuals in the Pretrial Medically Vulnerable and Disability Subclasses who are in custody solely because they cannot afford bail. Plaintiffs further seek a process by which to consider for release or enlargement other persons who are medically vulnerable or disabled, as detailed in the proposed Order.

## A.    Absent Relief, Plaintiffs are Near Certain to Suffer Irreparable Harm.

The Ninth Circuit recently recognized that dangerous conditions of detention

---

[29] Though *Winter* sets forth the standard for a preliminary injunction, the legal standard for issuing a temporary restraining order is the same. *Doe v. McAleenan*, 415 F. Supp. 3d 971, 976 (S.D. Cal. 2019) ("The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction.").

[30] *Urdaneta*, at *12.

- 17 -

CORE/3502877.0004/160200868.1

constitute irreparable harm supporting injunctive relief. *Padilla v. U.S. Immigration & Customs Enforcement*, 953 F.3d 1134, 1147 (9th Cir. 2020).

All detained persons at the Maricopa County jails—and especially the Medically Vulnerable and Disability Subclass members—face a heightened risk of serious injury or death due to COVID-19. Absent immediate steps, the continuing spread of COVID-19 throughout the facility is virtually inevitable, and subclass members are likely to experience serious injury or death. Given these grave risks, this factor weighs heavily in favor of injunctive relief.

## B. Plaintiffs Have a Substantial Likelihood of Success on the Merits Under 42 U.S.C. Section 1983.

To establish a likelihood of success on the merits, "the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009) (citations omitted). Here, Plaintiffs are likely to prevail on their claims under § 1983 and have certainly raised questions serious enough to require further litigation.

Defendants have failed to "take reasonable measures to guarantee the safety of the inmates." *See Hudson* v. *Palmer*, 468 U.S. 517, 526-27 (1984). Defendants are liable for depriving Plaintiffs of their constitutional right to adequate treatment and safety, having a policy, custom, or practice that is the "moving force" behind a constitutional violation, endorsing unconstitutional conduct, and failing to adequately supervise employees who commit constitutional violations. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 139-40 (1988); *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008); *Gibson v. County of Washoe*, 290 F.3d 1175, 1186 (9th Cir. 2002); *Starr v. Baca*, 652 F.3d 1202, 1206-08 (9th Cir. 2011).

### 1. *Defendants' Unconstitutional Punishment of Pretrial Detainees Violates Due Process Rights.*

The Fourteenth Amendment prohibits punishment of detained persons prior to "a formal adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441

- 18 -

U.S. 520, 535 n.16 (1979). Thus, the government violates the rights of a person incarcerated pretrial if the conditions of confinement amount to punishment. *See Doe v. Kelly*, 878 F.3d 710, 720 (9th Cir. 2017).

A punitive condition exists "(1) where the challenged restrictions are expressly intended to punish, or (2) where the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless excessive in relation to the alternative purpose, or are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (citations and quotation marks omitted); *Kelly*, 878 F.3d at 720.

Given the rampant spread of COVID-19 cases at the Maricopa County jails, and Defendants' failure to implement adequate protective measures, further transmission of the virus is inevitable. This poses an imminent threat to the Medically Vulnerable and Disability Subclass members, as well as to all detained persons at the Maricopa County jails, facility employees, and members of the surrounding community. The consequences of further spread of COVID-19 are dire; once contracted, there is no known treatment or cure, and the risks of serious illness or injury are substantial. Ex. 15 (Cohen Decl.) ¶ 16. Staff members enter the jails every day, risk exposure, and then take that exposure back to their families and communities when they leave the jails. The relief requested herein lays out an available alternative to confinement under the current conditions that offers a meaningful way to prevent death and mitigate the proliferation of the virus among those in custody at the Maricopa County jails, and ultimately to the community at large. Thus, the current conditions are unconstitutional and, in some instances, require release.

Indeed, one purpose of pretrial confinement is to ensure a defendant's presence for trial and the security and order of its detention facilities, as well as public safety. *Bell*, 441 U.S. at 540. Those purposes are not served if a pretrial detainee is rendered incapable of appearing at trial due to serious illness, hospitalization, or death from COVID-19, or an infectious disease is allowed to spread, endangering detained people and staff and making that facility more hazardous and difficult to manage.

- 19 -

The imminent danger posed by COVID-19 vastly outweighs any government interest in maintaining the current conditions. The government has no interest in operating facilities that violate public health guidance and place detainees in harm's way. Moreover, for those persons to be released, they have locations where they can remain and adhere to guidelines for self-quarantine, further undercutting any interest in confinement. The harsh conditions and viable alternatives prove that the Maricopa County jails are punishing individuals prior to an adjudication of guilt in violation of the Fourteenth Amendment.

