1
2
3
4
5
6
7
8
9

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Hesman, Bar No. 028874
Kevin L. Nguyen, Bar No. 027870
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
dstruck@strucklove.com
rlove@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
knguyen@strucklove.com

*Attorneys for Defendants-Respondents Sheriff*
*Paul Penzone and Maricopa County*

10

## UNITED STATES DISTRICT COURT

11

## DISTRICT OF ARIZONA

12
13
14
15
16
17
18
19
20
21
22
23
24

Jason Fenty, et al.,

Plaintiffs-Petitioners,

v.

Sheriff Paul Penzone, et al., et al.

Defendants-Respondents.

NO. 2:20-cv-01192-PHX-SPL (JZB)

**DEFENDANTS-RESPONDENTS'**
**COMBINED RESPONSE TO:**

**PETITION FOR WRIT OF**
**HABEAS CORPUS (DKT. 1)**

**AND**

***EX PARTE* APPLICATION FOR**
**TEMPORARY RESTRAINING**
**ORDER (DKT. 14)**

**AND**

**DEFENDANTS-RESPONDENTS'**
**MOTION TO DISMISS**
**COMPLAINT FOR INJUNCTIVE**
**AND DECLARATORY RELIEF**
**(DKT. 1)**

25
26
27
28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES....................................................1

I.    Facts and Procedural Background. .........................................................................1

    A.    The Habeas Petition, Civil Complaint, and TRO Application.......................1

    B.    The MCSO Jail System. ...............................................................................3

    C.    The MCSO Inmate Population. ......................................................................6

    D.    The Extensive Measures Taken by Respondents to Protect Detainees and Staff from Exposure to COVID-19. ..............................................................6

II.   Petitioners' Failure to Exhaust Remedies Bars All Relief. ...................................18

    A.    Petitioners Failed to Exhaust Their State-Court Remedies...........................18

    B.    Petitioners Failed to Exhaust Their Administrative Remedies. ....................23

III.  The PLRA Bars Much of the Relief that Petitioners Seek. ...................................25

    A.    State Prisoners May Not Challenge the Conditions of Their Confinement in a Habeas Petition. .......................................................................................25

    B.    The Court Does Not Have Authority to Issue a Release Order. ...................27

IV.   Petitioners Have Not Shown that Respondents Are Violating Their Constitutional or Statutory Rights..........................................................................................................27

    A.    Standard of Review. .....................................................................................27

    B.    Petitioners Lack Standing..............................................................................28

        1.    The Pretrial Petitioners lack standing to challenge the conditions at 1280 Jail, and the Post-Conviction Petitioners lack standing to challenge the conditions at Towers and Estrella Jails.........................28

        2.    Puente lacks organizational standing to sue at all. ..............................29

    C.    The Official Capacity Claims Against Sheriff Penzone Are Duplicative of the *Monell* Claims Against the County. .......................................................34

    D.    Petitioner Reason's Claims Are Moot..........................................................35

    E.    Petitioners' Constitutional Rights Are Not Being Violated..........................35

        1.    The Pretrial Petitioners' Fourteenth Amendment claims lack merit...35

2. The Post-Conviction Petitioners' Eighth Amendment Claims Lack Merit. ................................................................38

F. Petitioners' Rights Under the ADA and RA Are Not Being Violated..........42

V. Petitioners Are Not Entitled to Preliminary Injunctive Relief. .............................46

A. Petitioners Are Not Likely to Succeed on the Merits. ..................................47

B. Petitioners Cannot Show an Immediate and Irreparable Harm Absent a Preliminary Injunction...................................................................................46

C. The Balance of Equities and the Public Interest Merge and Tip in Respondents' Favor.......................................................................................47

VI. The Court Should Dismiss the Complaint................................................................48

VII. Conclusion................................................................................................................49

1      Defendants-Respondents Sheriff Paul Penzone and Maricopa County (collectively

2  "Respondents") hereby respond to Plaintiffs-Petitioners' Petition for Writ of Habeas Corpus

3  ("Habeas Petition") and *Ex Parte* Application for Temporary Restraining Order ("TRO

4  Application").   Respondents further move to dismiss Plaintiffs-Petitioners' Complaint for

5  Injunctive and Declaratory Relief ("Civil Complaint").   The Court should deny the Habeas

6  Petition and TRO Application and dismiss the Civil Complaint.   This omnibus Response

7  and Motion are supported by the following Memorandum and cited Declarations.

8  **MEMORANDUM OF POINTS AND AUTHORITIES**

9  **I.**    **Facts and Procedural Background.**

10      **A.**    **The Habeas Petition, Civil Complaint, and TRO Application.**

11      Petitioners are the Puente Human Rights Movement ("Puente"), an immigrant

12  advocacy group, and six pretrial detainees ("Pretrial Petitioners") and three post-conviction

13  prisoners ("Post-Conviction Petitioners")[1] in the custody of the Maricopa County Sheriff's

14  Office ("MCSO").  (Dkt. 1, ¶ 18.)  Although they bring their Habeas Petition, Civil Action,

15  and TRO Application on behalf of all others similarly situated, no class has been certified.

16      Petitioners allege that the conditions of their confinement are unconstitutional and

17  discriminatory due to the alleged failure to comply with CDC Guidelines to abate the spread

18  of COVID-19.   Specifically, they allege that Respondents have implemented inadequate

19  safeguards to protect inmates and staff in the County jails, including inadequate:

20  (1) COVID-19 testing, screening, and cohorting or quarantining of new intakes and those

21  who have symptoms or have been exposed to a known or suspected case; (2) "protections

---

[1] The six Pretrial Petitioners include: Brian Stepter and Douglas Crough, who are detained at Lower Buckeye Jail (Dkt. 1, ¶¶ 10, 11); Anthony Scroggrins, who is detained at 4th Avenue Jail (id., ¶ 15); Jason Fenty and Dale Perez, who are detained at Towers Jail (id., ¶¶ 9, 16); and Tamara Ochoa, who is detained at Estrella Jail (id., ¶ 18).  None of the Pretrial Petitioners are detained at 1280 Jail. The three Post-Conviction Petitioners include: Edward Reason, who was serving a 60-day sentence at 1280 Jail (id., ¶ 12); Jesus Tequida, who is awaiting sentencing at Lower Buckeye Jail (id., ¶ 13); and Ramon Avenenti, who is awaiting sentencing at 4th Avenue Jail (id., ¶ 14). None of the Post-Conviction Petitioners are detained at Towers Jail or Estrella Jail.

for medically vulnerable and disabled persons"; (3) "social distancing" measures; (4) "cleaning, hygiene, decontamination, and disinfecting supplies and procedures"; (5) personal protective equipment ("PPE"), including the failure to mandate the use and regular replacement of PPE; and (6) education about COVID-19 and prevention methods. (Dkt. 1, ¶¶ 2 (a)–(j), 70–158.)

Based on these allegations, Petitioners raise the following claims:

- First, Third, and Fifth Claims (all Pretrial Petitioners): alleging unconstitutional conditions of confinement, 42 U.S.C. § 1983, in violation of the Fourteenth Amendment (Dkt. 1, ¶¶ 159–168, 178–180);

- Second Claim (all Post-Conviction Petitioners): alleging unconstitutional conditions of confinement, 42 U.S.C. § 1983, in violation of the Eighth Amendment (id., ¶¶ 169–177, 189–194);

- Fourth Claim (Pretrial Petitioners Fenty, Stepter, Crough, and Scroggins): seeking a writ of habeas corpus, 28 U.S.C. § 2241, based on their alleged heightened risk of a serious illness if infected with COVID-19 (id., ¶¶ 26, 181–188; Request for Relief at 47–48, ¶¶ c, h);

- Sixth and Seventh Claims (Pretrial Petitioners Fenty, Stepter, Crough, and Scroggins and Post-Conviction Petitioners Reason and Tequida): alleging disability discrimination in violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA") (id., ¶¶ 26, 30, 195–215).

The writ of habeas corpus that Petitioners seek is narrow. They request the "immediate[] release of" those detainees who (1) are 50 years or older or who have an "impaired immunity" ("medically vulnerable") or (2) have disabilities as defined under the ADA and RA that "put them at increased risk of serious illness or death if they contract COVID-19" ("disability"), and who are "incarcerated solely due to their inability to afford a financial condition of release, or whose release Defendants do not object to."  (Dkt. 1, ¶¶ 24 25 & Request for Relief, ¶ c.)  Because no class has been certified, only Petitioners Fenty, Stepter, Crough, and Scroggins, who allege they qualify under these standards, are eligible for habeas corpus relief/release.[2]  (Id., ¶ 26.)

_____

[2] The proper Respondent for purposes of Petitioners' Habeas Petition is Sheriff

For their Civil Complaint, and for purposes of their TRO Application (which the Court has construed as a request for preliminary injunction), Petitioners seek a preliminary and permanent injunction requiring Respondents to implement unidentified "public health and safety measures" to abate the risk of the spread of COVID-19 in the jails.  (Dkt. 1, Request for Relief, ¶ e–f; Dkt. 14-1 at 1–4.)  Petitioners' proposed Order requests an order requiring the parties to submit "a form of order setting forth measures to be implemented with respect to Plaintiffs that are consistent with public health guidelines," and lists 10 topics. [3]  (Dkt. 14-1 at 1–4.)

### B.    The MCSO Jail System.

The Maricopa County Jail system is made up of five distinct jails: Fourth Avenue, Estrella, Lower Buckeye, Towers, and 1280 Jail.  (Declaration of B. Roska, ¶ 6.)

### Fourth Avenue Jail

The Fourth Avenue Jail has a capacity of 1,992 beds, with 1,152 cells.  (Id., ¶ 7.)  The facility is 577,883 square feet, and consists of 5 levels. (Id.) The basement level includes Inmate Programs, Chaplain Services, Legal Services staff, and the Main Medical Clinic.  (Id.)  The first floor consists of Central Intake, which, before March 2020, averaged over 260 persons booked per day.  (Id.)  The second, third, and fourth levels consist primarily of inmate housing units.  (Id.)  Level 2 has a total of 6 housing units, consisting of 12 pods, with 36 cells in each pod.  (Id.)  In addition, there is a 120-bed dormitory style unit.  (Id.)  Level 3 consists of 6 housing units, with 12 pods and 36 cells in each pod.  (Id.)  Level 4 has four housing units, with a total of 12 pods.  (Id.)  Houses A and F have 2 pods each with 36 cells in each pod.  (Id.)  Houses B and E have 4 pods each, with 9 cells in each

---

Penzone, not Maricopa County. *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004); *Stanley v. California Supreme Court*, 21 F.3d 359, 360 (9th Cir. 1994).

[3] Because no class has been certified, Petitioners' hybrid request for a temporary restraining order/habeas relief seeking (1) a list of all other medically vulnerable and disabled detainees, and (2) consideration of releasing medically vulnerable and disabled detainees who can afford a financial condition of release, are not at issue.  (Dkt. 1, Request for Relief, ¶¶ b, d; Dkt. 14 at 37.)

of the 4 pods.  (Id.)  Level 4 also has 4 cell runs, with 18 cells in each run.  (Id.)  Floors 2, 3, and 4 each have a Mini Medical Clinic.  (Id.)  Each housing pod on these floors has two classrooms, four video visitation booths, an attorney visitation room, a day room, and a recreation yard.  (Id.)  This physical plant allows MCSO to limit the amount of inmate movement.  (Id.)  As of July 15, 2020, the population in the Fourth Avenue Jail was 1,202, which is 60% of the facility's capacity.  (Id., ¶ 9.)

**Estrella Jail**

The Estrella Jail has an inmate capacity of 1,671 and is comprised of 15 housing units and 11 dormitories.  (Id., ¶ 10.)  It has a square footage of 281,072.  (Id.)  It is an all-female facility which houses all classifications of un-sentenced inmates.  (Id.) Estrella also houses permanent no-work sentenced inmates and sentenced inmates participating in the Mosaic Program.  (Id.)  Dorms I, J, K, and L have a capacity of 99 beds; Dorms E, F, and G have a capacity of 128 beds; Dorm H has a capacity of 155 beds; Dorm M has a capacity of 36 beds; Dorm N has a capacity of 160 beds; and Dorm O has a capacity of 51 beds.  (Id.) In addition, there are 4 cell style housing units, comprised of 16 pods with 15 cells per pod. (Id.)  As with all other MCSO facilities, the population at Estrella Jail has been significantly reduced to promote social distancing and to protect the inmate population and MCSO staff amid COVID-19.  (Id., ¶ 11.)  As of July 15, 2020, Estrella Jail housed 461 inmate, which is 27.59% of its capacity.  (Id.)  This is down from a population of 1,160 on of January 1, 2020, a 60% population reduction.  (Id.)

**Lower Buckeye Jail**

The Lower Buckeye Jail has an inmate capacity of 2,112.  (Id., ¶ 12.)  It is the largest detention facility in Arizona, with a square footage of 670,237.  (Id.)  It is an all-male facility, housing non-sentenced minimum and medium general population inmates, minimum, medium, and maximum administrative restrictive housing inmates, minimum, medium and maximum nature of charge inmates, all classification levels of remanded juvenile inmates, and disciplinary restrictive housing inmates.  (Id.)  Lower Buckeye Jail consists of 4 direct-supervision dormitory style housing units, each with 102 beds and a

recreation area, and 12 tower style observation units, each with 2 pods of 36 two-man cells. (Id.)  Each pod has its own recreation area.  (Id.)  The Lower Buckeye Jail has a 62 bed medical infirmary, with 19 negative airflow rooms for control of infectious diseases and has ADA compliant rooms for disabled and physically challenged inmates.  (Id.)  It also has a 210 bed mental health unit. The Lower Buckeye Jail is a self-surrender facility, and averaged 1,100 self-surrenders per month prior to March 2020.  (Id.)  In April and May, there were no self-surrenders.  (Id.)  There were 87 self-surrenders in June, and 47 thus far in July.  (Id.)  As with other MCSO facilities, the population at Lower Buckeye Jail has been significantly reduced to promote social distancing and to protect the inmate population and MCSO staff amid COVID-19.  (Id., ¶ 13.)  As of July 15, 2020, Lower Buckeye Jail housed 1,174 inmates.  (Id.)  This is 55.6% of the design capacity.  (Id.)