> ### 2. Defendants' Deliberate Indifference to the Risks of COVID-19 Also Violates the Right to Constitutional Conditions of Confinement.

The Constitution imposes an affirmative duty on the government to "provide humane conditions of confinement," including by providing for incarcerated persons' reasonable safety and by addressing their serious medical needs. *Farmer v. Brennan*, 511 U.S. 825, 828, 832-33 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (requiring corrections officials to address prisoners' serious medical needs). The government violates this obligation when it takes a person into its custody but "fails to provide . . . medical care, and reasonable safety." *DeShaney v. Winnebago Cty. Dep't. of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). The government may not act with "deliberate indifference" to a substantial risk of serious harm. *Farmer*, 511 U.S. at 828.

The Pretrial Class's claims are governed by the Fourteenth Amendment, whereas the Post-Conviction Class's claims are governed by the Eighth Amendment.[31] The Fourteenth Amendment's "objective standard" is violated when: "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those

---

[31] A number of circuits have held that that the due process clause applies to individuals who have been convicted and not yet sentenced in addition to pretrial detained persons. *See*, *e.g.*, *Lewis v. Downey*, 581 F.3d 467, 474 (7th Cir. 2009). The Supreme Court has further suggested that a "formal adjudication" includes both conviction and sentence. *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1986) ("Eighth Amendment[] protections d[o] not attach until after conviction and sentence."). The Ninth Circuit has addressed this issue only in the context of the standard for determining a due process liberty interest in being free from segregated housing, *see Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000). It is thus an open question whether the objective deliberate indifference standard described in *Gordon*, 888 F.3d at 1125, also protects those convicted but not yet sentenced to incarceration.

- 20 -

conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved— making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 794 (2019). This is "akin to reckless disregard" as the standard is "more than negligence but less than subjective intent." *Id.* at 1125.

Every element is satisfied here. *First*, Defendants have "made an intentional decision with respect to the conditions under which" Plaintiffs are confined. *See id.* at 1125. Defendants have confined Plaintiffs to the jails while they either await trial or serve their terms of incarceration. The conditions of confinement at the jails—including inadequate social distancing, disinfecting, and PPE—have resulted from Defendants' deliberate decisions. Indeed, as this Court has already ruled, when detention centers do not "implement responsive measures specific to high-risk detainees[,] . . . despite knowledge of the acute risks posed to them," then they "have made an intentional decision." *Urdaneta*, at *10.

*Second*, Defendants also have put Plaintiffs at "substantial risk of suffering serious harm." *See Gordon*, 888 F.3d at 1125. Though the risks and spread of COVID-19 are well known, the record here establishes that Plaintiffs face heightened and unreasonable exposure to these serious—and often deadly—risks at the jails. In this pandemic, few places are more dangerous than a jail. Indeed, Dr. Cohen confirms that congregate settings like the Maricopa County jails are a breeding zone for the spread of COVID-19. Ex. 15 (Cohen Decl.) ¶ 9. That is especially true because of the lack of social distancing and other protective measures coupled with the inadequate testing procedures at the jails. *Id.* And it is especially true for persons who are medically vulnerable and disabled. Ex. 15 (Cohen Decl.) ¶ 4. But this Court need not take Dr. Cohen's word for it. The number of cases alone—skyrocketing at a rate of over 14,000 percent over the past month—establishes that the spread of COVID-19 across the incarcerated population has already begun and has

placed Plaintiffs at substantial risk of suffering serious harm.

This Court has already recognized the risk of harm associated at other detention centers in Arizona, especially for at-risk detainees:

> Absent specific measures which safeguard high-risk detainees, or other measures which reasonably prevent and manage detainee exposure to COVID-19, the unmitigated risk of transmission in detention facilities yields a substantial risk of severe illness or death to high-risk detainees. Because reasonable measures have not been implemented in LPCC to limit the risk of Petitioner's exposure . . . and the parties do not dispute that Petitioner has a medical condition which places him at high-risk of severe illness or death, the conditions under which Petitioner is detained poses a substantial risk of serious harm to his health and safety.

*Urdaneta*, at *10.