#### Towers Jail

The Towers Jail is an all-male facility that has an inmate capacity of 1,080 beds and a square footage of 90,000.  (Id., ¶ 14.)  It houses minimum and medium inmates, and has both sentenced and non-sentenced inmates.  (Id.)  The Towers Jail consists of 6 housing units with 4 pods each.  (Id.)  Each pod houses up to 45 inmates in a cell style units. (Id.) As with other MCSO facilities, the population at the Towers Jail has been significantly reduced to promote social distancing and to protect the inmate population and MCSO staff amid COVID-19.  (Id., ¶ 15.)  As of July 15, 2020, the population at the Towers Jail was 495 inmates, or 45.8% of design capacity.  (Id.)  The total population at the facility has been reduced by nearly 40% since January 1, 2020.  (Id.)

#### The 1280 Jail

The 1280 Jail is the newest facility in the Maricopa County Jail system, and opened on May 28, 2020.  (Id., ¶ 16.)  It has a current design capacity of 1,600 beds, made up of 5 housing units.  (Id.)  Each housing unit has 4 pods which can hold up to 80 inmates.  (Id.) Three (3) of the housing units are dormitory style, and 2 of the housing units are cell style. The cell style housing units have 8 large capacity cells each, and can hold up to 10 inmates per cell.  (Id.)  The 1280 Jail is the new Intake Transfer and Release facility, designed to

house new bookings for 72 hours or less.  (Id.)  MCSO is committed to keeping the population at 1280 Jail low during the pandemic to maximize social distancing.  As of July 15, 2020, the population was 1,056, or 66% of the design capacity.  (Id.)

### C.    The MCSO Inmate Population.

In January 2020, Maricopa County jails were averaging over 250 bookings per day. (Id., ¶ 9.)  Due to the pandemic, MCSO has reduced the average daily bookings at the Maricopa County jails to 100 to 150 per day, and the average daily population decreased from over 7,100 inmates in January 2020 to 4,597 as of July 16, 2020.  (Id.)

In March 2020, MCSO made a concerted effort, in conjunction with the Maricopa County Attorney's Office, to reduce the inmate population in all of its jail facilities by accepting fewer new intakes.  (Id., ¶ 8.)  The purpose of this concerted effort was to promote social distancing and mitigate the spread of COVID-19 among the inmate population and MCSO staff.  (Id.)  The total design capacity of all Maricopa County jail facilities is 8,773 inmates.  (Id.)  As of July 15, 2020, MCSO housed 4,598 inmates, or 52.4% of the overall design capacity of the Maricopa County Jail system.  (Id.)

As of July 15, 2020, a total of 4,062 MCSO inmates have been tested or retested for COVID-19: 2,809 inmates have tested negative, 1,081 inmates have tested positive, and there are 172 pending results.  (Declaration of Dr. G. Phillips, ¶ 15.)  Out of a total population of 4,062 inmates, MCSO has 213 active cases of COVID-19 in custody, 700 recovered cases in custody, and 168 cases have been released.  (Id.)  As of July 17, no MCSO inmate has died from COVID-19, and only two are currently in the hospital related to COVID-19.  (Id.)  As of July 15, 2020, 101 Detention Officers have tested positive for COVID-19; 25 have recovered, and 76 are on leave.  (Roska Decl., ¶ 21.)  MCSO employs 1,744 Detention Officers, 214 Sergeants, 61 Lieutenants and 14 Captains.  (Id.)

### D.    The Extensive Measures Taken by Respondents to Protect Inmates and Staff from Exposure to COVID-19.

Respondents recognize the unique nature of the current pandemic.  (Id., ¶ 22.) Sheriff Penzone, the MCSO Executive Staff, and Maricopa County Correctional Health

Services ("CHS") take seriously their responsibility of the care, custody, and control of the inmate population, and to protect the safety and security of the general public, inmates, and MCSO employees. (Id.) MCSO and CHS are in constant contact with the Maricopa County Department of Health and the Arizona Department of Health Services. (Roska Decl., ¶ 29; Phillips Decl., ¶¶ 21–24.)

### First Steps

In late February 2020, MCSO began consulting with CHS regarding steps to manage the COVID-19 pandemic. (Roska Decl., ¶ 23; Phillips Decl., ¶ 17.) As early as February 2020, CHS began coordinating action plans for medical response when an inmate patient presented with possible symptoms of COVID-19. (Phillips Decl., ¶ 18.)

On March 15, 2020, MCSO suspended access into jail facilities for all inmate volunteer and supplemental services in light of COVID-19. (Roska Decl., ¶ 24.) MCSO also suspended in-person visitation, with the exception of attorney visitation, which could still take place in a non-contact, glass partitioned rooms or video visitation. (Id.) All non-employee access into jail facilities was limited to legal or essential operational personnel. (Id.) MCSO has also followed court directives regarding the transportation of inmates to court, and has allowed inmates in medical observation to appear telephonically at court hearings. (Id.) In addition, by March 15, 2020, MCSO began contacting private industry suppliers to locate and obtain additional personal protective equipment ("PPE") and cleaning supplies beyond what would have normally been utilized. (Id., ¶ 26.)

### Compliance with CDC Guidelines

In early March 2020, CHS created a Management Plan for COVID-19. (Roska Decl., ¶ 29; Phillips Decl., ¶¶ 19–20.) This Management Plan is continuously revised to reflect the most updated guidelines in the CDC Interim Guidance on Management of [COVID-19] in Correctional and Detention Facilities ("CDC Interim Guidance"). (Id.) The Management Plan was updated as recently as July 10, 2020. (Phillips Decl., ¶¶ 21–24.) As discussed thoroughly in Chief Roska's and Dr. Phillips' Declarations, MCSO and CHS operate in compliance with CDC Interim Guidance. (Roska Decl., ¶¶ 85–87; Phillips Decl.,

¶¶ 179–187).  MCSO communicates regularly with CHS to ensure that MCSO is aware of any changes in CDC guidelines regarding updating CDC protocols.  (Roska Decl., ¶ 70.)

### Staff and Inmate COVID-19 Education

The Management Plan educates about COVID-19, including symptoms and necessary precautions.  (Phillips Decl., ¶¶ 25–27.)  Beginning in March 2020, MCSO began to educate staff about COVID-19, including how the virus is spread, how to protect yourself from exposure, and appropriate PPE that should be utilized when coming in contact with individuals suspected or confirmed to have COVID-19.  (Roska Decl., ¶ 67.)  On March 18, all staff received a detailed memorandum detailing what was known about COVID-19 at that time, including how the virus is spread, what steps to take to assist in avoiding contracting the virus, the common symptoms and how to interact with inmates to avoid spreading the virus within the jail system and general public.  (Id., ¶ 69.)  On March 26, 2020, all staff received a detailed memorandum detailing what was known about COVID-19 at that time and provided direction regarding response to inmates with symptoms, disinfection protocols, transportation protocols, and PPE precaution requirements.  (Id.)

MCSO works in conjunction with CHS to help educate the inmate population on stress management and COVID-19 specifically, including disease process information and prevention techniques.  (Id., ¶ 74.)  COVID-19 education is provided to inmates in English and Spanish via the inmate tablet system.  (Phillips Decl., ¶¶ 28–29.)  Inmates in general population have access to tablets.  (Id.)  Inmates also receive one-on-one counseling during medical and mental-health checks.  (Id., ¶ 30.)  Counseling can include education on social distancing, proper hygiene, and mask use.  (Id.)  In accordance with CDC Interim Guidance, educational materials have been posted throughout the facility and in all housing units regarding COVID-19 symptoms, what to do if you become sick, hand-washing, sanitation and cleanliness, mask use and steps to reduce exposure. (Roska Decl., ¶ 75.)

### Staff Procedures and Protocols

Staff are instructed to stay at home if they are feeling ill, have any symptoms that are associated with COVID-19, or if someone living in their home has been diagnosed or is ill.

(Id., ¶ 71.)  Staff are screened upon arrival at their assigned facility by a series of questions, or a healthy situation report, to which they must respond when logging onto a computer at the beginning of their shift.  (Id., ¶ 72.)  All CHS staff must sign an Attestation declaring that if they are sick or have symptoms (shortness of breath, difficulty breathing, and/or cough) or have a fever (100.4 degrees Fahrenheit or above) they will immediately notify their direct supervisor and staffing, self-quarantine, and seek immediate medical attention.  (Phillips Decl., ¶ 30.)  Employees who develop symptoms and/or fever must report to their direct supervisor and leave the facility immediately.  (Id.)  CHS staff who test positive for COVID-19 are to self-quarantine for 10 days and be free of symptoms for 72 hours before they can return to work.  (Id., ¶ 32.)  CHS Infection Control notifies employees if they potentially came into contact with someone who tested positive.  (Id., ¶¶ 33–34.)

As of May 2020, all CHS staff are required to wear masks while on duty and appropriate PPE when required.  (Id., ¶ 36.)  However, even before COVID-19, CHS staff wore masks when interacting with inmates, and were educated on use of PPE.  (Id.)  CHS staff receive email communications several times a week concerning daily updates on COVID-19 statistics within the inmate population, possible exposures, COVID-19 precautions, and mask use.  (Id., ¶ 37.)  CHS staff are likewise educated on the importance of practicing proper hygiene and are required to comply with hygiene practices.  (Id., ¶¶ 42–44.)  Similarly, all detention officers have been issued N95 masks.  (Roska Decl., ¶¶ 33, 65.)  Detention officers are instructed to wear masks at all times while inside the common areas of the jail or anywhere that inmate interaction could take place, or when transporting inmates in vehicles.  (Id.)  Staff also received the Huron N5 DLV mask filter insert for the N95 respirator, which is machine washable.  (Id.)  Before June 29, 2020, staff were strongly encouraged to wear masks in common areas in the jail.  (Id., ¶ 64.)  On June 29, MCSO made it a requirement.  (Id.)  This information is posted on signage on access points, doorways and pod doors.  (Id., ¶ 65.)

MCSO has reduced the number of opportunities for large groups of employees to gather in close proximity to one another.  (Id., ¶ 73.)  For example, all shift briefings, which

1   was conducted in-person prior to March 2020, have been changed to an email or telephonic

2   briefing when necessary.  (Id.)

3                                         **PPE Inventory**

4          MCSO maintains sufficient stock of PPE supplies in its warehouse that are accessible

5   to meet the needs of MCSO jails, including medical units.  (Roska Decl., ¶¶ 27–28; Phillips

6   Decl., ¶ 40.)  Each jail also has an additional supply of PPE and cleaning supplies.  (Id.)  If

7   the CHS nurse manager at a facility identifies a need for additional PPE supplies, the CHS

8   Medical Inventory Supply Team is contacted, and the PPE materials are distributed in a

9   timely manner from the PPE supply inventory.  (Id.)

10                          **Inmate Intake Screening Procedure**

11         As of March 2020, CHS developed and implemented a Supplemental Screening

12  Form that allows CHS staff to immediately identify and isolate inmates with symptoms, or

13  those considered at-risk for COVID-19 (i.e. travel outside of the U.S. or the state, or close-

14  contact with a person positive for COVID-19).  (Phillips Decl., ¶ 55.)  The purpose of the

15  Supplemental Screening Form is to prevent such individuals from entering general

16  population until they are determined to be negative for COVID-19.  (Id.)

17         Specifically, CHS screens all incoming inmates upon arrival to the MCSO jail

18  facility for symptoms of COVID-19 using a verbal screening process and a Supplemental

19  Screening Form.  (Id., ¶ 56.)  In addition to COVID-19 screening, incoming inmates are

20  also screened for other medical conditions, including but not limited to hypertension,

21  diabetes, thyroid disease, cancer, lung problems, and heart disease.  (Id.)  The screening

22  process includes obtaining a patient's temperature and vital signs, including blood pressure,

23  pulse rate, respiratory rate, and oxygenation level.  (Id.)  Screening occurs at jail Intake or

24  Self-Surrender.  (Id.)  Screening for health conditions and medications is based on the

25  inmate's self-report.  (Id.)  Verification of medical conditions also occurs at the time of

26  Intake screening process, based on a review of a patient's medical chart from any prior jail

27  bookings.  (Id.)  In addition, a records request for pharmacy, medical, or mental health

28  records may be initiated at the time of the Intake screening process.  (Id.)

The Management Plan likewise provides for a verbal screening process to screen inmates for COVID-19 symptoms.  (Id., ¶¶ 57–58.)  CHS designates inmates who have or are at risk of having COVID-19 as "Persons Under Investigation" ("PUI").  (Id.)  A person is identified as a PUI if s/he exhibits, among other symptoms: a fever equal to or above 100.4; symptoms of lower respiratory illness (cough or shortness of breath); or close contact with a laboratory-confirmed COVID-19 individual within 14 days of symptom onset.  (Id.)  These screening protocols for new intakes comport with the CDC Interim Guidance.  (Id., ¶ 72.)  Inmates identified as having a chronic disease, other significant health conditions, or disabilities, either at Intake and/or during any other health care encounter with a nurse or provider, receive ongoing multidisciplinary care aligned with management based standards, including those recommended by the CDC.  (Id., ¶¶ 59–64.)