*Third*, Defendants have not "take[n] reasonable available measures to abate risk[s], even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of [Defendants'] conduct obvious." *See Gordon*, 888 F.3d at 1125. Even where Defendants take "some action" "to prevent and mitigate the spread of COVID-19," when "these actions [do] not include[] reasonable, necessary, and available measures to abate the risk of harm," they are objectively unreasonable. *See Urdaneta*, at *10; *see also Gutierrez-Lopez v. Figueroa*, 2020 WL 2781722, at *9 (D. Ariz. May 27, 2020) ("While Respondents have taken some action in EDC to prevent and mitigate the spread of COVID-19, . . . these actions have not included reasonable, necessary, and available measures to abate the risk of harm to Petitioner and other high-risk detainees.").

While Defendants have implemented *some* policies and practices, their efforts have been insufficient in light of the obvious risks posed by COVID-19 to those incarcerated. And despite publicly acknowledging the importance of policies to protect those in their custody, Defendants have not implemented public-health experts' recommended measures—measures that are available to them—to abate the risks of COVID-19. For example, Defendants have not implemented social distancing or universal testing, both extremely effective and reasonable ways to abate COVID-19. Defendants also have not provided Plaintiffs sufficient cleaning supplies or taken steps to ensure that cleaning high

CORE/3502877.0004/160200868.1

touch surfaces is in fact being conducted. Defendants have failed to provide sufficient PPE to Plaintiffs and have failed to ensure that staff are properly using PPE. Defendants have engaged in haphazard quarantine and intake cohorting procedures. Critically, despite clear proof that their policies have failed to curb the spread of the COVID-19 across the jails, Defendants have nevertheless maintained much of their ineffective policies. Ex. 15 (Cohen Decl.) ¶ 36. Each of these actions and omissions can hardly be described as reasonable.

Indeed, Defendants could have instituted a myriad of measures consistent with public health guidelines, including: immediate release of persons identified in this motion; improved intake mechanisms to consistently quarantine upon intake and prevent exposure to people in the general population, testing newly booked people both at the start and at the end of intake quarantine, and conducting regular symptom screening and temperature checks; universal testing of all incarcerated persons and staff; providing for the ability of incarcerated people to maintain six feet distance in booking, housing, recreation, and in routine movements in the jails; providing proper, twice daily medical monitoring of people who are symptomatic and awaiting test results or confirmed to have COVID-19 and housing them in clean, non-punitive conditions; closely monitoring people in quarantined housing units that have been exposed to COVID-19 to identify symptoms and quickly isolating anyone who becomes symptomatic, to the extent group quarantine is necessary; closely monitoring the medical conditions and vital signs of all medically vulnerable incarcerated persons, including daily temperature and symptom screening; providing adequate cleaning supplies (and additional cleaning supplies upon request) and ensuring that shared and individual housing areas are regularly cleaned, particularly high touch areas; providing adequate PPE (and additional PPE upon request) and ensuring that both staff and incarcerated people wear masks; providing hand sanitizer with at least 60% alcohol; increased cleaning of common areas and communal surfaces; housing medially vulnerable persons to reduce their exposure to others and ensuring that staff who supervise them are regularly tested; ensuring that staff regularly change gloves between contact with individuals and sterilize equipment between uses; and offering additional information about

- 23 -

CDC guidelines. Critically, many of these measures are recommended by the CDC,[32] yet Defendants have not instituted any of them.

Fourth, "by not taking such measures," Defendants will cause Plaintiffs' injuries and perhaps even deaths. *See Gordon*, 888 F.3d at 1125. Without the measures recommended by public health experts, it is inevitable that the virus—which already has ravaged the facilities—will continue to spread through the Maricopa County jails. This not only will infect hundreds of additional individuals, but also threatens to lead to serious illnesses and potential deaths. Ex. 15 (Cohen Decl.) ¶¶ 160-161. This Court has recognized that a detention facility's failure to implement measures to protect the facility's most vulnerable causes "an objectively unreasonable risk of transmission of COVID-19 and a resulting substantial risk of serious harm" to the Petitioner's safety. There is no reason for the Court to rule differently here. *See Urdaneta*, at *12. In sum, the "conditions serve no legitimate government objective" and "amount to punishment" thereby "violating the Due Process Clause." *Id.*

While a claim under the Fourteenth Amendment need only meet "objective deliberate indifference," a claim under the Eighth Amendment—which protects those who are incarcerated post-conviction—must show "subjective deliberate indifference." *Gordon*, 888 F.3d at 1120, 1125 n.4 (citation omitted). To prove a violation of the Eighth Amendment,[33] "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. A fact finder may infer that a prison official had knowledge of a substantial risk by looking to "circumstantial evidence" or "the very fact that the risk was obvious." *Id.* at 841-42. For example, that a risk to incarcerated people is "pervasive, well-documented, or expressly noted by prison officials in the past" is enough for a fact finder to determine actual knowledge on the part of prison

---

[32] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, supra note 7.