As for staff sanitation and PPE protocols during the intake process, CHS staff are required to change their gloves, sanitize their work station, and wash their hands between every encounter.  (Id., ¶ 65.)  At a minimum, CHS staff are required to wear surgical masks and gloves when screening incoming inmates.  (Id.)  CHS staff are educated on how to wear PPE equipment correctly and removal/disposal procedures.  (Id., ¶ 66.)

If an inmate is awaiting transport to jail (from an arrest location, prison, or a medical or psychiatric treatment facility) and is complaining of symptoms of fever, cough, shortness of breath, or other symptoms of acute illness, MCSO staff contacts the CHS facility nurse manager and an on duty CHS health care provider will be consulted, as needed.  (Id., ¶ 67.)  If the MCSO report identifies a high suspicion of a possible COVID-19 infection, CHS staff advise MCSO staff to provide the inmate with a surgical mask during transport.  (Id., ¶ 68.)  MCSO staff are also required to wear a mask, gown, gloves, and face shield or eye protection during transport.  (Id.)  CHS staff are notified of the inmate's arrival and instruct MCSO on where the inmate's evaluation will take place.  (Id.)

**14-Day Intake Cohort Strategy**

In conjunction with screening protocols discussed above, MCSO began cohorting new arrivals in March 2020 to protect against new arrival asymptomatic inmates infecting

11

the established population.  (Roska Decl., ¶¶ 37–38; Phillips Decl., ¶¶ 103–104.)  New intakes remain in Cohort Housing for 14 days from admission, unless they present with symptoms of possible COVID-19 (wherein isolation/testing protocols are employed). (Phillips Decl., ¶¶ 104–106.)  MCSO staff report observation of symptomatic inmates to CHS. (Id.) Inmates in Cohort Housing who display symptoms of COVID-19 are transported to Medical Observation Housing for testing and monitoring.  (Id., ¶¶ 107–108.)

**Isolation of Inmates Suspected of COVID-19**

Inmates who screen in the affirmative for possible COVID-19 infection are immediately isolated in a private room and placed on droplet precautions, contact precautions, and standard precautions. (Id., ¶ 70.) All persons entering the suspected COVID-19 room are required to wear PPE, including a surgical mask, gown, gloves, face shield and/or eye protection.  (Id., ¶ 71.)  Only essential healthcare personnel with designated roles may enter the room to evaluate or care for the patient.  (Id.)  Inmates suspected of having COVID-19 are evaluated by a health care provider.  (Id.)  Patients with objective findings of cough, shortness of breath, or other signs of acute illness are prioritized for COVID-19 testing. (Id.) In addition, all patients with symptoms of acute illness, including mild symptoms, are considered for testing based on updated guidelines from the CDC.  (Id., ¶ 72.)  Inmates requesting COVID-19 testing are assessed by a nurse and if symptoms warrant, a health care provider determines whether COVID-19 testing is indicated. (Id., ¶ 73.)  CHS tests inmates for COVID-19 using the nasopharyngeal swab test. (Id., ¶ 74.) COVID-19 test results are generally received within two to five days. (Id.) Inmates designated as PUI for COVID-19 and those who test positive for COVID-19 are transferred to Medical Observation Housing.  (Id., ¶ 75.) Inmate medical services co-pays are waived for COVID-19 testing to not discourage inmates from disclosing symptoms.  (Roska Dec., ¶ 32; Phillips Dec., ¶ 82.)

**Medical Observation Housing**

Inmates who display symptoms of COVID-19, meet PUI criteria, are confirmed positive for COVID-19, were in close contact with an individual with COVID-19, or have

12

previously recovered from and present with symptoms of COVID-19, are housed in a medical isolation setting designated as a Medical Observation Unit.  (Roska Decl., ¶¶ 32, 36; Phillips Decl., ¶ 76.)  CHS staff have been directed to cast a "wide net" concerning symptoms when considering inmate placement in Medical Observation Housing.  (Phillips Decl., ¶ 77.) Medical Observation Units are cell design rather than a dormitory style setting. (Id., ¶ 78.)  If an inmate meets PUI criteria, the inmate is housed alone so as to not cause exposure to others.  (Id.)  Inmates who test positive for COVID-19 may be housed in the same cell.  (Id.)  Placement in a Medical Observation Unit separates symptomatic, PUIs, and COVID-19 positive inmates from the rest of the MCSO population, thereby containing and preventing the spread of COVID-19 among the inmate population and staff.  (Id., ¶ 79.) This containment response also allows CHS staff to provide routine monitoring and treatment of inmates who are suspected of having or positive for COVID-19.  (Id.)  Inmates who test positive for COVID-19 are housed in Medical Observation until 10 days have elapsed since the positive test and at least 72 hours have passed since the resolution of fever (including chill, rigors, and body/muscle aches) without the use of fever reducing medication and improvement of respiratory symptoms (i.e. cough, shortness of breath/difficulty breathing, sore throat, and loss of taste or smell).  (Id., ¶ 84.)

CHS staff who enter Medical Observation Units are required to wear PPE.  (Id., ¶ 80.)  When a patient is brought out of his/her cell for an assessment, CHS staff are required to wear a surgical mask, gown, gloves, face shield, and/or eye protection.  (Id., ¶ 81.) Additionally, Medical Observation inmates are on restricted movement status, meaning they must stay within their housing unit, except in the case of a medical emergency or a release date from custody.  (Id., ¶ 92.)  They are not permitted to go to court.  (Id.)

CHS staff assesses Medical Observation inmates daily, including temperature checks.  (Id., ¶¶ 82, 86.)  If an inmate in Medical Observation is at a higher risk for COVID-19 complications, the inmate can be housed alone in the Infirmary.  (Roska Decl., ¶ 34; Phillips Decl., ¶ 85.)   An inmate is deemed as "higher risk" if he/she is age 60 or above, has diabetes, heart problems, lung problems, or other conditions that can lead to

1   immunocompromise.  (Id.)  Housing higher risk inmates in the Infirmary is a protective

2   measure that further protects these inmates from exposure/infection.   (Id.)   Infirmary

3   inmates receive 24-hour nursing care and frequent assessments.  (Id.)

4        Inmates who test negative for COVID-19 may be released from Medical Observation

5   to general population if at least 72 hours have passed since the resolution of fever (including

6   chill, rigors, and body/muscle aches) without the use of fever reducing medications and

7   improvement of respiratory symptoms.  (Phillips Decl., ¶¶ 98–99.)  If the inmate tests

8   negative but displays clinical or radiologic findings consistent with COVID-19, the inmate

9   may remain in Medical Observation for 10 days from the onset of symptoms.  (Id., ¶ 93.)

10   **Quarantine Status Housing Units**

11        If an inmate tests positive for COVID-19, then the housing unit from which that

12   inmate was residing is placed on 14-day quarantine status.  (Roska Decl., ¶ 39; Phillips

13   Decl., ¶¶ 111–113.)  Starting the week of June 1, 2020, mass COVID-19 testing of inmates

14   in quarantine status commenced.  (Id.)  In addition, all quarantine status inmates are offered

15   COVID-19 testing on the next business day after an inmate in the housing unit tests positive

16   for COVID-19 and on (or after) day 14 of quarantine.  (Id.) Inmates in a quarantine unit are

17   placed on movement restriction, which prohibits their movement outside of the housing unit

18   (including for court dates), except in the case of an emergency or release from custody.

19   (Phillips Decl., ¶ 119.)

20   **Recovery Status Housing Units**

21        Recovery Status Housing Units are designated for inmates who have tested positive

22   for COVID-19 and have recovered from the infection.  (Roska Decl., ¶¶ 40–41; Phillips

23   Decl., ¶ 122.)  Inmates who test negative for COVID-19 are not placed in Recovery housing.

24   (Id., ¶ 123.)

25   **Enhanced Sanitation Procedures**

26        MCSO has implemented enhanced sanitation procedures in response to the COVID-

27   19 pandemic.  (Roska Decl., ¶ 42.)  OSHA-approved Waxie 764 Lemon Quat Disinfectant

28   Cleaner and Triad-III Disinfectant are utilized for sanitation purposes. (Id.) These are

effective at disinfecting hard surfaces and destroying tough antibiotic-resistant viruses to include MRSA, HBV, HIV Virus, and Hepatitis B & C.  (Id., ¶ 44.)  They are also effective at killing the SARS-CoV-2 family of viruses, such as COVID-19.  (Id., ¶ 45.)

The cleaning schedule is determined based on the area within the facility to be cleaned, the type of surface to be cleaned, the type of soil present, and the type of procedure being performed.  (Roska Decl., ¶¶ 46–49; Phillips Decl., ¶¶ 48–51.)  On March 26, 2020, the Maricopa County Sheriff issued a Briefing Notes Report on enhanced sanitation procedures at MCSO facilities.  (Id.)  MCSO staff are directed to implement extra cleaning and sanitation of vehicles, work areas, high-touch areas in the offices, briefing rooms, and break rooms.  (Id.)  MCSO and CHS staff were also instructed to use Triad-III cleaner for surfaces, and that the cleaner must remain on the surface for 10 minutes prior to drying. (Id.)  CHS staff disinfect surfaces when indicated in patient care areas, in between patient contacts.  (Id.)

CHS has also developed a standard operating procedure for Cleaning/Disinfection of Unit Surfaces and Non-Disposable Instrument Equipment.  (Phillips Decl., ¶ 51.)  These cleaning procedures include surveillance, prevention, and control of communicable disease, including COVID-19.  (Id.)  The cleaning procedures are designed to minimize incidents of communicable disease transmission among patients and staff.  (Id.)  Inmates in every housing unit, including Medical Observation, Cohort Housing, and Quarantine Housing, have access to soap and personal hygiene products for personal use to mitigate the spread of COVID-19 and other infectious diseases. (Id., ¶ 53.)

MCSO internal housekeeping staff have increased sanitization protocols since the end of March 2020, and are concentrating increased efforts on sanitizing high touch surfaces, such as door handles, knobs, handrails, intercoms, push buttons, tables and showers. (Roska Decl., ¶ 50.)  MCSO has purchased Ryobi sprayers and pump sprayers for use with Triad III cleaner to sanitize mattresses, holding cells, and living spaces.  (Id., ¶ 51) All housing units have its own cleaning supplies to allow for easy access by staff and inmates to clean common areas and cells.  (Id.)  Medical observation cells are fully sanitized

after an inmate vacates a cell prior to use by a new occupant.  (Id.)  Common areas are also fully sanitized beyond daily cleaning after inmates in the Cohort have been moved out.  (Id.)

While hand sanitizer is available for Detention Officers, MCSO does not provide alcohol based hand sanitizer for the inmate population.  (Id., ¶ 54.)  The vast majority of prisons and jails in the United States do not do so for security reasons.  (Id.)  Hand sanitizer containing alcohol can be used as an accelerant, or to make alcohol based liquids for consumption, leading to intoxication.  (Id.)  Having impaired inmates in the jails could lead to serious injury to staff or inmates.  (Id.)  Moreover, soap and water is the best way to kill the COVID-19 virus.  (Id.)  Inmates have unimpeded access to soap and water.  (Id.)  If an inmate runs out of soap, all they have to do is request more, and it is given to them.  (Id., ¶ 81.)  Any allegation that soap is not available is simply false.  (Id.)  In addition, 32 custodial staff have been assigned to particular jail facilities in order to enhance cleaning of common areas.  (Id., ¶ 55.)

For vehicles used for inmate transportation, Triad cleaner is utilized between runs, and sprayers have been purchased to complete this task more efficiently and effectively.  (Id., ¶ 56.)  MCSO has dedicated certain vehicles to move inmates who have tested positive for COVID-19 to eliminate the possibility of infection when transporting inmates who are not positive.  (Id.)  These vehicles are disinfected after each run.  (Id.)  The Transportation Division makes every attempt to limit the cross contact of inmates who have been in MCSO custody for less than 14 days from the rest of the general population.  (Id., ¶ 57.)

**Inmate Masks & Social Distancing**

All inmates have been issued surgical masks without cost beginning in late March, 2020.  (Id., ¶¶ 58, 69.) The mask distribution to inmates occurred even before the CDC recommended that individuals who are well should wear masks.  (Id.)  If an inmate needs a new mask due to loss or damage, they simply need to ask, and they will receive one. (Id.)  Inmates in the 4th Avenue Jail receive a new surgical mask every Saturday morning during meal distribution.  (Id., ¶ 59.)  Inmates are instructed, in English and Spanish, to wear their masks whenever possible, and to always wear them to court, medical, or anytime they are

outside of the housing unit.  (Id., ¶ 60.)  They are also advised on the most effective ways to ensure the mask stays clean.  (Id.)  Gloves and masks are provided to inmates who work in food preparation, which are worn in addition to other protective equipment as required by Maricopa County Public Health guidelines, such as hair nets.  (Id., ¶ 62.)

Inmates are encouraged to practice social distancing and educated on the importance of trying to maintain at least a six foot distance from others, if possible, pursuant to the CDC guidelines.  (Id., ¶ 76.)  Although the CDC recognizes that it is not always possible to maintain a six-foot distance in a correctional setting, MCSO has taken great strides in altering its operations to allow inmates to do so.  (Id.)  This has been done primarily by a significant reduction in the inmate population throughout the Maricopa County Jail system. (Id.)  In addition, housing units, pods, and day room areas in all of the jails are large and allow ample space for inmates to socially distance, particularly when the jail populations are so far below their design capacities.  (Id., ¶ 78.)  Inmates are not "forced" to remain within six feet of one another.  (Id., ¶ 79.)  Allegations that inmates are "forced" to line up close to one another for meals or to receive medication, or sit close to one another while using a telephone, watching television or eating are false. (Id.) Although inmates often do this, they do so voluntarily, despite being reminded that they should not do so by Detention Officers.[4]  (Id.)