[33] An Eighth Amendment violation must also, be "objectively sufficiently serious." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). The violation here is objectively sufficiently serious for the same reason it is sufficiently serious for Fourteenth Amendment liability, as discussed above.

CORE/3502877.0004/160200868.1

officials. *Id.* at 842-43.

With respect to an impending infectious disease like COVID-19, deliberate indifference is demonstrated when officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. 25, 33, 36 (1993) (holding that a prisoner "states a cause of *action*. . . by alleging that [corrections officials] have, with deliberate indifference, exposed him to [conditions] that pose an unreasonable risk of serious damage to his future health"). In other words, it "would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id.* at 33-34.

Defendants have acted with subjective deliberate indifference. The threat of COVID-19 is "obvious . . . pervasive, [and] well-documented"—there are 565 COVID-19-positive cases in the jails to date. *See Farmer*, 511 U.S. at 842-43. Moreover, in enacting a policy, albeit a terribly ineffective one, to combat the spread of COVID-19, Defendants recognize the risks associated with the disease. Finally, Defendants have released a series of public statements acknowledging the risks of COVID-19 and the need for conditions to meet public health guidelines.[34]

Defendants have also consciously disregarded these substantial risks. That Defendants have made some efforts to address the COVID-19 risk does not immunize them from liability. Rather, the Eighth Amendment is violated where an official "fail[s] to take reasonable measures to abate" the risk. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Following *Farmer*, the Ninth Circuit has held that even extensive efforts to address unconstitutional conditions or treatment "do[] not immunize officials from the Eighth Amendment requirements." *Edmo* v. *Corizon, Inc.*, 935 F.3d 757, 793-94 (9th Cir. 2019) (upholding a deliberate indifference finding despite evidence of "extensive treatment over

---

[34] *See, e.g.*, https://www.mcso.org/Multimedia/PressRelease/FAQ%20Covid-19-6.15.20.pdf, *accessed* June 29, 2020.

- 25 -

a period of years" for gender dysphoria); *see also LaMarca* v. *Turner*, 995 F.2d 1526, 1537-38 (11th Cir. 1993) (deliberate indifference found despite warden's "good faith efforts to resolve the dilemmas facing" the prison, including his work to "secure additional funds, make improvements to GCI's physical plant, expand recruitment efforts, and institute policies that would have reduced the risk of violence if his staff had followed them."); *De'lonta* v. *Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("But just because Appellees have provided De'lonta with *some* treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment."); *Riley* v. *Olk-Long*, 282 F.3d 592, 597 (8th Cir. 2002) ("Although the record indicates that defendants investigated the several reports filed against Link, [defendants] are not shielded from liability because their responses were not adequate given the known risk."). As set forth above, there are multiple, available, reasonable steps Defendants have failed to take that demonstrate their conscious disregard of the risks of COVID-19.

### 3. Defendants Have a Policy, Custom, and Practice of Violating Plaintiffs' Rights.

A county is liable under § 1983 when there is a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 123 (1992) (quotation marks and citations omitted). Liability is "founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

The jails' policies are inadequate to ensure constitutionally adequate conditions of confinement, including adequate social distancing measures and sufficient PPE. Nor do Defendants follow the terms of their written policies, which further increases the risk of spreading the virus. *See Redman v. Cty. of San Diego*, 942 F.2d 1435, 1445 (9th Cir. 1991) (routine failure to follow written policy can be a custom supporting municipal liability). Moreover, as set forth above, Defendants' failure to release medically vulnerable and disabled incarcerated persons while the virus spreads amounts to deliberate indifference.

CORE/3502877.0004/160200868.1

*See Berry v. Baca*, 379 F.3d 764, 768-69 (9th Cir. 2004) (inefficient implementation of policies concerning timely release of prisoners could amount to a policy of deliberate indifference). For each of these reasons, municipal liability against Defendants is warranted.

### C. The Medically Vulnerable Subclasses Are Likely To Succeed on Their Habeas Claims.

Detainees are entitled to habeas relief where they are held "in violation of the Constitution." 28 U.S.C. § 2241(c)(3); *see Preiser* v. *Rodriguez*, 411 U.S. 475, 499 & n.14 (1973). Because the Medically Vulnerable Subclasses face a heightened risk of severe illness and death from COVID-19, there is no set of conditions that would render their continued confinement constitutional. This Court has already found the requested relief cognizable under §2241:

> Because Petitioners claim that their continued detention under the present conditions is unconstitutional and that their immediate release is the only effective remedy (*see e.g.*, Doc. 1 ¶ 14), Petitioners' claims can be viewed as challenging the fact, not simply the conditions, of their confinement. *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) (where an individual is "challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release," the proper remedy is a writ of habeas corpus). The fact that Petitioners' claims require consideration of detention conditions does not necessarily preclude habeas corpus review. Therefore, in the absence of clear or binding authority to the contrary, these claims are cognizable under § 2241.