Allegations that inmates are triple-celled are false.  (Id., ¶ 80.)  Although there are cells at some facilities with bunks that are stacked three high, these cells are all occupied by either one or two inmates.  (Id.)  The solid metal beds provide an adequate barrier to allow inmates to sleep in the bunks without the risk of infecting one another, in the event one of the inmates has the virus.  (Id.)

---

[4] Contrary to the allegations in the complaint, the food provided to the inmate population is of sufficient nutritional value and amount. Inmates are provided with two meals daily which contain 2,400 calories as well as one 200 calorie snack (2,600 calories total).  (Roska Decl., ¶ 82.)  MCSO employs a full-time dietician, and all food comports with USDA guidelines. (Id.) This diet was approved by the Court in *Graves v. Penzone* (originally *Hart v. Hill*, then *Hart v. Agnes*, then *Graves v. Arpaio*) litigation.  (Id.)

**II.   Petitioners' Failure to Exhaust Remedies Bars All Relief.**

Before reaching the merits of Petitioners' claims, the Court must determine whether they exhausted their state-court remedies and administrative remedies.  As discussed below, Petitioners failed to do either, and therefore all relief should be denied.

**A.   Petitioners Failed to Exhaust Their State-Court Remedies.**

Post-Conviction Petitioners Reason, Tequida, and Avenenti have been convicted (or pleaded guilty) of a crime.  (Dkt. 1, ¶ 12.)  Thus, they may only bring a habeas action pursuant to 28 U.S.C. § 2254.  *See* 28 U.S.C. § 2254(a).  A § 2254 habeas petition may not be granted "unless it appears that … the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. §§ 2254(b)(1)(A), 2254(c).

To properly exhaust state-court remedies, a petitioner must have fairly presented the *same* federal claims to the state court in a procedurally appropriate manner and appealed them through to the state's highest court.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999); *Picard v. Connor*, 404 U.S. 270, 275–78 (1971).  "It is not sufficient to raise only the facts supporting the claim; rather, "the constitutional claim ... inherent in those facts" must be brought to the attention of the state court." *Gatlin v. Madding*, 189 F.3d 882, 887 (9th Cir. 1999).  "If a petitioner fails to alert the state court to the fact that he is raising a federal constitutional claim, his federal claim is unexhausted regardless of its similarity to the issues raised in state court." *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996).  The petitioner has the burden to prove through the evidence that s/he has properly exhausted each claim.  *See Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir. 1981).

The Post-Conviction Petitioners have not exhausted their state-court remedies.  In Arizona, exhaustion requires the prisoner to file a Rule 32 petition for relief in superior court and appeal any adverse decision to the Arizona Court of Appeals.  *See Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999).  Because the Post-Conviction Petitioners did not first exhaust their constitutional and statutory claims by presenting them fairly in state court, their Habeas Petition is barred.  Indeed, the dockets in their criminal cases show that

1   none of the Post-Conviction Petitioners filed anything in state court.[5] *See State v. Tequida*,

2   CR2016-143931-001; *State v. Avenenti*, CR2019-134801-001; *State v. Reason*, CR2019-

3   116984-001.[6]

4          Although Pretrial Petitioners Fenty, Stepter, Crough, Scroggins, and Perez have not

5   been convicted of a crime and, therefore, must seek habeas relief under § 2241, *McNeely v.*

6   *Blanas*, 336 F.3d 822, 824 n.1 (9th Cir. 2003), the same principles of federalism and comity

7   codified in § 2254(b) places prudential limitations that require exhaustion of state-court

8   remedies before seeking habeas relief.  *Castro-Cortez v. INS*, 239 F.3d 1037, 1047 (9th Cir.

9   2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 36 &

10   n.5 (2006); *see also Carden v. Montana*, 626 F.2d 82, 83 (9th Cir. 1980) ("As an exercise

11   of judicial restraint, however, federal courts elect not to entertain habeas corpus challenges

12   to state court proceedings until habeas petitioners have exhausted state avenues for raising

13   [a] federal claim.").  Like the Post-Conviction Petitioners, the Pretrial Petitioners did not

14   exhaust their state-court remedies.

15          Under Arizona Rule of Criminal Procedure 7.2, and A.R.S. § 13-3967 (release on

16   bail), a pretrial detainee may file a motion to modify release conditions ("MRC").  None of

17   the Pretrial Petitioners, however, properly exhausted their claims through this state-court

18   remedy.[7]  Because they have presented no allegation or evidence that they have exhausted

19   ――――――――――――――――

20          [5] Respondents request the Court take judicial notice of the state court dockets and
    filings to determine this dispositive issue.  *See Catz v. Chalker*, 2006 WL 2547304, at *2
21   (D. Ariz. Aug. 31, 2006).

22          [6] On April 21, 2020, before his conviction, Petitioner Tequida filed a motion to
    modify release conditions ("MRC"), arguing that the COVID-19 pandemic has
23   economically affected his family, but he did not raise any Fourteenth Amendment or
    ADA/RA claims. Nor did he exhaust after his conviction. *See State v. Tequida*, CR2016-
24   143931-001.

25          [7] **Petitioner Fenty** filed an MRC motion on March 20, 2020, seeking release, but he
26   did not raise a Fourteenth Amendment or ADA/RA violations. The motion was denied on
    March 31. On April 1, he appears to have filed an amended MMR motion. That motion was
27   denied on April 21. On May 5, the court appears to have denied a second amended MRC
    motion.  He did not file an Appeal. *See State v. Fenty*, CR2019-001141-001.

28

1    their constitutional and statutory claims, their Habeas Petition is barred as well.

2        Federal courts must abstain from interfering with pending criminal proceedings in

3    state court "when the state proceedings: (1) are ongoing, (2) are quasi-criminal enforcement

4    actions or involve a state's interest in enforcing the orders and judgments of its courts,

5    (3) implicate an important state interest, and (4) allow litigants to raise federal challenges."

6    *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014)

7    (citing *Younger v. Harris*, 401 U.S. 37, 43–45 (1971)).  All four *Younger* abstention criteria

8    are satisfied here.  First, the Pretrial Petitioners are awaiting a criminal trial in the Arizona

9    Superior Court.  Second, it cannot be disputed that Arizona has an important state interest

10   in resolving the criminal charges against them.  *See Kelly v. Robinson*, 479 U.S. 36, 49

11   (1986) ("The right to formulate and enforce penal sanctions is an important aspect of the

12   sovereignty retained by the States.") (citing *Younger*, 401 U.S. at 46)); *see also Middlesex*,

13   457 U.S. at 432 ("Proceedings necessary for the vindication of important state policies or

14   for the functioning of the state judicial system also evidence the state's substantial interest

———————————

15

16       **Petitioner Crough** filed an MRC motion on April 20, 2020, raising a Fourteenth
     and Fifth Amendment argument, but he did not claim an ADA violation. It was denied on

17   April 24. He appears to have filed another MRC motion on May 19. He did not file an
     appeal. *See State v. Crough*, CR2019-136111-001 DT.

18
         **Petitioner Stepter** filed a MRC motion on April 23, 2020, without raising

19   Fourteenth Amendment or ADA/RA violations.  It was denied on May 1. He did file an
     appeal. *See State v. Stepter*, CR2019-144387-001; CR2016-137702-001.

20
         **Petitioner Scroggins** filed an Emergency MRC motion on June 9, 2020, citing the

21   Fourteenth and Fifth Amendments but did not claim an ADA/RA violation.  The motion
     was denied on June 10, 2020—the same day he filed this lawsuit—finding "No information

22   suggests that this defendant is unusually susceptible to corona virus." Scroggins did not file
     an appeal. Because he filed the MRC only *six* days before this Petition, he failed to give the

23   Arizona courts a reasonable and fair opportunity to address all his claims before bringing

24   suit remedies.  *See State v. Scroggins*, CR2019-157083-001 DT; CR2018-002155-001 DT.

25       **Petitioner Perez** did not file any MRC motion. *See State v. Perez*, CR2020-118664-
     001.

26
         **Petitioner Ochoa** is not seeking habeas relief under § 2241, but she has not filed

27   any MRC motion. *See State v. Ochoa*, CR2019-138576-002; CR2018-149622-001;
     CR2018-143850-001.

28

1    in the litigation.").

2        Third, in addition to the above remedies that they failed to exhaust, the Pretrial

3    Petitioners have "an adequate opportunity in the state proceedings to raise constitutional

4    challenges," at the trial and appellate court levels.  *See* Ariz. Const. Art. 6, § 18 (authorizing

5    superior court to issue "writs of habeas corpus on petition by or on behalf of a person held

6    in actual custody within the county."); A.R.S. § 13-4121 ("A person unlawfully committed,

7    detained, confined or restrained of his liberty, under any pretense whatever, may petition

8    for and prosecute a writ of habeas corpus to inquire into the cause of such imprisonment or

9    restraint."); *see generally* A.R.S. §§ 13-4124 through 4147 (governing habeas petitions);

10   A.R.S. § 13-3967 (pretrial release on bail).  Nothing has prevented the Pretrial Petitioners

11   from exhausting their state court remedies.[8]  *See United States v. Pirro*, 104 F.3d 297, 299

12   (9th Cir. 1997) (allowing defendants to simultaneously pursue both § 2241 petitions and

13   raise challenges in their criminal proceedings "would eviscerate [the] goal of judicial

14   economy by engaging the attention of two courts on the same case at the same time").

15   Fourth, habeas relief from this Court would have the "practical effect" of enjoining the state

16   court criminal proceedings, including interfering with the state trial court's bail decisions.

17       While narrow exceptions to *Younger* abstention exist, they apply "[o]nly in cases of

18   proven harassment or prosecutions undertaken by state officials in bad faith" or "in other

19   extraordinary circumstances where irreparable injury can be shown."  *Perez v. Ledesma*,

20   401 U.S. 82, 85 (1971).  Here, the Pretrial Petitioners do not allege that their state custody

21   was for harassment or undertaken in bad faith, and their generalized fear of contracting

22   _____

23       [8] Even in the federal detainee context, courts will typically abstain from interfering
     with the criminal proceedings. *See Reese v. Warden Philadelphia FDC*, 904 F.3d 244, 245
24   (3d Cir. 2018) ("We join the two other Circuits to have addressed this issue and conclude
     that a federal detainee's request for release pending trial can only be considered under the
25   Bail Reform Act and not under a § 2241 petition for habeas relief.") (citing *Fassler v. United
     States*, 858 F.2d 1016, 1017–19 (5th Cir. 1988); *United States v. Pipito*, 861 F.2d 1006,
26   1009 (7th Cir. 1987); *see also Alvarez-Caceres v. Kline*, 2020 WL 3064461, at *2 (D. Ariz.
     June 9, 2020) ("Petitioner's claims should be raised in his ongoing criminal case, not in a
27   pretrial 28 U.S.C. § 2241 petition or § 2255 motion.") (citing *Jones v. Perkins*, 245 U.S.
     390, 391 (1918)). Here, both comity and federalism concerns favor abstention.
28

COVID-19 is not both "great and imminent" so as to constitute an irreparable injury.  *See Gansert v. Barnes*, 2020 WL 1975387, at *3 (C.D. Cal. Apr. 24, 2020) (rejecting argument that state-court exhaustion was unavailable due to COVID-19 and abstaining from reviewing pretrial detainee's habeas petition under § 2241); *see generally Younger*, 401 U.S. at 46 (holding "irreparable injury is insufficient unless it is 'both great and immediate'").

### B.     Petitioners Failed to Exhaust Their Administrative Remedies.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under … any … Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Woodford v. Ngo*, 548 U.S. 81, 85 (2006) ("Exhaustion … is mandatory.").  The PLRA's exhaustion requirement applies to both pretrial and post-conviction detainees, 42 U.S.C. § 1997e(h), and "all inmate suits about prison life[.]"  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  This includes ADA and RA claims.  *O'Guinn v. Lovelock* Corr. Ctr., 502 F.3d 1056, 1062 (9th Cir. 2007).  The same principles of federalism and comity discussed supra also require exhaustion of administrative remedies before seeking habeas relief.  *Castro-Cortez*, 239 F.3d at 1047.

Proper exhaustion requires compliance with "all steps" of the facility's grievance system.  *Woodford*, 548 U.S. at 88, 90–91.  Strict compliance is necessary so that officials are alerted to "the nature of the wrong for which redress [is] sought" and can "take corrective action where appropriate."  *Fuqua v. Ryan*, 890 F.3d 838, 844 (9th Cir. 2018) (quoting *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009), and citing *Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016)).  Claims that were not properly and fully exhausted are barred.  *Jones v. Bock*, 549 U.S. 199, 211 (2007); *McKinney v. Carey*, 311 F.3d 1198, 1199–1201 (9th Cir. 2002).  "This exhaustion obligation is mandatory—there are no 'futility or other [judicially created] exceptions to the statutory exhaustion requirements."  *Valentine v. Collier*, 956 F.3d 797, 804 (5th Cir. 2020) (quoting *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) (alteration in original); *accord Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).  Nor

1   is an inmate excused from complying with a facility's grievance process because of the

2   "special circumstances of the COVID-19 crisis." *Id.*; *see also Marlowe v. LeBlanc*, *v.*

3   *LeBlanc*, 810 F. App'x. 302**,** at *3 (5th Cir. 2020).