*Urdaneta*, at *6.[35] Accordingly, the Court should order that members of the Medically Vulnerable Subclasses be released or enlarged pursuant to the process set forth in the

---

[35] *See also Wilson*, 2020 WL 3056217, at *5 ("[P]etitioners' claims are properly brought under § 2241 because they challenge the fact or extent of their confinement by seeking release from custody."); *Vazquez Barrera* v. *Wolf*, 2020 WL 1904497, at *4 (S.D. Tex. Apr. 17, 2020) ("Because Plaintiffs are challenging the fact of their detention as unconstitutional and seek relief in the form of immediate release, their claims fall squarely in the realm of habeas corpus. The mere fact that Plaintiffs' constitutional challenge requires discussion of conditions in immigration detention does not necessarily bar such a challenge in a habeas petition."); *Bent* v. *Barr*, 2020 WL 1812850, at *2 (N.D. Cal. Apr. 9, 2020) ("In this case, Bent does not solely challenge the conditions of his confinement. He contests that his continued detention during the COVID-19 pandemic violates his substantive due process rights. This is patently a 'challenge[ ] to the validity' of his confinement."); *Malam* v. *Adducci*, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) ("Petitioner may nonetheless bring her claim under 28 U.S.C. § 2241 because she seeks immediate release from confinement as a result of there being no conditions of confinement sufficient to prevent irreparable constitutional injury under the facts of her case."); *Coreas* v. *Bounds*, 2020 WL 1663133, at *7 (D. Md. Apr. 3, 2020) (Plaintiffs entitled to seek habeas relief where there otherwise would be "no vehicle by which to seek redress for the constitutional violation they allege").

CORE/3502877.0004/160200868.1

proposed order. Plaintiffs seek the immediate release or enlargement of Medically Vulnerable Subclass members who are only being held due to their inability to pay bail or whom Defendants agree to release. These persons have already been deemed by their presiding criminal court to be eligible for release subject to payment of bail, and therefore do not pose such a substantial public safety or flight risk that there are no conditions under which they can be released. For all remaining Medically Vulnerable Subclass Members, Plaintiffs have proposed a process by which public safety objections can be considered in light of the grave risks of serious illness and death faced by these persons should they remain jailed, and whether there are alternative conditions short of confinement that could be imposed.

       1.     *No Set of Conditions Will Reduce the Risk of Serious Harm for the Medically Vulnerable Subclass.*

While COVID-19 poses a risk to everyone, there is a "risk of serious consequences from the COVID-19 virus, up to and including death, because of [] underlying medical conditions." Ex. 21 (*Rose v. Baker*, No. 17-15009 (9th Cir. Apr. 9, 2020)) at 2 (granting bail pending resolution of habeas case for medically vulnerable prisoner)); Ex. 22 (*Mendoza v. Barr*, No CV-20-00514-PHX-SPL (MTM) (D. Ariz. June 16, 2020)) at 4-5 (finding the trajectory of COVID-19 infection for diabetic patients "is not only unpredictable, but potentially deadly," and that "[a]ll patients with symptomatic COVID-19 and risk factors for severe disease should be closely monitored [as] the clinical course may rapidly progress."). The CDC recently reported that persons who are medically vulnerable are twelve times more likely to die, and six times more likely to be hospitalized, from COVID-19 infection.[36] Similarly, while the overall rate of COVID-related hospitalization for those between the ages of 18-49 is 46.7 per 100,000, that number jumps to 126.2 per 100,000 for those between 50-64 years old, and a shocking 254.7 per 100,000 for those above 65. Ex. 15

---

[36] *See Coronavirus Disease 2019 Case Surveillance - United States, January 22 - May 30, 2020,* CTRS. FOR DISEASE CONTROL & PREVENTION (accessed June 18, 2020), https://cutt.ly/wuAV1MZ.