4         MCSO Policy DJ-3 provides a multi-level process for the redress of inmate

5   grievances, which are detailed in Section 13 of the Rules and Regulations for Inmates and

6   provided to each inmate.   (Declaration of B. Williams, ¶ 6.)   None of the Petitioners

7   exhausted MCSO's grievance process, before filing suit, with respect to their claims in the

8   claims in this case.  (Id., ¶ 28.)[9]  The PLRA thus bars their claims.

9   _____

10        [9] **Petitioners Crough and Reason** did not submit any grievances regarding COVID-
      19. (Id., ¶ 48.)

11        **Petitioner Tequida** submitted Grievance #2020-04920 on June 8, 2020, relating to
12    COVID-19, but it was denied because he did not properly submit it. (Id., ¶ 46.)

13        **Petitioner Avenenti** submitted a grievance on May 26, 2020, but abandoned it after
      Level 4. (Id., ¶ 29.)  On June 8, he submitted a different grievance alleging he had contracted
14    COVID-19. (Id., ¶ 30.) He filed this lawsuit before a response was due. (Id.) He appealed
      to Level 5 but abandoned the grievance after filing this lawsuit. (Id.) On June 27—after he
15    filed this lawsuit—he submitted multiple grievances, which he did not appeal when an
16    officer confirmed he was not charged. (Id., ¶ 31.) He did not properly exhaust any of these
      grievances before filing suit. (Id., ¶¶ 28–32.)

17        **Petitioner Fenty** submitted a grievance on April 3, 2020, requesting release due to
18    COVID-19, but it was denied because the officer did not have authority to release him. (Id.,
      ¶ 33.) Fenty appealed to Level 4 but did not appeal to the next level after he received a
19    response. (Id.) On June 8, he submitted a grievance relating to COVID-19 issues—two days
20    before he filed this lawsuit. (Id., ¶ 34.)  He appealed through Level 4 after filing suit, but he
      failed to complete the grievance process before filing suit. (Id.) He submitted a third
21    grievance on June 9—one day before he filed this lawsuit. (Id., ¶ 35.) Again, he appealed
      only to Level 4 only after filing suit. (Id.) On June 24—two weeks *after* he filed this lawsuit,
22    Fenty submitted a fourth grievance. (Id., ¶ 36.) Thus, he did not initiate or complete that
23    grievance before filing suit.

24        **Petitioner Ochoa** submitted a grievance on June 11, 2020—one day after filing this
      lawsuit—relating to compliance with CDC COVID-19 guidelines. (Id., ¶ 38.) She did not
25    initiate or complete that grievance before filing suit. (Id., ¶ 39.)

26        **Petitioner Perez** submitted a grievance on May 29, 2020. (Id., ¶ 40.) He appealed
27    to Level 5, but did not submit any additional appeals. (Id.) He appealed to Level 4 but failed
      to complete exhaustion of this grievance before filing suit. (Id., ¶¶ 41–41)

28        **Petitioner Scroggins** submitted a grievance on June 10, 2020, but he did not appeal

**III.   The PLRA Bars Much of the Relief that Petitioners Seek.**

    **A.   State Prisoners May Not Challenge the Conditions of Their Confinement in a Habeas Petition.**

Unlike situations involving inmates in federal custody, the Ninth Circuit has held that the habeas statutes are not an appropriate remedy for *state* inmates challenging the conditions of their confinement. *See Nettles v. Grounds*, 830 F.3d 922, 931 & n.6, 932–35 (9th Cir. 2016) ("Different rules apply to state and federal prisoners seeking [habeas] relief."). This distinction between federal and state prisoners is crucial because "§ 1983 is generally unavailable to federal prisoners challenging prison conditions…." *Id.*[10]

In *Nettles*, the Ninth Circuit recognized that both it and the Supreme Court have long held that *state* prisoners may not challenge the conditions of confinement in a habeas petition. *See id.* at 927–30 (citing *Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005); *Crawford v. Bell*, 599 F.2d 890, 891–92 (9th Cir. 1979)). The court explained that "the writ of habeas corpus is limited to attacks upon the legality or duration of confinement." *Crawford*, 599 F.2d at 891–92. "[F]or these sorts of claims the exhaustion requirement gives a state court 'an opportunity to correct its own constitutional errors' before a federal court orders release, thus respecting traditional notions of federal-state comity." *Nettles*, 830 F.3d at 933 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 490–91 (1973)).

—————————————————

this response. (Id., ¶ 42)

    **Petitioner Stepter** submitted a grievance on March 30, 2020. (Id., ¶ 44.) He appealed to Level 6, but he failed to complete the grievance process before filing suit because he did not submit his External Grievance Appeal until June 23, 2020. (Id.)

    **Petitioner Tequida** submitted a grievance on June 8, 2020. (Id., ¶ 46.) He attempted to appeal this issue on June 16, but it was rejected because he improperly attached the paperwork from a separate grievance. (Id.) After filing this lawsuit, he appealed to Level 5 on June 23, but he did not complete the grievance process before filing suit. As such, he failed to exhaust his administrative remedies regarding the claims in this grievance. (Id.)

    **Petitioners Crough and Reason** did not submit any grievances regarding COVID-19 while at MCSO. (Id., ¶ 48.)

    [10] Petitioners string cite inapposite cases that involved federal prisoners or civil immigration detainees to argue that they are properly challenging the conditions of their confinement to obtain release pursuant to § 2241. (Dkt. 10 at 27 n.35.) *Nettles* controls here.

Because challenges to the conditions of confinement fall outside the "core of habeas corpus," they must be brought in a civil rights action under § 1983. *Id.* at 932. These remedies are mutually exclusive. *See id.* ("Just as Congress's amendments to the habeas statute indicated an intent to make habeas the exclusive remedy for claims at the core of habeas, Congress's enactment of the Prison Litigation Reform Act (PLRA) indicated an intent to make § 1983 the exclusive remedy for 'all inmate suits about prison life.'"); *accord Muhammad v. Close*, 540 U.S. 749, 750 (2004). Thus, while the Supreme Court has left open the question whether conditions of confinement may be challenged in a habeas petition brought by a federal inmate, *see Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017), the Ninth Circuit has unambiguously resolved that question in *Nettles,* 830 F.3d at 932, holding state inmates may *not* file habeas petitions to circumvent Congress's intent under the PLRA.

Here, Petitioners challenge the *conditions* of their confinement, not Respondents' authority to hold them in custody, i.e., they are not challenging the fact or duration of their confinement. Regardless of the hybrid label they have given it, their "Petition for Habeas Corpus" is purely a civil rights action that challenges the *conditions* of confinement at MCSO jails. *See Alvarez v. Larose*, 2020 WL 2315807, at *3 (S.D. Cal. May 9, 2020) (ruling that federal inmates' challenge to COVID-19 conditions in detention center was not properly brought as a habeas action). Thus, under *Nettles*, § 1983 is the exclusive vehicle to bring their claims.

## B. The Court Does Not Have Authority to Issue a Release Order.

Petitioners' primary request for relief is for several of them to be immediately released. However, this Court lacks the authority to grant release as a remedy for the alleged constitutional and statutory claims challenging the conditions of their confinement. Generally, "[t]he function of a court is limited to determining whether a constitutional violation has occurred, and to fashioning a remedy that does no more and no less than correct that particular constitutional violation." *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982), *overruled on other grounds by Sandin v. O'Connor,* 682 F.2d 1237, 1250 (9th. Cir. 1982). "The appropriate remedy for such constitutional violations, if proven, would be

a judicially mandated change in conditions . . . not release from confinement." *Crawford*, 599 F.2d at 891–92; *see also Pierce v. Cty. of Orange*, 761 F. Supp. 2d 915, 954 (C.D. Cal. 2011) ("[T]he least intrusive means to compel the County to remedy the physical barriers and disparate provision of programs, services, and activities to disabled detainees is to allow the County to draft a proposed plan that will address and correct each and every physical barrier identified in this Order.").

In addition, the PLRA precludes this Court from ordering Petitioners' release. Congress enacted the PLRA to "revive the hands-off doctrine," which was "a rule of judicial quiescence derived from federalism and separation of powers concerns[,]" in order to remove the federal judiciary from day-to-day prison management. *Gilmore v. California*, 220 F.3d 987, 991, 996–97 (9th Cir. 2000) (ref. 141 Cong. Rec. S14418, at S14418-19 (1995); H.R. Rep. No. 104-378, at 166 (1995); and H.R. Rep. No. 104-21, at 24 n.2 (1995)). The PLRA "restrict[s] the equity jurisdiction of federal courts," *Gilmore*, 220 F.3d at 999, and, "[b]y its terms . . . restricts the circumstances in which a court may enter an order 'that has the purpose or effect of reducing or limiting the prison population,'" *Brown v. Plata*, 563 U.S. 493, 511 (2011). The PLRA's "requirements ensure that the 'last remedy' of a population limit is not imposed 'as a first step.'" *Id*. at 514 (quoting *Inmates of Occoquan v. Barry*, 844 F.2d 828, 843 (D.C. Cir. 1988)). "The release of prisoners in large numbers . . . is a matter of undoubted, grave concern." *Plata*, 563 U.S. at 501.

By its terms, the PLRA places strict limits on a district court's ability to order the release of inmates "in any civil action with respect to prison conditions," and expressly precludes a single district judge from doing so. 18 U.S.C. § 3626(a)(3)(B). "The authority to release prisoners as a remedy to cure a systemic [constitutional] violation … is a power reserved to a three-judge district court, not a single-judge district court." *Plata*, 563 U.S. at 500 (citing 18 U.S.C. § 3626(a)); *see* 18 U.S.C. § 3626(a)(3)(B). And a three-judge court may not enter such an order unless "(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable

amount of time to comply with the previous court orders."  18 U.S.C. § 3626(a)(3)(A).

Here, there can be no dispute that Petitioners' lawsuit is a "civil action with respect to prison conditions" governed by the PLRA.  Indeed, a plain reading of the Complaint shows that Petitioners do not challenge the fact or duration of their detention but instead challenge the conditions of their confinement as inadequate to address the threat to health and safety posed by COVID-19.  As another district court recently recognized, although "the issue of inmate health and safety is deserving of the highest degree of attention," an "order imposing a court-ordered and court-managed 'process' for determining who should be released" from a state prison in response to the COVID-19 pandemic falls "squarely within Section 3626(a)(3) – which forbids this Court from granting it." *Money v. Pritzker*, 2020 WL 1820660, at *13 (N.D. Ill. Apr. 10, 2020); *see also Frazier v. Kelley*, 2020 WL 2561956, at *26 (E.D. Ark. May 19, 2020) (ruling it lacked authority under the PLRA to issue a release order as a remedy for state prisoners who, under the guise of a habeas petition, challenged the conditions of their confinement); *Alvarez*, 2020 WL 2315807, at *1 (holding "the PLRA applies to Plaintiffs' claims and divests the Court of authority to grant" their "release"); *Plata v. Newsom*, 2020 WL 1908776, at *1 (N.D. Cal. Apr. 17, 2020) (similar); *see generally Feltz v. Bd. of Cty. Comm's of Cty. of Tulsa*, 2020 WL 2393855, at *8 (N.D. Okla. May 11, 2020) (The CDC guidance for jails "does not recommend that inmates be released from jail; rather, it provides a comprehensive strategy for combating COVID-19 in jails.").

## IV. Petitioners Have Not Shown that Respondents Are Violating their Constitutional or Statutory Rights.

### A. Standard of Review.

To establish a right to a writ of habeas corpus, Petitioners must prove that they are "in custody in violation of the Constitution or laws … of the United States[.]"  28 U.S.C. §§ 2241(c)(3), 2254 (prisoners challenging state custody).  To state a claim for relief under § 1983, Petitioners must demonstrate that Respondents: "(1) were acting under color of state law"; and "(2) deprived [them] of a right, privilege, or immunity secured by the Constitution

or laws of the United States." *Kildare v. Saenz*, 325 F.3d 1078, 1085 (9th Cir. 2003).  Both procedural vehicles require Petitioners to prove the underlying constitutional or statutory violation.  *See Herrera v. Collins*, 506 U.S. 390, 400 (1993); *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### B.    Petitioners Lack Standing.

"Standing is a threshold question in every case before a federal court." *McMichael v. Cty. of Napa*, 709 F.2d 1268, 1269 (9th Cir. 1983).  As the party invoking federal jurisdiction, Petitioners bear the burden of establishing standing, which "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997).  At this stage, "[t]he facts to show standing must be clearly apparent on the face of the complaint." *Baker v. United States*, 722 F.2d 517, 518 (9th Cir. 1983); *see also Warth v. Seldin*, 422 U.S. 490, 518 (1975) ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is the proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.").

To establish standing under Article III, a plaintiff must demonstrate an injury in fact, a causal connection between that injury and the challenged conduct, and redressability of the injury by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In addition to these constitutional requirements, a plaintiff must satisfy the prudential limitations on standing: (1) a plaintiff must assert his own rights and cannot rest his claim to relief on the legal rights or interests of third parties; (2) the injury must not be a generalized grievance shared by all or a large class of citizens; and (3) the plaintiff must be within the "zone of interests" protected by the statute or constitutional guarantee in question. *McMichael*, 709 F.2d at 1271. A plaintiff lacks standing if any of the constitutional or prudential requirements are not satisfied. *Id*.

### 1.    The Pretrial Petitioners lack standing to challenge the conditions at 1280 Jail, and the Post-Conviction Petitioners lack standing to challenge the conditions at Towers and Estrella Jails.