(Cohen Decl.) ¶ 28. These complications can manifest at an alarming pace: Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner. Ex. 15 (Cohen Decl.) ¶ 22. These problems are magnified by the lack of adequate healthcare present at most jails, including the Maricopa County jails, which prevents medically vulnerable individuals from accessing the treatment they would need upon infection. Ex. 15 (Cohen Decl.) ¶ 13. Thus, for medically vulnerable detainees, the consequences of COVID-19 are so dire that even a diminished risk of infection is constitutionally intolerable—for them, the only remedy is release or enlargement from their current confinement.

2. *The Medically Vulnerable Subclass Members Are Also Entitled to Release or Enlargement Under § 1983.*

To the extent the Court construes the Medically Vulnerable Subclasses' claim for release or enlargement as a challenge to the conditions of their confinement, they are entitled to relief under section § 1983. As set forth above, members of the Medically Vulnerable Subclasses are incarcerated in conditions that expose them to an unacceptable risk of harm from COVID-19 infection, and "the courts have a responsibility to remedy the resulting Eighth Amendment violation." *See Brown v. Plata*, 563 U.S. 493, 511 (2011). The only remedy that will cure the violation for these subclasses is release or enlargement. And where, as here, the unconstitutional conditions giving rise to a section 1983 claim do not relate to "overcrowding"—*i.e.*, incarcerated population over a jail's capacity—then a single district court judge is empowered to grant the requested relief.[37]

**D. Defendants Have A Substantial Likelihood of Success on the Merits of Their ADA and Section 504 Claims.**

Plaintiffs are likely to prevail on their claims under the ADA and Section 504 because Defendants have failed to provide reasonable accommodations to protect members

---

[37] To the extent the Court characterizes Plaintiffs' § 1983 release claim as a request for relief from "overcrowding," Plaintiffs reserve the right to request a three-judge court for a prisoner release order at the appropriate time. *See* 18 U.S.C. § 3626(a)(3).

- 29 -

of the Disability Subclasses from the serious dangers posed by COVID-19. To state an ADA or Section 504 claim, a plaintiff must show "(1) the plaintiff is an individual with a disability, (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities, (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity, and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002). Section 504 imposes parallel requirements on entities that receive federal financial assistance. *See Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). Because the ADA and Section 504 claims are distinct from the constitutional claims, the Disability Subclasses need only show that Defendants failed to discharge their affirmative obligation to reasonably accommodate Disability Subclass members in order to be entitled to relief under the statutes. Plaintiffs readily satisfy each of the elements.

*First*, the members of the Disability Subclasses have disabilities under the ADA, which are disabilities that "substantially limit[] one or more major life activities of such individual[s]." 42 U.S.C. § 12102(1)(A).[38] For example, members of the class include individuals with hypertension, also known as high blood pressure, Ex. 5 (Fenty Decl.) ¶ 4; Ex. 14 (Tequida Decl.) ¶ 4, and chronic respiratory problems, Ex. 12 (Stepter Decl.) ¶ 4; Ex. 3 (Crough Decl.) ¶ 4. All of these conditions are disabilities under the ADA and Section 504, and all significantly increase the risk of serious medical complications or death upon COVID-19 infection. Ex. 15 (Cohen Decl.) ¶ 4.

*Second*, members of the Disability Subclasses are "qualified" for Defendants'

---

[38] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," as well as "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(a).

CORE/3502877.0004/160200868.1

programs, services, and activities, including adjudication of their cases; safe, constitutional living conditions during confinement; and medical care and rehabilitative services to prepare for reentry after release. *See* 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104; 28 C.F.R. § Pt. 35, App. B ("[T]itle II applies to anything a public entity does"). The jails are a "public entity" for purposes of the ADA and are bound to comply with Title II. *See* 42 U.S.C. § 12131(B).

*Third*, the Maricopa County jails are excluding members of the Disability Subclasses from equally safe participation in, and benefits of, the jails' services. Under the ADA and Section 504, public entities, like the jails,[39] have an affirmative obligation to take steps to ensure that people with disabilities can participate and benefit equally in all aspects of life in the jails. 28 C.F.R. §§ 35.102(a), 35.130(a), (b). These affirmative obligations include making reasonable modifications to their policies, practices, or procedures where necessary to avoid disability discrimination. 28 C.F.R. § 35.130(b)(7)(i). The ADA also prohibits public entities from "utiliz[ing] criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i)-(ii).