Generally, a plaintiff "must assert his own legal rights and interests, and cannot rest

his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. "To demonstrate third party standing, a plaintiff must show his own injury, a close relationship between himself and the parties whose rights he asserts, and the inability of the parties to assert their own rights." *McCollum v. Calif. Dep't of Corr. & Rehab.*, 647 F.3d 870, 879 (9th Cir. 2011). Because no Pretrial Petitioner is detained at 1280 Jail, and no Post-Conviction Petitioner is incarcerated at Towers Jail or Estrella Jail, they have not suffered an injury there. Nor have they shown a close relationship to and the inability of others there to bring their own claims. Thus, they lack direct or third-party standing to challenge the conditions at those Jails. *See id.*; *see also Daniels v. Sherman*, 749 F. App'x 600, 601 (9th Cir. 2019) (holding inmate "lacked standing to seek statewide injunctive relief on behalf of other visually disabled inmates"); *Carbonell v. Cty. of San Diego*, 2017 WL 5176986, at *3 (S.D. Cal. Nov. 7, 2017) (holding plaintiff lacked standing "to assert § 1983 claim based on the violation of the rights of others"). Accordingly, the ADA/RA claims should be dismissed with respect to the conditions at all three Jails; the Fourteenth Amendment claims should be dismissed with respect to the conditions at 1280 Jail; and the Eighth Amendment claims should be dismissed with respect to the conditions at Towers and Estrella Jails.

## 2. Puente lacks organizational standing to sue at all.

"Organizations can assert standing on behalf of their own members, or in their own right." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265 (9th Cir. 2020) (internal citations omitted). Puente cannot establish standing based on its own right because it does not claim that it was deprived of any personal right guaranteed by the Fourteenth and Eighth Amendments and the ADA/RA with respect to the jail conditions. Instead, Puente claims an injury to the organization based solely on the purported violations of the rights of others—its members. (Dkt. 1, ¶ 18.) Prudential limitations on standing bar Puente's ability to directly sue in their own right for the alleged injuries of third parties. *See San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 479 (9th Cir. 1998) ("The Fentises do not allege that they were deprived of any constitutional or statutory right. They have no standing

to assert that the rights of the mentally ill have been violated by the City."); *see also Reihner v. Cty. of Washington*, 672 F. App'x 142, 144 (3d Cir. 2016); *Schachter v. U.S. Life Ins. Co. in City of New York*, 77 F. App'x 41, 42 (2d Cir. 2003).

Nevertheless, Puente cannot establish direct standing either. To establish direct standing for redress of its own injury, an organization must satisfy the same standing requirements that apply to individuals. *Trump*, 950 F.3d at 1265. It may accomplish this by showing that the defendant's conduct has "frustrated its mission and caused it to divert resources in response to that frustration of purpose." *Id.* As the Supreme Court explained, this requires the organization to show "far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). The organization must show that the defendant's conduct has "perceptibly impaired" its ability to serve its organizational purpose and forced it to devote "significant resources" to counteract the problem. *Havens*, 455 U.S. at 79. Moreover, "[i]t cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). "It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.* In other words, it must show that "it was *forced* to divert resources in order to avoid an injury caused by the defendant's conduct." *Id.* at 1088 n.4 (emphasis added).

Here, Puente has failed to show that the conditions of confinement and alleged ADA/RA discrimination perceptively impaired its organizational purpose. According to Puente, "[i]ts mission is to promote justice, human dignity, nonviolence and interdependence.… It aims to develop, educate, and empower immigrant communities." (Dkt. 1, ¶ 18.) But that is precisely the abstract interest that the Supreme Court rejected as insufficient to confer standing in *Havens*. *See*, *e.g.*, *We Are Am./Somos Am., Coal. of Ariz. v. Maricopa Cty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1101 (D. Ariz. 2011) (finding LULAC's "sweeping" allegations that 'its primary goals include promoting and protecting

the legal, political, social, and cultural interests of Latinos in the United States' … amount to nothing more than 'simply a setback to [its] abstract societal interests'…. Such an "abstract" interest, as *Havens* made clear, is not the type of 'concrete and demonstrable injury' which is necessary for an organization to allege that it has 'suffered [an] injury in fact.'") (internal citations omitted).[11]

Moreover, Puente does not allege that its primary purpose as an organization is promoting the healthcare of inmates or other confinement conditions in jails or the accommodation of inmates with disabilities. Thus, its own stated mission is not germane to alleged constitutional and statutory violations that form the bases for its claims, much less frustrated by them. *See*, *e.g.*, *Calif. Parents for Equalization of Educ. Materials v. Noonan*, 600 F. Supp. 2d 1088, 1107 (E.D. Cal. 2009) (finding organization's purpose of promoting accurate portrayal of Hinduism in public schools was not germane to its claims against Christian and Jewish indoctrination).

Nor has Puente alleged it was left with no choice but to divert significant resources in response to the alleged constitutional and ADA/RA violations. Because it cannot manufacture its own injury, Puente's voluntary decision to "launch[ ] a full-fledged public campaign to support incarcerated people at the Maricopa County jails and raise public awareness about COVID-19 for incarcerated people and their families" is insufficient. (Dkt. 1, ¶ 18.) Not only is that public campaign tenuously related to their primary mission as an immigrant advocacy group, Puente has not alleged anything that shows the

---

[11] This case is far removed from the facts of *Puente Arizona v. Arpaio*, 76 F.Supp.3d 833, 845, 851 (D. Ariz. 2015), *vacated in part and remanded on other grounds*, 821 F.3d 1098, 1108 (9th Cir. 2016), where Puente had direct standing to sue to enjoin Maricopa County and the Sheriff from arresting undocumented alien workers for violations of identity theft statutes because those arrests frustrated its mission by deterring its members and leaders from participating in the organization and forced it to divert significant resources to respond to the workplace raids, through which the arrests of its members were made. That same type of concrete and demonstrable injury to Puente does not exist here in its assertion of only a broad and abstract mission and diversion of resources that are tenuously related to Respondents' alleged violations of the confinement conditions and disability rights at MCSO jails due to their COVID-19 policies.

1    organization itself (rather than its members) would have been injured in some other way

2    had it not launched the campaign. *See Rodriguez v. City of San Jose*, 930 F.3d 1123, 1136

3    (9th Cir. 2019) ("The mere fact that these organizations represent California gun owners

4    and provide legal advice in navigating California's gun laws does not automatically lead to

5    the conclusion that the confiscation and retention of Lori's guns frustrates their missions or

6    requires them to divert resources.").

7            Accordingly, Puente's standing must rest, if at all, on associational standing to sue

8    as a third party on behalf of its members whose constitutional and disability rights it seeks

9    to vindicate. *See United Safeguard Distribs. Ass'n, Inc. v. Safeguard Bus. Sys., Inc.*, 2016

10   WL 2885848, at *5 (C.D. Cal. May 17, 2016) ("Associational standing is a narrow and

11   limited exception to the general rule that litigants must assert their own rights in order to

12   have standing.").  To establish associational standing, an organization must show: (a) its

13   members would otherwise have standing to sue in their own right; (b) the interests it seeks

14   to vindicate are germane to the organization's purposes; and (c) neither the claim asserted

15   nor the relief requested requires the participation of individual members in the lawsuit.

16   *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

17           Puente cannot meet these requirements.  First, none of the individual Petitioners

18   allege that they are members of Puente. (Dkt. 1, ¶¶ 9–17.) Although Puente vaguely refers

19   to "incarcerated" members, it has not alleged that any of its members are detainees

20   incarcerated at any of the five MCSO jails.  (Id., ¶ 18.)  Thus, the face of the Petition does

21   not show that any Puente member would have standing to sue in his or her own right, and

22   Puente has not submitted any evidence in support of its motion for preliminary injunction

23   to prove otherwise. *See*, *e.g.*, *Siskiyou Alternative Med. v. Lopey*, 2016 WL 6895446, at *2

24   (E.D. Cal. Nov. 23, 2016) (finding organization "failed to allege facts or provide any

25   admissible evidence to satisfy its burden of establishing associational standing" because it

26   had "not identified any of its members, let alone shown that such member would have

27   standing to sue in his own right").  Second, for the same reasons it cannot show a frustration

28   of purpose for direct standing, Puente also cannot show that the constitutional and statutory

rights it seeks to vindicate on behalf of any member is germane to its purpose of promoting migrant rights.  Third, Puente does not allege any facts that show its individual members would not need to participate in the litigation, given that finding either a constitutional or statutory violation requires an individualized determination that turns on the particular facts of each case.  *See Fraser v. Goodale*, 342 F.3d 1032, 1039 (9th Cir. 2003) ("We do not decide whether every diabetic is disabled, and we do not decide whether every severely obese person is not disabled.  Instead, '[w]hether a person is disabled under the ADA is an individualized inquiry.'") (citation omitted).  Consequently, Puente must be dismissed from this lawsuit for lack of standing.

### C.     The Official Capacity Claims Against Sheriff Penzone Are Duplicative of the *Monell* Claims Against the County.

Petitioners sue Sheriff Penzone "in his official capacity only." (Dkt. 1, ¶ 19.) Those official capacity claims are thus duplicative of the *Monell* claims against the County and should be dismissed.  *See Klatt v. Maricopa Cty.*, 2017 WL 10188870, at *4 (D. Ariz. July 14, 2017) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

### D.     Petitioner Reason's Claims Are Moot.

Petitioner Reason was released on July 11, 2020. *See State v. Reason*, CR2019-116984-001. Therefore, his claims are moot.  *See Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir.1995).

### E.     Petitioners' Constitutional Rights Are Not Being Violated.

Petitioners challenge the conditions of their confinement under the Fourteenth and Eighth Amendments. [12] To succeed under either constitutional provision, they must

---

[12] Although the Pretrial Petitioners raise three separate Fourteenth Amendment claims, they are all based on the same allegations—that their conditions of confinement are unsafe due to COVID-19. They are discussed together because the same standard applies regardless of whether Petitioners claim the confinement conditions were punitive, or the result of inadequate medical care or a failure to protect. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Graham v. Connor*, 490 U.S. 386, 395 (1989). Similarly, the Post-Conviction Petitioners raise two separate Eighth Amendment claims, but they are discussed together because they differ only with respect to whether the prisoners alleged a medical condition.

establish that Respondents were deliberately indifferent to the conditions of their confinement. *See Farmer v. Brennan*, 511 U.S. 825, 846 (1994) (Eight Amendment); *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015) (Fourteenth Amendment). As the Ninth Circuit has explained, "[d]eliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions.  It entails something more than negligence but is satisfied by something less than acts or omission for the very purpose of causing harm or with knowledge that harm will result."  *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013).

### 1.    The Pretrial Petitioners' Fourteenth Amendment claims lack merit.

The Fourteenth Amendment prohibits pretrial conditions of confinement that amount to punishment or otherwise violate the Constitution. *Bell v. Wolfish*, 441 U.S. 520, 536 (1979).  "A court, ruling on these claims, 'must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'"  *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1484 (9th Cir. 1993) (quoting *Bell*, 441 U.S. at 536–37).  A punitive purpose can be express or inferred from conditions that are "excessive" to accomplishing an objective that could be achieved is "so many alternative and less harsh methods." *Id.* (quoting *Bell*, 441 U.S. at 539 n.20).

Petitioners argue that their confinement conditions are punitive because the COVID-19 risks "vastly outweighs any government interest" and they can be simply released.  (Dkt. 14 at 20.)  But this argument incorrectly suggests that a balancing test applies.  *See United States v. Terrone*, 2020 WL 1844793, at *13 (D. Nev. Apr. 10, 2020) ("The recent COVID-19 pandemic does not change the analysis … under the Fifth Amendment's Due Process Clause. [Petitioner's] argument, that the COVID-19 pandemic presents a significant risk of harm that outweighs the government's interest in confinement, improperly suggests a balancing test applies.…The Fifth Amendment's Due Process Clause simply asks whether the pretrial detainment is reasonably related to a legitimate government interest.") (citing *Bell*, 441 U.S. at 539) (internal record citation omitted).  Moreover, the Supreme Court

expressly rejected a similar argument in *Bell*:

> Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial. We need not here attempt to detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention. It is enough simply to recognize that in addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment.

441 U.S. at 540 & n. 23.  Here, it cannot be disputed that Respondents have a legitimate government and public safety interest in detaining Pretrial Petitioners pending trial on their criminal charges under Arizona law.  But that is not all.  Respondents also have a legitimate non-punitive interest in the effective management of their jails, and the conditions resulting from that purpose are not for a punitive purpose.  *See also Roehl v. Arpaio*, 2012 WL 1605328, at *2 (D. Ariz. May 8, 2012) ("Legitimate, non-punitive government interests include 'ensuring a detainee's presence at trial, maintaining jail security, and effective management of a detention facility.'") (citations omitted).

Petitioners' deliberate indifference claim also fails.  An objective deliberate-indifference standard applies to Petitioners' Fourteenth Amendment claims.  *See Kingsley*, 135 S. Ct. at 2475.  Under the objective deliberate-indifference standard, a pretrial detainee must "prove more than negligence but less than subjective intent—something akin to reckless disregard."  *Castro v. Cty. of Los Angeles*, 833 F.3d at 1071 (9th Cir. 2016).  To state a claim, a plaintiff must allege: (1) "[t]he defendant made an intentional decision with respect to the conditions under which the plaintiff was confined"; (2) "[t]hose conditions put the plaintiff at substantial risk of suffering serious harm"; (3) "[t]he defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious"; and (4) "[b]y not taking such measures,

1    the defendant caused the plaintiff's injuries." *Id.*; *see also Gordon v. Cty. of Orange*, 888

2    F.3d 1118, 1125 (9th Cir. 2018) (applying this standard to a medical conditions claim).

3           Here, Petitioners argue that Respondents made intentional decisions with respect to

4    their conditions.  But they allege only that Respondents made omissions, such as failing to

5    implement certain measures or taking inadequate measures in response to COVID-19.  (Dkt.