Disability Subclass members are medically vulnerable to severe illness or death if they contract COVID-19. They are entitled to reasonable modifications to avoid exclusion —in the form of inability to participate in programming due to severe illness, or death. But Defendants have failed to take steps to protect this vulnerable group in particular to prevent their infection—as discussed in Section I.A.1. above. By failing to account for the specific needs of people with disabilities, the jails are effectively denying disabled detainees an equal opportunity to benefit from the jails' services, including "recreational 'activities,' medical 'services,' and educational and vocational 'programs.'" *Penn. Dept. of*

---

[39] *See Penn. Dept. of Corrections* v. *Yeskey*, 524 U.S. 206, 210 (1952) (holding that state prisons are "public entities" under the ADA).

CORE/3502877.0004/160200868.1

*Corrections*, 524 U.S. at 210; *see also United States* v. *Georgia*, 546 U.S. 151, 157 (2006) (plaintiff adequately alleged exclusion where he was deprived of "mobility, hygiene, medical care, and virtually all other prison programs"); *Ahlman v. Barnes*, 2020 WL 2754938, at *12 (C.D. Cal. May 26, 2020) (jail likely violated ADA by "fail[ing] to make reasonable accommodation to allow members of the Disability Class to participate safely in the programs of the Jail" during the COVID-19 crisis).

The result of Defendants' failure to take action to protect and accommodate people with disabilities is devastating. Persons with disabilities do not participate in jail programs and services because they fear participation will lead to infection. *See*, *e.g.*, Ex. 14 (Tequida Decl.) ¶ 13 ("During the day, I stay in my cell and read the Bible. The guards tell us to get in line to take our meds and receive our meals but there is no social distancing in the lines so I refuse to get in line because of the risk of contracting COVID-19."). Moreover, since a purpose of pretrial detention is to ensure appearance at trial, if a pretrial detainee becomes too sick or, at worst, dies due to COVID-19, they are denied the rights associated with pretrial detention. Thus, the failure to make basic services accessible to individuals with disabilities, even if merely out of "thoughtlessness and indifference" rather than "invidious animus," is exactly the type of harm that the ADA and Section 504 are meant to prevent. *Alexander* v. *Choate*, 469 U.S. 287, 295 (1985).

*Fourth*, a failure to provide the reasonable modifications necessary to ensure equal access is, itself, discrimination "by reason of" disability. *McGary v. City of Portland*, 386 F.3d 1259, 1265-67 (9th Cir. 2004) (holding that a defendant's failure to provide reasonable accommodations is sufficient to demonstrate discrimination "by reason of" disability, and noting that "the crux of a reasonable accommodation claim is a facially neutral requirement that is consistently enforced. . . . [t]he . . . suggestion that *un*equal treatment is required to state a reasonable accommodation claim eviscerates this fundamental purpose of the ADA").

In light of Defendants' inaction and the growing spread of COVID-19 in the jails, the *only* reasonable accommodation that Defendants can institute to ameliorate continued

- 32 -

disability discrimination is release or enlargement of the Disability Subclass—starting with the members of the Pretrial Subclass who are held due to an inability to afford bail and using a process to consider release for all others in the Disability Subclasses—and immediate changes to current conditions at the jails for all who remain incarcerated there.

### E. The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor.

Given the "preventable human suffering" at issue in this case, the "balance of hardships tips decidedly in plaintiffs' favor." *See Hernandez*, 872 F.3d at 996 (quotation omitted) (granting preliminary injunction where bond process denied detainees' constitutional rights). The government "cannot reasonably assert that it is harmed in any legally cognizable sense" by being compelled to follow the law. *See Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). The balance of equities thus favors preventing the violation of "requirements of federal law." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Finally, "it is *always* in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (emphasis added and citations omitted).

It is in the interest of the Plaintiffs, the Defendants, and the broader public to improve the conditions at the jails and release a subset of legally innocent incarcerated persons. As set forth above, improved conditions will reduce the risk of serious illness and death for all members of the Medically Vulnerable and Disability Subclasses, as well as the remaining detained population. *See also* Ex. 15 (Cohen Decl.) ¶¶ 136-159. These measures will also be consistent with recommended guidelines from public health experts, including quarantining where needed and social distancing. *Id.*

But improved conditions, alone, will not suffice. Indeed, it is necessary to release certain members of the Pretrial Medically Vulnerable and Disability Subclasses to minimize risk not just to the Subclass members, but also for the remaining detained persons and facility staff at the Maricopa County jails. Ex. 15 (Cohen Decl.) ¶¶ 134-135. Indeed, because of the severity of the threat posed by COVID-19, and its potential to rapidly spread

throughout a correctional setting, public health experts recommend, first and foremost, the rapid release from custody of people with heightened vulnerability to COVID-19.[40] Ex. 15 (Cohen Decl.) ¶¶ 134-135. Release of medically vulnerable people is especially important given the heightened risks to their health and safety and given the lack of a viable vaccine for prevention or effective treatment at this stage. Ex. 15 (Cohen Decl.) ¶¶ 16, 31, 134-135. Release protects medically vulnerable people from transmission of the virus, and also allows for greater risk mitigation for people held or working in a prison and the broader community. *Id.* It also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time. *Id.*

In short, "the impact of [the temporary restraining order]," *i.e.* by improving conditions at the Maricopa County jails and releasing those persons set forth in this motion, "reaches beyond the parties, carrying with it a potential for public consequences." *Hernandez*, 872 F.3d at 996 (quotation omitted).