6    1, ¶ 2.) At most, such omissions amount to negligence, which is insufficient.  Moreover,

7    Petitioners do not allege, and they fail to point to any evidence, that these

8    decisions were intentionally made for purposes of punishment.  *See Moriarty v. Cty. of San*

9    *Diego*, 2019 WL 4643602, at *10 (S.D. Cal. Sept. 24, 2019) (ruling that the "failure to

10   appreciate that he was suicidal was not an 'intentional decision'" under the objective-

11   reasonableness test).  They also do not argue or point to any evidence that these omissions

12   placed them at a particular risk of harm or were omitted in reckless disregard of their safety.

13   *See Gordon*, 888 F.3d at 1125.  Indeed, they cannot make that requisite showing (reckless

14   disregard for their safety) in light of all the protective measures that Respondents have taken

15   at MCSO jails—in compliance with CDC Guidelines—to abate the spread of COVID-19.

16          Moreover, in seeking preliminary injunctive relief, Petitioners vaguely argue that

17   Respondents are deliberately indifferent for not following their own *written* policies.

18   Petitioners support this argument by misconstruing *Redman v. County of San Diego*, 942

19   F.2d 1435 (9th Cir. 1991), as holding that a municipality can be liable under *Monell* for

20   repeated failures to follow its own written policy.  In *Redman*, however, liability was not

21   imposed because of the failure to follow a written policy but rather because the municipality

22   had an *unwritten* policy—a custom or practice—that was the driving force behind the

23   constitutional injury in that case.  *Id.*

24          To establish *Monell* liability on that theory, Petitioners must show that Maricopa

25   County has a "longstanding practice or custom which constitutes the standard operating

26   procedure of the local government entity."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.

27   1996.  "The custom must be so 'persistent and widespread' that it constitutes a 'permanent

28   and well settled city policy."  *Id.* (quoting *Monell*).  "Liability for improper custom may not

1    be predicated on isolated or sporadic incidents; it must be founded upon practices of

2    sufficient duration, frequency and consistency that the conduct has become a traditional

3    method of carrying out policy." *Id.*

4          Here, Petitioners have not shown any evidence that comes close to a persistent and

5    widespread custom with respect to their constitutional and statutory claims.  At most, they

6    have offered unverified hearsay statements of some inmates pointing to "isolated or

7    sporadic" incidents of non-compliance with Respondents' COVID-19 policies.  As the

8    district court explained in *Lucero-Gonzalez v. Kline*, 2020 WL 2987002, at *10 (D. Ariz.

9    June 2, 2020), that is insufficient to show deliberate indifference:

10                Although there may be instances in which Defendants' policies
             have not been followed — such as lack of cleaning supplies or
11           inconsistent cleaning, or where the detainees themselves do not
             practice social distancing or wear their masks — this does not
12           reflect that the policies themselves are objectively insufficient.
             Rather, it supports only that various staff, detainees, or other
13           individuals — who are not named as Defendants to this action
             — have failed to comply with Defendants' COVID-19-related
14           policies.  Such failures do not, however, support that
             Defendants, named in their official capacities only, are liable
15           for Plaintiffs' alleged injuries.

16   *See also Swain v. Junior*, 961 F.3d 1276, 1290 (11th Cir. 2020) ("*Swain II*") (finding "the

17   allegedly nonuniform enforcement of social distancing cannot alone constitute deliberate

18   indifference. The district court *never* found that the defendants knew of any potential lapses

19   in enforcement and deliberately ignored them").

20         And while Petitioners fault Respondents' policies for failing to prevent the increase

21   of COVID-19 infections at certain jails, the entire nation is having difficulty containing this

22   pandemic.  Neither the alleged spread of the virus in MCSO jails, nor the alleged inability

23   to eradicate it, constitutes deliberate indifference.  *See Matos v. Lopez Vega*, 2020 WL

24   2298775, at *10 (S.D. Fla. May 6, 2020) ("Detention comes with its flaws. Even without a

25   highly contagious pandemic, there is always an unfortunate risk that detainees will be

26   exposed to certain communicable diseases, such as the common cold or tuberculosis. This

27   is due in obvious part to limited space, overpopulation, and lack of resources. But these

28   shortcomings do not automatically translate into a constitutional violation. The relevant

inquiry here is whether the nature of detention in BTC passes constitutional muster."); *see also Swain II*, 961 F.3d at 1287 ("Failing to do the 'impossible' doesn't evince indifference, let alone deliberate indifference."); *Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020) ("*Swain I*") ("The district court treated the increase in COVID-19 infections as proof that the defendants deliberately disregarded an intolerable risk. In doing so, it likely violated the admonition that resultant harm does not establish a liable state of mind. The district also likely erred by treating Metro West's inability to 'achieve meaningful social distancing' as evincing a reckless state of mind.") (citation omitted).

All that the Fourteenth Amendment requires is that Respondents provide for Petitioners' "reasonable safety," and to do what is reasonably available to abate the risks of harm. *See Dawson v. Asher*, 2020 WL 1704324, at *12 (W.D. Wash. Apr. 8, 2020) ("[U]nder the Fifth Amendment, Respondents are not required to eliminate any risk to Petitioners. Instead, Respondents are required to provide for their 'reasonable safety.'"). They have responded reasonably; they cannot be said to have been objectively reckless and deliberately indifferent. Courts have had little difficulty dismissing claims under similar circumstances. *See Cameron v. Bouchard*, 2020 WL 3867393, at *5 (6th Cir. July 9, 2020) (finding plaintiffs failed to show that "the jail officials acted with reckless disregard to the serious risk COVID-19 poses. Indeed, the steps that jail officials took to prevent the spread of COVID-19 were reasonable."); *Dzhabrailov v. Decker*, 2020 WL 2731966, at *9 (S.D.N.Y. May 26, 2020) ("The measures taken by OCJ officials demonstrate substantial efforts to reduce the likelihood of the spread of COVID-19 throughout the OCJ detainee population. The Court finds that such precautionary measures demonstrate that Respondents have not recklessly failed to act to protect the health and safety of ICE detainees.").

## 2.   The Post-Conviction Petitioners' Eighth Amendment Claims Lack Merit.

The Eighth Amendment's deliberate indifference analysis includes both an objective and subjective prong. *Farmer*, 511 U.S. at 834. To satisfy the objective prong, an inmate

must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* Under the subjective prong, an official must know of and consciously disregard "an excessive risk to inmate health or safety." *Id.* at 837. "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for condemnation, cannot … be condemned as the infliction of punishment." 511 U.S. at 838. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. Thus, "[d]eliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Mere indifference, negligence, medical malpractice, or even gross negligence is not enough. *Edmo v. Corizon, Inc.*, 949 F.3d 489, 495 (9th Cir. 2020) (noting "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference.") (citations omitted). To establish that the defendant was subjectively culpable, a plaintiff must show that the defendant acted with a "criminal reckless—or worse—state of mind." *Id.*

Here, the Post-Conviction Petitioners have alleged only a generalized fear of infection from the spread of COVID-19 at certain MCSO jails. But even if that were sufficient to show an objectively serious risk of harm, they cannot show that Respondents were deliberately indifferent to it. Indeed, for the same reasons they cannot show reckless disregard to COVID-19 risks under the Fourteenth Amendment, they are unable to satisfy the heightened subjective standard, akin to "criminal recklessness," under the Eighth Amendment. *Farmer*, 511 U.S. at 834. Circuit Courts that have addressed an Eighth Amendment claim under similar circumstances have found that the many efforts to abate the spread of COVID-19 disproves the defendants were subjectively culpable, even though—as *Farmer* instructs—the harm was ultimately not averted. *See Cameron*, 2020 WL 3867393, at *8 ("[W]hile the harm imposed by COVID-19 on inmates at [the Jail] 'ultimately [may] not [be] averted,' [Defendants have] 'responded reasonably to the risk' and therefore ha[ve] [likely] not been deliberately indifferent to the inmates' Eighth

Amendment rights.  The same can be said under the Due Process Clause of the Fourteenth Amendment."); *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (vacating preliminary injunction, and finding no Fourteenth or Eighth Amendment violation despite the spread of COVID-19 at the facility where the Bureau of Prisons took preventative measures); *Swain II*, 961 F.3d at 1289 ("We simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their best.' Because the defendants 'act[ed] reasonably,' they 'cannot be found liable' under the Eighth Amendment."); *Marlowe*, 810 F. App'x. 302, *3 ("Even assuming that Plaintiff's testimony somehow satisfies *Farmer*'s objective requirement, the district court cited no evidence establishing that Defendants subjectively believed that the measures they were (and continue) taking were inadequate. If anything, the record proves just the opposite. Defendants point to a plethora of measures they are taking to abate the risks posed by COVID-19…."); *Valentine*, 956 F.3d at 802–03 ("Though the district court cited the Defendants' general awareness of the dangers posed by COVID-19, it cited no evidence that they subjectively believe the measures they are taking are inadequate. To the contrary, the evidence shows that TDCJ has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus. Although the district court might do things differently, mere "disagreement" with TDCJ's medical decisions does not establish deliberate indifference.") (internal citation omitted).

###        F.       Petitioners' Rights Under the ADA and RA Are Not Being Violated.

Petitioners' ADA and RA claims are based on the same allegations and are analyzed under the same standard.  *Zukle v. Regents of Univ. of Calif.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999). To establish a prima-facie claim, a petitioner bears the burden of establishing that: "(1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Updike v. Multnomah Cty.*,

870 F.3d 939, 950–51 (9th Cir. 2017).  Where, as here, the alleged discrimination is based on a failure to provide accommodations to allow them meaningful access to programs, services, or activities, the ADA and RA require "only reasonable modifications that would not fundamentally alter the nature of the service provided" or "impose an undue financial or administrative burden." *Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004).

Although some Petitioners allege medical conditions that appear to qualify as disabilities under the ADA/RA,[13] they fail to allege sufficient facts showing that they were discriminated against *because of those conditions*.  The relevant "inquiry is whether the program, "'when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1021 (9th Cir. 2002).  But Petitioners have not shown how they were denied meaningful access to any medications, meals, or programming *because of* their disabilities or that Respondents even knew of their alleged disabilities and were somehow motivated by a desire to discriminate against them for that reason.  *See Belton v. Miranda-Mares*, 2017 WL 10574067, at *5 (C.D. Cal. Mar. 27, 2017) (dismissing ADA claim because it "is not clear from the Complaint from what CDCR service, program or activity he was denied or excluded, or how he was otherwise discriminated against on the basis of his disability.")

Instead, Petitioners merely conclude that Respondents deprived them of access to "'services, programs, and activities,' including medical care, meals, and rehabilitative programming." (Dkt. 1, ¶ 203)  They claim that Respondents failed to make reasonable modifications of jail services to protect them from the risk of "severe infection or death from COVID-19" due to their disability.  (Id.).  They request release or enlargement as "the only reasonable modification in the face of the unprecedented risks of COVID-19."  (Id., ¶ 205.)  And, in the alternative, they request: "separate living spaces rather than high-capacity shared rooms and dorms with people in close proximity; universal testing and

---

[13] Only Petitioners Crough, Reason, and Tequida have medical conditions that, per CDC Guidelines, place them at heightened risk of severe COVID-19 related illness. (Phillips Dec., ¶¶ 152–155, 159–60, 161–163, 168–178.)

screening for COVID-19; free distribution of adequate cleaning supplies, including soap; frequent cleaning of common areas; free distribution of adequate personal protective equipment, including masks and gloves; education on COVID-19 risks and prevention; suspension and waiver of co-payments and charges for medical treatments and visits; and staggered access to bathrooms, meals, and other shared resources." (Id., ¶ 205.)

At most, these allegations show that Petitioners are merely complaining about the adequacy of treatment they are provided for their disabilities.  Such allegations are not cognizable under the ADA or the RA.  *See Simmons v. Navajo Cty.,* 609 F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."), *overruled on other grounds* by *Castro*, 833 F.3d 1060, 1071 (9th Cir. 2016); *see also O'Guinn v. Nevada Dep't of Corr.*, 468 F. App'x 651, 653 (9th Cir. 2012) ("[Plaintiff] challenges the adequacy of his mental health care, a challenge that cannot be properly brought under the ADA and RA."); *Benge v. Ryan*, 2020 WL 601667, at *9 (D. Ariz. Feb. 7, 2020) ("Plaintiff's allegations regarding his disability are too vague and conclusory to state a claim under the ADA. … In addition, he has failed to allege that he was excluded from participation in or denied the benefit of a service, program, or activity because of his disability. Instead, he appears to be complaining of inadequate treatment for a disability—a claim that is not cognizable under the ADA."); *MacCool v. Arizona*, 2014 WL 2895444, at *7 (D. Ariz. June 26, 2014) (finding amendment of ADA and RA claims against prison provider futile: "Plaintiffs do not set forth any facts supporting a claim that Finn was subjected to intentional discrimination *because* of his disability nor was he excluded from participation in any prison program or activity. Improper medical treatment is not the same as discrimination under the ADA."); *Houser v. Ryan*, 2014 WL 584303, at *15 (D. Ariz. Feb. 13, 2014) ("As a general matter, an ADA claim does not lie when an inmate is complaining about negligent or deliberately indifferent medical care. Rather, a failure to provide care must stem from a discriminatory motive. Here, Plaintiff's complaint is simply that his various disabling conditions were not adequately treated.").

Moreover, Petitioners have not shown that their requested modifications are reasonable and necessary. Indeed, Petitioners claim nothing short of release or enlargement. (Dkt. 1, ¶ 204.) But release or enlargement is not required because it would fundamentally alter the nature of the services provided at MCSO jails by completely removing Petitioners. *Tennessee*, 541 U.S. at 531–32. Nor do the ADA or RA require Respondents to make any of the other accommodations Petitioners request in the alternative for their disabilities. (Id., ¶ 206.) Although Petitioners fail to show how those modifications are reasonable and necessary to *avoid* discrimination based on their disability at each MCSO jail, Respondents have no obligation to make them because doing so would cause significant financial and administrative burdens that far outweigh the nine individual Petitioners' desire for comfort.