## III.  CONCLUSION

Plaintiffs request: (1) the immediate improvement of conditions at the Maricopa County jails, as detailed in the proposed Order; (2) the immediate release of the Pretrial Medically Vulnerable and Pretrial Disability Subclasses who are incarcerated solely due to their inability to afford a financial condition of release, or whose release Defendants do not object to; and (3) a process to identify and promptly release other members of the Pretrial Medically Vulnerable and Pretrial Disability Subclasses from the Maricopa County Jails, as set forth in the Proposed Order.

---

[40] *See, e.g.*, Josiah Rich, Scott Allen, and Mavis Nimoh, *We must release prisoners to lessen the spread of coronavirus*, Washington Post, Mar. 17, 2020, *available at* https://wapo.st/2JDVq7Y.

RESPECTFULLY SUBMITTED, this 29th day of June, 2020.

**STINSON LLP**

*/s/ Larry Wulkan*
Larry J. Wulkan (021404)
**STINSON LLP**
Firm Identification Number 00462400
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Telephone: (602) 279-1600
Fax: (602) 240-6925
Email: larry.wulkan@stinson.com

**ETHAN J. SANDERS*** (MO 71151)
(ethan.sanders@stinson.com)
**STINSON LLP**
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone: (816) 691-2628

**SHARI ROSS LAHLOU*** (DC SBN 476630)
(shari.lahlou@dechert.com)
**DECHERT LLP**
1900 K Street, N.W.
Washington, DC 20006 - 1110
Telephone: (202) 261-3300

**BRIAN RAPHEL*** (NY SBN 5592308)
(brian.raphel@dechert.com)
**PAT ANDRIOLA*** (NY SBN 5406327)
(pat.andriola@dechert.com)
**TIMOTHY LY*** (NY SBN 5478540)
(timothy.ly@dechert.com)
**DECHERT LLP**
Three Bryant Park, 1095 Avenue of the
Americas
New York, NY 10036
Telephone: (212) 698-3500

**BENJAMIN M. SADUN*** (CA SBN 287533)
(benjamin.sadun@dechert.com)
**ALLISON OZUROVICH*** (CA SBN 312797)
(allie.ozurovich@dechert.com)

**DECHERT LLP**
633 West 5th Street. Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5700

**JARED G. KEENAN** (SBN 027068)
(jkeenan@acluaz.org)
**CASEY ARELLANO** (SBN 031242)
(carellano@acluaz.org)
**VICTORIA LOPEZ**** (SBN 330042)

(vlopez@acluaz.org)
**ACLU FOUNDATION OF ARIZONA**
P.O. Box 17148
Phoenix, AZ 85011
Telephone: (602) 650-1854

**OLGA AKSELROD** (*Admitted Pro Hac Vice*)
(oakselrod@aclu.org)
**ERIC BALABAN** (*Admitted Pro Hac Vice*)
(ebalaban@aclu.org)
**ZOE BRENNAN-KROHN** (*Admitted Pro Hac Vice*) (ZBrennan-Krohn@aclu.org)
**HUGH HANDEYSIDE** (*Admitted Pro Hac Vice*) (hhandeyside@aclu.org)
**CLARA SPERA** (*Admitted Pro Hac Vice*)
(cspera@aclu.org)
**SOMIL TRIVEDI\*** (NY SBN 4834495)
(strivedi@aclu.org)
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10014
Telephone: (212) 549-2569

915 15th St. NW, 7th Floor
Washington, DC 20005
Telephone: (202) 393-4930

39 Drumm Street
San Francisco CA 94111
Telephone: (415) 343-0769

\*Application for *pro hac vice* forthcoming
\*\*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

**CERTIFICATE OF SERVICE**

I hereby certificate that on June 29, 2020, I caused the foregoing document to be filed electronically with the Clerk of the Court through ECF, and served the counsel of record via the Court's CM/ECF System:

/s/     Kathleen Kaupke

- 36 -

CORE/3502877.0004/160200868.1