Further, the protective measures Respondents have already implemented are sufficient to abate the spread of COVID-19—without discriminating against Petitioners' alleged disabilities. Respondents are allowed to rely on their own professionals' judgment that those measures are reasonable. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 602 (1999) ("State actors may rely on the 'reasonable assessments' of their own professionals in determining whether an individual is qualified for services and programs and whether 'reasonable modifications; are available to prevent discrimination.").

Lastly, Petitioners claim that they could be deprived of "administrative services" because they would be unable "to make court appearances" *if* they were to become seriously ill, or "complete their sentences" *if* they were to die. (Dkt. 1, ¶ 207). While Petitioners fail to explain how attending criminal proceedings or completing a punitive sentence are "benefits" that jails provide within the meaning of the RA, *see Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998), this alleged discrimination would occur *if*, and only *if*, they were to become infected with COVID-19 in the first place. Petitioners lack standing to assert an ADA/RA claim based on such speculative discrimination. *See Deck v. Am. Hawaii Cruises, Inc.*, 121 F. Supp. 2d 1292, 1297 (D. Haw. 2000) ("ADA plaintiffs who seek injunctive relief must demonstrate that they themselves face a real and immediate threat of future harm; there must be sufficient immediacy, reality and causality between

1  defendant's conduct and plaintiffs' allegations of future injury to warrant injunctive
2  relief.").

3      Even assuming Petitioners could establish a prima facie case, their ADA/RA claims
4  fail because Respondents' COVID-19 policy is reasonable under the test outlined in *Turner*
5  *v. Safely*, 482 U.S. 78 (1987).  *See Gates v. Rowland*, 39 F.3d 1439, 1446–48 (9th Cir. 1994)
6  (applying *Turner* to ADA/RA prisoner claim).  In *Turner*, the Supreme Court identifies four
7  factors to consider: "(1) whether there is a valid, rational connection between the prison
8  policy and the legitimate governmental interest put forward to justify it; (2) whether there
9  are alternative means of exercising the right; (3) the impact that accommodation of the
10  constitutional right will have on guards, on other inmates, or on the allocation of prison
11  resources; and (4) whether the regulation or policy is an "exaggerated response" to prison
12  concerns."  *Gates*, 39 F.3d at 1447.  The burden is on the inmates to show that the challenged
13  regulation is unreasonable.  *Id.*  This standard is deferential to prison officials:

14  
15      Running a prison is an inordinately difficult undertaking that
       requires expertise, planning, and the commitment of resources,
       all of which are peculiarly within the province of the legislative
16      and executive branches of government. Prison administration
       is, moreover, a task that has been committed to the
17      responsibility of those branches, and separation of powers
       concerns counsel a policy of judicial restraint. Where a state
       penal system is involved, federal courts have … additional
18      reason to accord deference to the appropriate prison authorities.

19  *Turner*, 482 U.S. at 84–85.

20      All four *Turner* factors weigh in Respondents' favor.  First, Petitioners' allegations
21  do not show that the existing COVID-19 precautionary measures are unrelated to legitimate
22  penological concerns.  Second, they have not shown that they are deprived of meaningful
23  access to any of the services or programming available to non-disabled persons.  Third,
24  making the requested modifications to treat Petitioners for their alleged disability would
25  undoubtedly result in financial and administrative burdens.  And fourth, Petitioners have
26  not alleged nor can they show that the existing measures are an exaggerated response.

27  **V.    Petitioners Are Not Entitled to Preliminary Injunctive relief.**

28      "The grant of a preliminary injunction is the exercise of a very far reaching power

never to be indulged in except in a case clearly warranting it." *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964).  It is "an extraordinary remedy that may only be awarded upon a *clear* showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis added).  Petitioners must demonstrate "'[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).  Alternatively, "serious questions going to the merits and a hardship balance that tips sharply that tips sharply towards the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).  This is a "heavy burden." *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1312 (9th Cir. 2015).

### A.      Petitioners Are Not Likely to Succeed on the Merits.

"Likelihood of success on the merits is the most important factor; if a movant fails to meet this threshold inquiry, [the Court] need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (internal quotations and citation omitted).  A court may deny a preliminary injunction if the request involves "doubtful and difficult questions of law or disputed questions of fact," *Dymo*, 326 F.2d at 143, or if there are "material disputed issues of fact which cast reasonable doubt upon the certainty of plaintiff's prevailing at a trial on the merits," *Knudsen Corp. v. Ever-Fresh Foods, Inc.*, 336 F. Supp. 241, 248 (C.D. Cal. 1971).

As discussed above in Section II, Petitioners are unlikely to prevail on the merits because they failed to exhaust their available administrative remedies.  *See Swain II*, 961 F.3d at 1292 (holding "the plaintiffs could show a substantial likelihood of success on the merits only if the defendants were unlikely to demonstrate a lack of PLRA exhaustion").  Because Petitioners have not exhausted their administrative remedies, which is a threshold issue, they cannot succeed on the merits of their claims.  Even if there are disputed facts as

to exhaustion, that dispute precludes a "clear showing" that they are likely to succeed. *See Upshaw v. Alameda Cty.*, 377 F. Supp. 3d 1027, 1034 (N.D. Cal. 2019) ("[T]he record is at best sharply conflicted on the facts, and the Court cannot say that plaintiffs have carried their burden for a preliminary injunction ....").

Furthermore, as discussed in Section IV above, Petitioners have not established a constitutional or statutory violation.  It follows that they have not shown a likelihood of success on those claims.  Any conflicting facts weigh against a preliminary injunction. *See Upshaw*, 377 F. Supp. 3d at 1034; *SPS Techs., LLC v. Briles Aerospace, Inc.*, 2019 WL 1974902, at *8 (C.D. Cal. Mar. 11, 2019) ("Indeed, courts routinely deny a request for injunctive relief … where the parties fundamentally disagree on the facts underlying the case.") (collecting cases); *FTC* v. *Infinity Group Servs.*, 2009 WL 10670551, at *6 (C.D. Cal. Oct. 1, 2009) (finding defendant's contrary evidence "at least militates against awarding preliminary injunctive relief in light of the many competing facts presented.").

### B.  Petitioners Cannot Show an Immediate and Irreparable Harm Absent a Preliminary Injunction.

A plaintiff seeking a preliminary injunction bears the burden of demonstrating that irreparable harm is likely in the absence of such relief. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).  "Speculative injury cannot be the basis for a finding of irreparable harm," *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007), rather a movant "must establish a likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative allegations of harm," *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2014). As one leading commentator has explained, "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that … the applicant is likely to suffer irreparable harm" in the absence of such relief.  C. Wright, A. Miller & M. Kane, 11A Fed. Practice and Procedure § 2948.1 (3d ed.).

Here, Petitioners make little effort to show that they have suffered any harm, let alone an immediate and irreparable harm absent an injunction.  Instead, they refer to the

Ninth Circuit's finding of irreparable harm in *Padilla v. ICE*, 953 F.3d 1134, 1147 (9th Cir. 2020), without attempting to explain how the immigration detainees, conditions, facts, and law in that case are similar to this case—other than their bald assertion that the court found "dangerous conditions of detention constitute irreparable harm." (Dkt. 1, ¶ 21.) This does not satisfy their burden to make a *clear* showing that they are entitled to extraordinary relief.

Moreover, Petitioners have not otherwise shown an immediate and irreparable harm. The mere presence or even spread of COVID-19 in MCSO jails alone is not enough. "There is no doubt that COVID-19 poses risks of harm to all Americans.  But the question is whether Plaintiffs have shown that they will suffer irreparable injuries even after accounting for the protective measures [in the particular jail where each Petitioner is housed]." *Valentine*, 956 F.3d 797, 804.  Petitioners do not even attempt to make that showing for them individually, instead only generally asserting that everyone is at risk of infection unless they are granted relief.  The fact that Petitioners filed this civil action on June 16, 2020 (Dkt. 1), but waited until June 29, 2020 to request a temporary restraining order (at the suggestion of the Court, Dkt. 5 at 1 n.1), belies any suggestion that they will suffer immediate and irreparable harm absent a preliminary injunction.

### C.    The Balance of Equities and the Public Interest Merge and Tip in Respondents' Favor.

Because the government is opposing the preliminary injunction, the remaining two factors—balance of harms and the public interest—merge. *California*, 911 F.3d at 575. Both factors tip sharply against a preliminary injunction. It is "difficult to imagine an activity in which the state has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures than the administration of its prisons." *Valentine*, 956 F.3d at 803 (quoting *Woodford*, 548 U.S. at 94, and *Preiser*, 411 U.S. at 491–92).  Thus, the public interest is always advanced when courts refrain from "second-guess[ing] the expertise of administrators on matters which they are better informed." *Youngberg v. Romeo*, 457 U.S. 307, 322–23 (1982) (citing *Bell*, 441 U.S. at 544) (courts should "not second-guess the expertise of administrators on matter on which they are better

1    informed.").

2        Furthermore, despite the purpose of a preliminary injunction to *maintain* the "status

3    quo, *Zepeda v. INS*, 753 F.2d 719, 728 n.1 (9th Cir. 1983), Petitioners seek to radically alter

4    the status quo.  Petitioners ask the Court to interrupt their criminal proceedings by releasing

5    them outright.  In the alternative, they ask the Court to impose some vague court-monitored

6    process. But "[p]rison administration is … a task that has been committed to the

7    responsibility of [the legislative and executive] branches, and separation of powers concerns

8    counsel a policy of judicial restraint." *Turner*, 482 U.S. at 85.  Because of that delegation

9    of responsibility, "judges … must defer to prison officials' expert judgments." *Norwood v.*

10   *Vance*, 591 F.3d 1062, 1066–67 (9th Cir. 2010).  Indeed, the Supreme Court has cautioned

11   that "the problems that arise in the day-to-day operation of a corrections facility are not

12   susceptible of easy solutions," and therefore prison administrators "should be accorded

13   wide-ranging deference in the adoption and execution of policies and practices that in their

14   judgment are needed to preserve internal order and discipline and maintain institutional

15   security." *Bell*, 441 U.S. at 547; *see also Whitley v. Albers*, 475 U.S. 312, 322 (1986)

16   (noting that this deference requires "that neither judge nor jury freely substitute their

17   judgment for that of officials who have made a considered choice").

18       The proposed preliminary injunction intrudes upon this separation of powers and

19   tramples the deference that prison officials are owed.  *See Alvarez*, 2020 WL 2315807, at

20   *5 (third and fourth prongs not satisfied because the court "could not issue injunctive relief

21   without unfairly intruding on Defendants' operation of the prison system").  It also creates

22   "an administrative nightmare" for Respondents to comply with, particularly during a time

23   in which they must remain flexible in their response to this unprecedented pandemic.  *See*

24   *Valentine*, 956 F.3d at 803.  The burden "in terms of time, expense, and administrative red

25   tape is too great." *Id.*

26   **VI.    The Court Should Dismiss the Complaint.**

27       As has been the custom in these COVID-19 cases, Petitioners filed a hybrid Petition

28   for Writ of Habeas Corpus *and* Complaint for Injunctive and Declaratory Relief, followed

by an Application for Temporary Restraining Order.  The allegations and requests for relief in all three all overlap.  As discussed above, Sheriff Penzone should be dismissed; Petitioner Reason's claims are moot; Petitioner Puente lacks standing to pursue any claims; no Petitioners have standing to pursue ADA or RA claims at 1280, Towers, or Estrella Jails; no Petitioners have standing to pursue constitutional claims at 1280 Jail; and the Post-Conviction Petitioners lack standing to pursue their constitutional claims at Towers and Estrella Jails.  At a minimum, these Respondents/claims should be dismissed.  *See* Fed. R. Civ. P. 12(b)(1), (6).  As further discussed above, Petitioners' factual allegations fall short of establishing punitive intent, deliberate indifference, or reckless disregard, and fail to demonstrate disability-based discrimination and unreasonable regulation. Thus, their constitutional and statutory claims should be dismissed in full.  *Id*.

## VII.   Conclusion.

For these reasons, the Court should deny Petitioners' Petition for Writ of Habeas Corpus and Application for Temporary Restraining Order and dismiss the Complaint.

DATED this 18th day of July, 2020.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/ Daniel P. Struck
　　Daniel P. Struck
　　Rachel Love
　　Nicholas D. Acedo
　　Ashlee B. Hesman
　　Kevin L. Nguyen
　　3100 West Ray Road, Suite 300
　　Chandler, Arizona 85226

　　*Attorneys for Defendants-Respondents*
　　*Sheriff Paul Penzone and Maricopa County*

# CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Allison Ozurovich      allie.ozurovich@dechert.com
Benjamin M. Sadun     benjamin.sadun@dechert.com
Clara S. Spera          cspera@aclu.org
Eric Balaban            ebalaban@aclu.org
Ethan Sanders         ethan.sanders@stinson.com
Hugh Handeyside       hhandeyside@aclu.org
Jared G. Keenan       jkeenan@acluaz.org
Lawrence J. Wulkan    Larry.wulkan@stinson.com
Olga Akselrod         oakselrod@aclu.org
Pat Andriola           pat.andriola@dechert.com
Shari R. Lahlou        shari.lahlou@dechert.com
Zoe Brennan-Krohn    Zbrennan-krohn@aclu.org
Casey Arellano        carellano@acluaz.org

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

/s/ Daniel P. Struck

50