1  Larry J. Wulkan (Bar No. 021404)
2  **STINSON LLP**
   1850 North Central Avenue, Suite 2100
3  Phoenix, Arizona 85004-4584
   Tel: (602) 212-8511
4  Fax: (602) 240-6925
   Email:  larry.wulkan@stinson.com

5  Additional counsel listed on following page
   Attorneys for Plaintiffs
6
                    **UNITED STATES DISTRICT COURT**
7
                          **DISTRICT OF ARIZONA**
8

9  Jason Fenty, Brian Stepter, Douglas          No. 2:20-cv-01192-SPL-JZB
   Crough, Edward Reason, Jesus Tequida,
10 Ramon Avenenti, Anthony Scroggins,           **REPLY IN SUPPORT OF**
   Dale Perez, and Tamara Ochoa on behalf       **PLAINTIFF-PETITIONERS' *EX***
11 of themselves and those similarly            ***PARTE* APPLICATION FOR A**
   situated,                                    **PRELIMINARY INJUNCTION**
12               Plaintiffs-Petitioners,

13

14 Puente Human Rights Movement,

                  Plaintiff,
15
   v.
16
   Sheriff Paul Penzone, in his official
17 capacity, and Maricopa County, a
   municipal entity,
18
                  Defendants.
19

20

21

22

23

24

25

26

27

28

CORE/3502877.0004/160760201.1

Ethan J. Sanders (MO 71151)
*Pro Hac Vice*
**STINSON LLP**
1201 Walnut Street, Suite 2900
Kansas City, MO 64106
Telephone: (816) 691-2628
ethan.sanders@stinson.com

Shari Ross Lahlou (DC 476630)
*Pro Hac Vice*
**DECHERT LLP**
1900 K Street, N.W.
Washington, DC 20006 - 1110
Telephone: (202) 261-3300
Shari.lahlou@dechert.com

Brian Raphel (NY 5592308) *Pro Hac Vice*
Pat Andriola (NY 5406327) *Pro Hac Vice*
Timothy Ly (NY 5478540) *Pro Hac Vice*
**DECHERT LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
brian.raphel@dechert.com
pat.andriola@dechert.com
timonty.ly@dechert.com

Benjamin M. Sadun (CA 287533)
*Pro Hac Vice*
Allison Ozurovich (CA 312797)
*Pro Hac Vice*
**DECHERT LLP**
633 West 5th Street. Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5700
benjamin.sadun@dechert.com
allie.ozurovich@dechert.com

Jared G. Keenan (AZ 027068)
*Casey Arellano (AZ 031242)
**ACLU FOUNDATION OF ARIZONA**
P.O. Box 17148
Phoenix, AZ 85011
Telephone: (602) 650-1854
jkeenan@acluaz.org
casey.arellano@acluaz.org

Eric Balaban (Admitted to Maryland Bar)
*Pro Hac Vice*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
915 15th St. NW, 7th Floor
Washington, DC 20005
Telephone: (202) 393-4930
ebalaban@aclu.org

Olga Akselrod (NY 4132825)
*Pro Hac Vice*
Hugh Handeyside (NY 5394002)
*Pro Hac Vice*
Clara Spera (NY 5590229)
*Pro Hac Vice*
Somil Trivedi (NY 4834495)
*Pro Hac Vice*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10014
Telephone: (212) 549-2569
oakselrod@aclu.org
hhandeyside@aclu.org
cspera@aclu.org
strivedi@aclu.org

Zoe Brennan-Krohn (CA 324912)
*Pro Hac Vice*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
39 Drumm Street
San Francisco CA 94111
Telephone: (415) 343-0769
Zbrennan-krohn@aclu.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

CORE/3502877.0004/160760201.1

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ...................................................................................................1

II.  EVEN IF DEFENDANTS' POLICIES WERE ENFORCED—THEY ARE
NOT—THEY ARE CONSTITUTIONALLY INSUFFICEINT ...........................1

   A.  Differences Between Policies Applicable To Staff And Incarcerated
Persons Confirm That Defendants Are Indifferent To Incarcerated
Persons' Serious Medical Needs .................................................................2

     B.  MCSO's Policies Are Inadequate For Protecting Medically
Vulnerable And Disabled Subclass Members ............................................5

   C.  Defendants Concede That MCSO Policies, Even When Enforced, Do
Not Allow Social Distancing ......................................................................6

   D.  MCSO's New Testing Scheme Is Inadequate ..............................................7

    E.  Defendants Ignore the Gaps Between Stated Policy and Actual
Practice .......................................................................................................8

II.  PLAINTIFFS HAVE STANDING ......................................................................13

   A.  The Individual Plaintiffs Have Standing .................................................13

   B.  Puente Has Standing .................................................................................14

III.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY ANY EXHAUSTION
DOCTRINE ..........................................................................................................19

   A.  Administrative Remedies Are Satisfied Or Otherwise Unavailable ..........19

     1.  Plaintiffs Perez and Stepter Have Exhausted Their Claims, So
All Plaintiffs Are Exhausted. .........................................................19

     2.  Defendants' Refusal to Process Grievances, Disregard of
Formal Grievance Policy, and Improper Screening Render
Administrative Remedies Unavailable ...........................................20

     3.  Defendants' Lack An Emergency Grievance Procedure,
Thereby Rendering Administrative Remedies Unavailable ............22

     4.  The PLRA Does Not Apply To The Medically Vulnerable
Pretrial Subclass Seeking Habeas Relief ........................................24

     5.  Prudential Exhaustion of the Habeas Claim Is Inapplicable ............25

    B.  Plaintiffs Are Not Required to Exhaust State Court Remedies to
Pursue §2241 Habeas Relief .....................................................................26

IV.  PLAINTIFFS' CONSTITUTIONAL AND STATUTORY RIGHTS ARE
BEING VIOLATED ..............................................................................................28

   A.  Plaintiffs' Fourteenth Amendment Rights Are Being Violated .................28

   B.  Defendants are Violating Plaintiffs' Eighth Amendment Rights ..............32

   C.  Defendants are Violating Plaintiffs' ADA and Rehabilitation Act
Rights ........................................................................................................33

V.  PLAINTIFFS ARE SUFFERING IRREPARABLE HARM ...............................35

VI.  THE BALANCE OF THE EQUITIES ARE IN PLAINTIFFS' FAVOR ............37

VII.  THE COURT HAS AUTHORITY TO ORDER RELEASE ...............................37

CORE/3502877.0004/160760201.1

VIII.   CONCLUSION .................................................................................................... 39

## TABLE OF AUTHORITIES

### CASES

*Albino v. Baca*,
747, F.3d 1162, 1172 (9th Cir. 2014) ........................................................................ 20

*Aleknagik Natives, Ltd. v. Andrus*,
648 F.2d 496 (9th Cir. 1980) ..................................................................................... 25

*Andres v. Marshall*,
867 F.3d 1076 (9th Cir. 2017) .............................................................................. 20, 21

*Barfield v. Cook*,
2019 WL 3562021 (D. Conn. Aug. 6, 2019) ............................................................ 19

*Beltran-Ojeda v. Doe*,
No. CV 12-1287-PHX-DGC, 2013 WL 6059242 (D. Ariz. Nov. 18,
2013) .............................................................................................................. 20, 21, 22

*Brown v. Rison*,
895 F.2d 533 (9th Cir. 1990) ..................................................................................... 25

*Brown v. Valoff*,
422 F.3d 926 (9th Cir. 2005) ................................................................................ 20, 23

*Chandler v. Crosby*,
379 F.3d 1278 (11th Cir. 2004) ................................................................................. 19

*Coal. of Clergy, Lawyers, & Professors v. Bush*,
310 F.3d 1153 (9th Cir. 2002) ................................................................................... 18

*E. Bay Sanctuary Covenant v. Barr*,
No. 19-16487, 2020 WL 3637585 (9th Cir. 2020) .................................................... 14

*E. Bay Sanctuary Covenant v. Trump*,
950 F.3d 1242 (9th Cir. 2020) ...................................................................... 14, 15, 16

*Fletcher v. Menard Corr. Ctr.*,
623 F.3d 1171 (7th Cir. 2010) ................................................................................... 22

*Four Seasons Hotels and Resorts, B .V. v. Consorcio Barr, S.A.*,
320 F.3d 1205 (11th Cir.2003) .................................................................................... 4

*Freedom From Religion Found. v. Weber*,
628 F. App'x 952 (9th Cir. 2015) .............................................................................. 18

CORE/3502877.0004/160760201.1

*Gates v. Cook*,
376 F.3d 323 (5th Cir. 2004)........................................................................... 19

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ....................................................................................... 14

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017)........................................................................... 25

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
477 U.S. 274 (1986) ....................................................................................... 17

*Karas v. Marciano*,
2017 WL 6816858 (C.D. Cal. Nov. 13, 2017)................................................. 23

*Lewis v. Washington*,
265 F. Supp. 2d 939 (N.D. Ill. 2003)............................................................... 19

*Liang v. Ashcroft*,
370 F.3d 994 (9th Cir. 2004)........................................................................... 25

*Massie ex rel. Kroll v. Woodford*,
244 F.3d 1192 (9th Cir. 2001).......................................................................... 18

*McBride v. Lopez*,
807 F.3d 982 (9th Cir. 2015)...................................................................... 20, 22

*McPherson v. Lamont*,
2020 WL 2198279 (D. Conn. May 6, 2020)........................................ 22, 24, 25

*Nunez v. Duncan*,
591 F.3d 1217 (9th Cir. 2010)................................................................... 20, 22

*Planned Parenthood Arizona, Inc. v. Brnovich*,
172 F. Supp. 3d 1075, 1085 (D. Ariz. 2016) (Logan, J.) ............................... 14, 17, 18

*Puente v. Arpaio,* 821 F.3d 1098, 1108 (9th Cir. 2016) ............................................ 15, 16

*Rodriguez v. City of San Jose*,
930 F.3d 1123 (9th Cir. 2019)......................................................................... 15

*Ross v. Blake*,
136 S. Ct. 1850 (2016)............................................................................... 19, 20

*Sapp v. Kimbrell*,
623 F.3d 813 (9th Cir. 2010)...................................................................... 19, 20

- v -

*Sierra Club v. Trump*, 963 F.3d 874, 883 (9th Cir. 2020) ................................. 17

*Torres v. Milusnic*,
    Case No. 2:20-cv-4450-CBM-PVC, Doc. 45 (C.D. Cal. July 14, 2020) .................... 24

*Valentine v. Collier*, 956 F.3d 797, 804 (5th Cir. 2020).................................... 35

*Ward v. Chavez*,
    2009 WL 2753024 (D. Ariz. Aug. 27, 2009), *overruled on other grounds*
    *by Ward v. Chavez*, 678 F.3d 1042 (9th Cir. 2012) ............................................... 24, 25

*Wilson v. Williams*,
    2020 WL 3056217 ............................................................................................... 24

## STATUTES

28 U.S.C. § 2241.................................................................................................. 24

42 U.S.C. § 1997e................................................................................................ 19

42 U.S.C. § 1997e(a)............................................................................................ 19

## I.      INTRODUCTION

Defendants congratulate themselves for taking steps "to manage" the spread of COVID-19 "[a]s early as February 2020"—as if taking any action immunizes them from their deliberate indifference. Doc. 28 (Opposition) at 7. Defendants' policies—which are inadequate in their own right—combined with Defendants' decision to turn a blind eye toward the implementation of those policies have placed people incarcerated at the Maricopa County jails and jail staff at an unreasonable risk, and will continue to do so absent preliminary injunctive relief from the Court.

Indeed, in the short period since Plaintiff-Petitioners and Plaintiff Puente ("Plaintiffs") moved for an injunction, the number of COVID-19 cases inside the jails has more than doubled. Given that the virus spreads exponentially, it threatens to double again and again. This will continue irreparably harming Plaintiffs, and particularly the medically vulnerable and disabled class members, unless and until injunctive relief is granted.

## II.     EVEN IF DEFENDANTS' POLICIES WERE ENFORCED—THEY ARE NOT—THEY ARE CONSTITUTIONALLY INSUFFICIENT

While Defendants make much of their "extensive" efforts to address the pandemic, their papers merely confirm the inadequacy of these efforts. Defendants tout policies that are not implemented at the jails. And the policies themselves are patently inadequate, failing to adhere to established public health guidelines. Indeed, Defendants fail to meet even the most basic of CDC guidelines—such as creating a separate set of measures specifically to protect the medically vulnerable from being infected. Ex. 11 (Cohen Suppl. Decl.) ¶¶ 27-28. Nor have Defendants put into place numerous other measures included in CDC guidance, including daily temperature and symptoms checks for staff upon entry, symptom monitoring of quarantined individuals to ensure quick detection of people who are infected and symptomatic, proper verbal and written education on COVID-19 for people incarcerated in the jails, or measures to ensure proper cleaning of high touch areas and sanitization of places where people with COVID-19 were housed, amongst numerous other failings. Ex. 11 (Cohen Suppl. Decl.) ¶¶ 30, 43-49, 50-54, 56.

CORE/3502877.0004/160760201.1

1

2

     *A.    Differences Between Policies Applicable To Staff And Incarcerated Persons Confirm That Defendants Are Indifferent To Incarcerated Persons' Serious Medical Needs*

3

4

5

6

7

8

9

10

11

     Maricopa County's policies are particularly jarring when the requirements applicable to the staff are compared to those applicable to the incarcerated population.[1] Staff are purportedly prohibited from entering the jail if they exhibit any COVID-19 symptoms and must leave "immediately" if they develop a fever while on the job. Doc. 28 at 8-9. Yet incarcerated persons do not have any ability to leave the jail if they develop those same symptoms, and Defendants are actively fighting their release or even temporary enlargement via this lawsuit. This makes social distancing all the more important—a step which Defendants have yet to implement. *See* Ex. 11 (Cohen Suppl. Decl.) ¶¶ 37-42.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

     Even within the jail, there is a significant gap between the policies designed to protect staff versus those designed to protect the incarcerated. Mask policies underscore these gaps. As of June 29, 2020, MCSO[2] requires staff to wear masks "in common areas in the jail." Doc. 28 at 9. All staff have purportedly received N95 masks with machine washable inserts. *Id.* In stark contrast, incarcerated persons are not required to wear any masks—much less N95 masks—even in common areas. *Id.* at 16-17. Instead, they are merely "instructed" to wear, thin, surgical paper masks in limited situations, such as when they attend court, receive medical care, or leave their housing unit. *Id.* While MCSO has recently provided paper masks to people incarcerated at 4th Avenue Jail weekly, most other facilities appear to provide paper masks infrequently. *Id*. And unlike the N95 masks given to staff, the masks given to incarcerated persons are intended only for a single use and generally must be replaced daily to be effective. Doc. 12 (R. Cohen Decl.) ¶¶ 119-120; Ex. 11 (Cohen Supp. Decl.) ¶ 51. Although incarcerated persons are purportedly "advised on the most effective ways to ensure the mask stays clean," an internal MCSO

26

---

27

28

[1] Plaintiffs in no way suggest that the policies applied to jail staff are in fact sufficient under public health guidelines. Further, Plaintiffs have no basis at this juncture to assess whether the applicable staff policies are being implemented.
[2] All citations to "MCSO" refer to Maricopa County Sheriff's Office.

CORE/3502877.0004/160760201.1

memo to staff itself recognizes that "[d]isposable face mask [sic] can only be used once." Doc. 28 at 17; Doc. 29-1 at MCSO-FENTY-000362.

Moreover, Defendants concede that during transportation incarcerated persons only receive a paper mask if they complain of symptoms and then a staff member determines that there is a "high suspicion of possible COVID-19 infection." Doc. 28 at 11. This concession is particularly stunning as Defendants are aware that there is a very real risk of "new arrival asymptomatic inmates infecting the established population." *Id.* at 11-12. Yet "new arrival asymptomatic inmates" are apparently not required to wear a mask at the time of arrival. *Id.*

Defendants' response also reveals gross differences between policies pertaining to staff and incarcerated persons regarding sanitation. On March 26, 2020, Defendants purportedly enacted a policy designed to "implement extra cleaning and sanitation of vehicles, work areas, high-touch areas in the offices, briefing rooms, or break rooms." Doc. 28 at 15. Critically, the only parts of the jails subject to janitorial cleaning are places exclusive to staff use or where infected staff have worked, and janitorial staff are required to wear masks and gloves while performing such work. Doc. 29 (Roska Decl.) ¶¶ 42-51; Doc 29-1 at MCSO-FENTY000353, 394-395. Defendants also require cleaning schedules and logs to ensure the implementation of cleaning policies in staff areas and vehicles—a measure not replicated for areas used by the incarcerated population. Doc 29-1 at MCSO-FENTY000415-416. In other words, extra cleaning has been ordered for the areas frequented by staff but not the incarcerated. People incarcerated in the jails are left to fend for themselves and required to clean common areas—even areas recently vacated by people who are suspected or known to have had COVID-19—with limited disinfectant, no gloves, and without other basic cleaning supplies. Ex. 5 (Perez Supp. Decl.) ¶ 11; Ex. 10 (Tequida Supp. Decl.) ¶ 11; Ex. 4 (Ochoa Supp. Decl.) ¶ 8; Ex. 3 (Fenty Supp. Decl.) ¶¶ 5, 15, 16; Ex. 8 (Stepter Supp. Decl.) ¶ 8; Ex. 1 (Avenenti Supp. Decl.) ¶¶ 10; Ex. 9

(Suggs Supp. Decl.) ¶ 3; Doc. 28 at 15.[3] Defendants further admit that hand sanitizer is made available to staff but not to the incarcerated population. *Id.* at 16. To justify this discrepancy, Defendants suggest hand sanitizer is not safe in a detention facility. *Id.* at 16. But the CDC recommends its use *in detention facilities* to combat COVID-19 and at least 30 correctional departments have allowed hand sanitizers despite purported safety concerns. *See* Doc. 12 (R. Cohen Decl.) ¶ 125. Moreover, any safety concerns about hand sanitizer pale in comparison to the fatal risks created by the uncontrolled spread of the virus. *Id.*

Finally, there are significant differences in the quantity and quality of education provided to staff and incarcerated persons. For staff, efforts to improve COVID-19 education began in March 2020. Doc. 28 at 8. Incarcerated persons, on the other hand, have not received these "detailed memoranda." *Id.* Instead, they appear to have only recently been given access to materials that provide critical information about COVID-19 symptoms and precautions—which tellingly do not mention social distancing—"via the inmate tablet system," a mode of communication that will be inadequate for people who are illiterate or not adept at technology. Doc. 28 at 8; Doc 29-1 at MCSO-FENTY000381. Moreover, while Defendants claim that detention officers provide frequent verbal communications about the need to wear masks and remain socially distant and that people *may* receive similar counseling during medical visits, Doc. 28 at 9, Defendants fail to counter the consistent accounts of Plaintiffs and declarants that no such verbal communications or counseling is occurring.  Ex. 5 (Perez Supp. Decl.) ¶ 12; Ex. 10 (Tequida Supp. Decl.) ¶ 13; Ex. 4 (Ochoa Supp. Decl.) ¶¶ 2, 3; Ex. 3 (Fenty Supp. Decl.) ¶¶ 20, 21; Ex. 8 (Stepter Supp. Decl.) ¶¶ 13, 14; Ex. 1 (Avenenti Supp. Decl.) ¶¶ 10; Doc.

---

[3] Defendants suggest that cleaning supplies are available to both incarcerated persons and staff. Doc. 28 at 15. But there is no evidence that the staff are assisting prisoners cleaning common spaces. Moreover, though the Roska Declaration points to a variety of supplies that MCSO has in its possession, it does nothing to identify which of those supplies incarcerated people have access to versus staff. Doc. 29 (Roska Decl.) ¶ 28. In any event, if the Court is inclined to weigh the evidence and make credibility determinations in ruling on the preliminary injunction, then Petitioners respectfully request a hearing. *See Four Seasons Hotels and Resorts, B .V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211.

CORE/3502877.0004/160760201.1

8-1 (Boykins Decl.) ¶ 27; *id.* (Player Decl.) ¶ 14; *id.* (Avenenti Decl.) ¶ 4; *id.* (Fenty Decl.) ¶ 20; *id.* (Crough Decl.) ¶ 25; *id.* (Ochoa Decl.) ¶ 18; *id.* (Perez Decl.) ¶¶ 14, 27; *id.* (Scroggins Decl.) ¶ 19; *id.* (Stepter Decl.) ¶ 18; *id.* (Tequida Decl.) ¶ 24. Defendants also insist that there are signs posted within the jails with educational information specific to COVID-19 (which Plaintiffs have not seen). Doc. 28 at 8. And those signs likewise do not mention social distancing. Doc. 29 (Roska Decl.) ¶ 75. In sum, nothing suggests Defendants have created a formal COVID-19 education curriculum for its incarcerated population.

Defendants could easily implement the same policies and conduct for the incarcerated population as they do for the staff, but have chosen not to, demonstrating their deliberate indifference.

     **B.**    *MCSO's Policies Are Inadequate For Protecting Medically Vulnerable And Disabled Subclass Members*

There is no dispute that certain persons are particularly susceptible to severe illness and death should they contract COVID-19 because of their age, disability, and/or medical histories. Doc. 12 (R. Cohen Decl.) ¶ 24. The risks and injuries caused by Defendants' policies are particularly severe for these people.[4] *Id.* ¶ 78.

The CDC expressly recommends that the medically vulnerable "should not be cohorted with other quarantined individuals." Doc. 12 (R. Cohen Decl.) ¶ 86. Yet *all* new intakes are placed in Cohort Housing for 14 days regardless of the extreme danger that this procedure places on medically vulnerable individuals. Doc. 28 at 12. Additionally, Defendants do not set forth any practice for identifying medically vulnerable individuals or ensuring that they are removed from quarantined housing units to keep them separate from potentially contagious persons. *See* Doc. 28 at 12-13. The only practice that is arguably specific to medically vulnerable persons is that some persons under medical

---

[4] For example, MCSO treats people as being medically vulnerable due to their age only if they are age 60 or older. As set forth in the declaration of Plaintiffs' expert, Dr. Robert Cohen, which Defendants completely ignore, any reasonable definition of "medically vulnerable" persons must include all people aged 50 or older. Doc. 12 (R. Cohen Decl.) ¶ 84.

CORE/3502877.0004/160760201.1

observation may be moved to the infirmary if they are suspected to have COVID-19 or test positive. Doc 22 at 13-14. But there does not appear to be a set criteria for determining when someone should be moved to the infirmary. Nor do Defendants do daily or increased temperature checks or symptom screening in order to allow for earlier detection of COVID-19 in the medically-vulnerable.

Defendants repeatedly mention that the jails' population has decreased due to a purported effort "to reduce the inmate population in all of its jail facilities by accepting fewer new intakes." Doc. 28 at 6. But there is no indication that a person's age, medical history, or disability status has played any role in this "effort" to reduce the jail's population, nor does this "effort" do anything for existing incarcerated persons. Ex. 11 (Cohen Supp. Decl.) ¶ 27. Defendants do not suggest that they are specifically making an effort to reduce the proportion of medically vulnerable or disabled persons in the jails.

### C. *Defendants Concede That MCSO Policies, Even When Enforced, Do Not Allow Social Distancing*

Defendants concede that social distancing is not possible in their jails. Doc. 28 at 17. Incarcerated persons are simply "encouraged to practice social distancing" when possible, a claim that is itself unsupported. *Id.* Defendants appear to take pride in the fact that they lack a policy literally "forcing" people to remain within six feet of each other, but they also have failed to implement policies or practices that would allow people to maintain six feet of distance. *Id.* Indeed, several Plaintiffs have stated that they are required to line up multiple times a day to receive food and medicine, and another Plaintiff recounts being told to line up for COVID-19 testing. Ex. 4 (Ochoa Supp. Decl.) ¶¶ 3, 9; Ex. 5 (Perez Supp. Decl.) ¶ 10; Ex. 10 (Tequida Supp. Decl.) ¶ 10; Ex. 3 (Fenty Supp. Decl.) ¶¶ 14, 17; Ex. 8 (Stepter Supp. Decl.) ¶ 8; Ex. 1 (Avenenti Supp. Decl.) ¶¶ 4, 6.

Instead of enacting a policy allowing for social distancing, Defendants point to a smaller jail population as a proxy for social distancing. Doc. 28 at 3-6. But, importantly, Defendants do not explain how this translates into social distancing. *See* Ex. 11 (Cohen

CORE/3502877.0004/160760201.1

1   Supp. Decl.) ¶¶ 37-38. Nothing in the Roska declaration provides descriptions of the

2   current occupancies in individual units or any efforts to redistribute persons across

3   housing units—many of which remain at or near capacity notwithstanding the reduced jail

4   population—to allow for better social distancing. *Id.* Nor can it, as Defendants admit that

5   incarcerated persons continue to live in dormitories or have cellmates. Doc. 28 at 3-6.

6          Defendants instead take the *incredible* position that it is somehow safe for COVID-

7   19 negative incarcerated persons to sleep in the same cells as COVID-19 positive people

8   because "solid metal beds provide an adequate barrier" to prevent transmission of the

9   virus. *Id.* at 17. This is not supported by any known science and defies common sense.

10  The fact that the bunk beds are made of metal does nothing to mitigate the fact that

11  cellmates are in constant close proximity with each other, touch the same common

12  surfaces as each other, and breathe the same air in the exceptionally limited common areas

13  of each cell, including while sleeping. Ex. 11 (Cohen Supp. Decl.) ¶ 40. For this reason,

14  the CDC recommends that bunks be reassigned to individuals to maintain at least 6 feet of

15  distance in all directions, regardless of the material components of bunks, and also

16  recommends that incarcerated persons sleep head to foot. Doc. 12 (R. Cohen Decl.) ¶ 95.

17          D.     *MCSO's New Testing Scheme Is Inadequate*

18          Seven days after filing their response, Defendants filed a Notice of Supplemental

19  Facts to inform the Court (and Plaintiffs) that they would test *all* incarcerated persons at

20  the Maricopa County jails for COVID-19. *See generally* Doc. 36 (Phillips Supp. Decl.).

21  But there's a catch. The testing will take five weeks to complete. While Defendants'

22  timing is curious, given just days ago their response denigrated Plaintiffs for requesting

23  universal testing, the decision to broaden testing at the Maricopa County jails is

24  welcome—and constitutionally required. Regrettably, the new testing scheme is not just

25  insufficient, but further evidence of Defendants' deliberate indifference. Given the current

26  outbreak at the facility, delaying testing across a five week period will allow the virus to

27  ravage the remaining facilities while Defendants process results from the first facilities to

28

- 7 -

1   be tested. Ex. 11 (Cohen Supp. Decl.) ¶ 23. Indeed, in the approximately five week period

2   from the filing of the complaint to this reply, the number of cases has nearly quadrupled

3   from 313 to 1,274.[5] Critically, Dr. Phillips' declaration does not explain why the testing

4   plan will span five weeks, especially when the subcontractor lab selected by Defendants'

5   contractor has the capacity to process 1200 samples per day. Doc. 36 (Phillips Supp.

6   Decl.) ¶ 18, MCSO-FENTY000483. And notably absent from Defendants' new testing

7   scheme is any intention to prioritize testing the medically vulnerable. Ex. 11 (Cohen Supp.

8   Decl.) ¶ 23. Accordingly, medically vulnerable people will continue to be at an increased

9   risk of serious illness solely because they do not reside in Defendants' facility of choice.

10   *Id.*

11        Moreover, the plan appears to delay testing of newly detained persons until after all

12   of the other jail facilities are tested. Doc. 36 (Phillips Supp. Decl.) ¶ 26. Thus, new intakes

13   will be cohorted together while awaiting the opportunity to receive a COVID-19 test. *Id.*

14   This is dangerous, as it allows for the transmission of the virus amongst the cohorted

15   population for weeks—and perhaps, more concerning, to the general population. Ex. 11

16   (Cohen Supp. Decl.) ¶ 24. Because each new intake has the potential to bring the virus

17   into the jails, any reasonable testing plan must prioritize testing newly detained persons to

18   stymie new points of entry of the virus into the jails. *Id.* ¶ 25.

19        Finally, the testing is unreasonable because it does not mandate testing of all staff

20   members. On a daily basis, staff members travel to the jails from their communities—

21   which are also experiencing massive COVID-19 outbreaks. *Id.* So each day they come to

22   work, staff serve as potential carriers of the virus into the jails. *Id.* Thus, any reasonable

23   and comprehensive testing scheme must include testing of the staff members.

24        *E.    Defendants Ignore the Gaps Between Stated Policy and Actual Practice*

25        To compound problems, Defendants' practices are not only deficient as designed

26   but especially deficient as implemented. Yet Defendants conflate policy with reality. *See*

27   

28   [5] *Compare* Doc. 1 *with* COVID-19 in County Jails, MARICOPA COUNTY, available at
     https://www.maricopa.gov/5574/COVID-19-in-County-Jails (accessed July 29, 2020).

Doc. 28 at 6-17. Defendants' response does not address the implementation of their policies. The below *examples* reveal why:

Detention Officers Are Risking Cross-Contamination Between Units

- According to Defendants, detention officers "are assigned to work in the same posts in order to prevent cross-contamination of housing units." Doc. 29 (Roska Decl.) ¶ 84.

- In reality, Detention Officers and medical staff move freely from quarantined housing units to non-quarantined units without proper removal of PPE. *See* Ex. 9 (Suggs Supp. Decl.) ¶ 8 ("I also see detention officers move between the quarantine unit and our unit, sometimes going into ours before going into the quarantine unit and sometimes going from the quarantine unit into ours. I have never seen them change their gloves when moving between the quarantine unit and ours, and I have even seen detention officers go into the quarantine unit without a mask on and come into ours. Also, we share brooms with the quarantine unit, and the detention officers bring them back and forth between the two units."); Ex. 7 (Scroggins Supp. Decl.) ¶ 13 ("For about the month, the pod across from ours has been on quarantine. The door to the quarantine pod is about four feet away from the door to our pod. . . . Frequently, jail staff opens the door to our pod and the quarantine pod at the same time. I am worried that because the virus is airborne, it could easily spread to our pod when the doors are both open."); Ex. 5 (Perez Supp. Decl.) ¶ 8 ("Since early July, almost every day, we have had new guards in our pod that I have never seen before. This worries me because the guards move from pod to pod in Towers without washing their hands or changing gloves and could spread the virus to our pod. Frequently, I see a guard walk through a pod which had confirmed positive COVID-19 cases and is under quarantine straight to our pod without changing gloves or their washing hands."); Ex. 10 (Tequida Supp. Decl.) ¶ 7 ("Currently, we are still under quarantine. . . . The guards still walk between pods frequently without changing gloves or washing their hands."); Ex. 2 (Crough Supp. Decl.) ¶ 6 ("I noticed that guards sometimes wear full body suits, including facemasks. When I asked why, the guards said that they wear these suits when they enter cells of people who have tested positive or are suspected of having COVID-19. However, the guards continue to wear these suits after they leave these cells and come to hand out meals, potentially contaminating others.").

Medical Staff and Detention Officers Routinely Fail To Wear Masks

- According to Defendants: "As of May 2020, all CHS staff are ***required to wear masks*** while on duty. . . . Detention officers are instructed to ***wear masks at all times*** while inside the common areas of the jail or anywhere that inmate interaction

could take place, or when transporting inmates in vehicles." Doc. 28 at 9.[6]

- In practice, medical staff and detention officers routinely failed to wear masks after those policies were put into place, and continue to be inconsistent in wearing masks or fail to properly wear them even now. *See* Doc. 8-1 (Dupont Decl.) ¶ 10 ("One of the medical staff members who comes to our dorm to distribute medications each day does not wear a mask when doing so. He distributes medications to other dorms as well."); *id.* (Boykins Decl.) ¶ 26 ("Before the quarantine, the detention officers basically never wore masks. Now, more detention officers wear the masks, but they still do not wear them almost half of the time."); *id.* (Fenty Decl.) ¶ 15 ("[E]very day I still see officers wearing the masks around their necks or on their chins."); Ex. 3 (Fenty Supp. Decl.) ¶ 13 ("The officers all wear masks while in the pod. However, because there is no intercom system, officers pull down their masks to shout when they need to address a group of prisoners."); Doc 8-1 (Scroggins Decl.) ¶ 18 ("Guards are still not consistent in wearing their masks. Some guards wear them all the time, and some never wear them or wear them pulled down below their chin so the masks are not covering their mouth and nose."); *id.* (Perez Decl.) ¶¶ 17, 26 ("Some of the guards who serve us food only wear their mask around their chin. . . . Some guards wear their mask and some never wear them. Some guards only wear their masks under their chin so we can see their mouth and nose."); Ex. 5 (Perez Supp. Decl.) ¶ 6 ("On July 14, 2020, I saw the medical provider at the medical unit and we sat less than six feet from each other. I was wearing a mask, but hers was pushed down below her chin and it was not covering her mouth or nose."); Doc. 8-1 (Suggs Decl.) ¶ 23 ("I often see detention officers in my unit without masks. All of the detention officers now have masks, but some just leave the mask hanging on one ear or wear it under their chin. Even amongst those officers who actually wear the mask, several of them take the mask off when speaking to us, which does not seem safe and defeats the purpose of wearing the mask."); Ex. 9 (Suggs. Supp. Decl.) ¶ 5 ("Detention officers are still inconsistent about wearing their masks, and often don't wear them at all, or wear them below their chin or just hang them on their ear. Often the officers wearing them have them over their mouths and do not cover their noses."); Ex. 1 (Avenenti Supp. Decl.) ¶ 7 ("Detention officers normally wear masks now. However, they pull down the mask to speak loudly to groups of prisoners.").

<u>Prisoners Have Limited Access to Masks</u>

- According to Defendants: "If an inmate needs a new mask due to loss or damage, they simply need to ask, and they will receive one." Doc. 28 at 16.

- In practice, requests for new masks are typically rejected. *See* Doc. 8-1 (Boykins

---

[6] Emphasis added. Throughout brief, all emphases added unless stated otherwise.

Decl.) ¶ 24 ("They told us that we would not be able to get another [mask] and sent us a memo on the tablet about how to wash it. My mask is dirty and smells. I have asked for another one and the detention officers said no, and I know that other people in my pod received the same response when they have asked for a new mask, even though we were on quarantine. . . . I still wear my mask because I am afraid of catching the virus, but most of the other inmates do not wear their masks because they are now old and ruined[.]"); *id.* (Crough Decl.) ¶¶ 20-21 ("One strap on my mask broke and I was forced to continue to use it for about 60 days. . . . We were told through our tablets that if our mask was damaged or lost, we would not get another one."); Ex. 3 (Fenty Supp. Decl) ¶ 13 ("I have received three masks since my arrival at Saguaro. My mask only lasts about three days because it becomes soiled and begins to stink due to condensation from my breath. I have asked for an additional mask and was told that no masks were available."); Ex. 2 (Crough Supp. Decl.) ¶ 7 ("I have received two masks since my last declaration on June 26, 2020. A guard told me that the jail would provide masks every Saturday. No masks were distributed on Saturday, July 25th. I requested an additional mask because the strap on mine was broken, but that request was denied.").

Even Prisoners Exposed to COVID-19 Are Denied Prompt Testing

- According to Defendants: "Starting the week of June 1, 2020, mass COVID-19 testing of inmates in quarantine status commenced. In addition, all quarantine status inmates are offered COVID-19 testing on the next business day after an inmate in the housing unit tests positive for COVID-19 and on (or after) day 14 of quarantine." Doc. 28 at 14.

- In practice, prisoners with known exposures to COVID-19 are not promptly tested. *See* Doc. 8-1 (Boykins Decl.) ¶¶ 7-9, 13 ("On May 15, 2020, my pod was put on quarantine after the person I mentioned above from my pod got sick with COVID-19. . . . When he got sick, they just removed him from the pod. . . . About a week and a half into the quarantine, someone in our pod got sick. Medical staff came to our pod and removed him. Again, they did not do any cleaning of the infected person's cell or bed area. A few days after they removed him, medical staff came and took our temperature for the first time. . . . Even though they never tested us for COVID-19, we were officially removed from quarantine on June 9th.").

Housing Areas and Day Rooms Are Not Configured For Social Distancing

- According to Defendants: "In addition, housing units, pods, and day room areas in all of the jails are large and allow ample space for inmates to socially distance, particularly when the jail populations are so far below their design capacities." Doc. 28 at 17.

- In reality, Defendants thwart social distancing. *See* Doc. 8-1 (Boykins Decl.) ¶ 14

- 11 -

("I am not able to social distance myself from my cellmates and others in my pod. . . . People in my pod cannot keep six feet apart, either in our rooms, in the recreation area, or in the day room."); *id.* ¶ 15 ("The pods contain a day room with bolted tables and bolted chairs that we share, and there are two operational pay phones and one operational video visit machine. The day room is about 60 feet by 20 feet."); *id.* (Dupont Decl.) ¶ 5 ("The bunks are bolted to the floor and are three tiers high, mostly arranged head-to-head, meaning it is impossible not to be in close proximity to neighbors while in our bunks or sleeping. The bunks touch each other, so separation from others can be a matter of inches."); *id.* (Ochoa Decl.) ¶ 8 ("In each set of bunks, the bunks are about three feet apart vertically, and there is not enough room to sit up. The bunk sets are placed along the walls, and all the bunk rows are connected head to toe. The metal on one set of bunks touches the metal on bunks to either side. You can easily touch someone in the bunks next to yours. There are two other women in my bunk set, three women in the bunk set on my left, two women in the bunk set on my right, and three women in the bunk set in front of ours, which also touches my bunk. . . . It is impossible for people in the dorm to keep six feet apart. Every bunk set has at least two women and many of them have three women per set. Our sleeping arrangements are not situated in a way that would help with social distancing."); *id.* (Lewis Decl.) ¶ 8 ("We were also crowded in the day room and other shared spaces. The day room was about 20 feet by 30 feet, and had six tables with four chairs at each, all of which were bolted into the floor, so you had to sit about a foot apart."); Ex. 3 (Fenty Supp. Decl.) ¶ 11 ("I am not able to socially distance myself from others in my pod, endangering both myself and my fellow prisoners. People in my pod cannot keep six feet apart in our bunk areas or in the common areas of the pod. . . . The bunks are in contact with each other, and we sleep head-to-foot, though it is not required by the jail. The bunk at the foot of my bed is about six inches away from and the bunk to my side is about two feet away. Top bunks are approximately three feet above the bottom bunks. There is only enough room for one person to walk down the middle of the bunks."); Ex. 8 (Stepter Supp. Decl.) ¶¶ 7-8 ("I remain unable to socially distance myself from my cellmate and others in my pod. People in my pod cannot keep six feet apart, either in our cells or in the day room. . . . There still is no social distancing in the day room. Staff members have not explained the importance of social distancing to prisoners. . . . People still wait in lines for food, standing right next to each other, and then sit close to each other at eight tables in the pod. Chairs at the table are bolted down."); Ex. 1 (Avenenti Supp. Decl.) ¶ 4 ("Prisoners line up closely together at mealtimes. The detention officers do not instruct prisoners to stay six feet apart from each other. Prisoners sit closely together to eat too. There are six tables with eight chairs each for all 72 people in my pod. The tables and chairs are bolted down, so I cannot move them in order to socially distance.").

Medical Units Are Not Routinely Sanitized

- According to Defendants: Medical observation cells receive full sanitization and, even then, only after someone "vacates [the] cell prior to use by a new occupant." Doc. 28 at 15-16.

- In reality, Plaintiffs have noted that medical observation cells are not cleaned consistently. Ex. 3 (Fenty Supp. Decl.) ¶ 5 ("When they opened [the Medical Observation cell], there was trash in the cell, and it was obvious that the cell had not been cleaned or disinfected after its prior occupant was moved."); Doc. 8-1 (Suggs Decl.) ¶ 7 ("When I arrived to the isolation cell, it was filthy. The floors were covered in dust and trash was laying inside the cell, including orange peels on the floor, empty milk cartons on the top bunk bed, and a bag filled with trash. I asked the detention officer for cleaning supplies, but was given none until my third day in the cell. On the third day, the detention officer gave me a broom and disinfectant spray. Since they did not give me any rags or paper towels, I used toilet paper to clean the cell, and I was not given gloves."); *id.* (Aveventi Decl.) ¶ 8 ("The [Medical Observation] pod was clearly dirty and had not been cleaned, and we had no means of cleaning it ourselves."); *id.* (Lewis Decl.) ¶ 19 ("The [Medical Observation] pod was filthy, and had apple cores and empty milk cartons on the floor when we got there.").

Prisoners Have Limited Access to Soap and Water

- According to Defendants: "Inmates have unimpeded access to soap and water." Doc. 28 at 16.

- In practice, some incarcerated people have limited access to soap and water. *See* Doc. 8-1 (Aveventi Decl.) ¶ 9 ("I received no soap or toothpaste at 4th Avenue, nor was I permitted to shower, until June 11th (almost a week after my arrival), and then not again until June 18th."); *id.* (Crough Decl.) ¶ 17 ("Drinking water must be taken from the shower as the water pressure in the [cell] sink is insufficient to push water above the spigot head[.]"). Some Plaintiffs have been denied commissary, preventing them from buying additional cleaning supplies.

## II.    PLAINTIFFS HAVE STANDING

### A.    *The Individual Plaintiffs Have Standing*

Defendants, who have a single policy applicable to each of its jails, nevertheless contend that Pretrial Plaintiffs do not have standing to challenge the conditions at 1280 Jail, and that Post-Conviction Plaintiffs do not have standing to challenge the conditions at Towers and Estrella jails, because neither group is alleged to be present at those facilities.

- 13 -

Doc. 28 at 28-29. But regardless of the conviction status of each Plaintiff, there is a Plaintiff incarcerated at each of the five Maricopa County jails. Moreover, the Plaintiffs' underlying injuries are the same regardless of the specific facility in which they are imprisoned. Plaintiffs adequately allege their constitutional rights are violated by the same course and conduct by Defendants "across the jails." Doc. 1 (Complaint) ¶ 2. Because COVID-19 is easily transmitted across facilities—a fact Defendants do not contest— Plaintiffs alleged that, for example: "Detention officers routinely move between pods or units within the jails and do not change or disinfect gloves before entering a pod and often do not wear masks." *Id.* ¶ 158. Likewise, "incarcerated persons are transported between jails and to court in vehicles with packed seating and no social distancing, regularly chained together, sitting shoulder to shoulder without masks." *Id.* ¶ 105. Therefore, all Plaintiffs have standing to challenge conditions at all the Maricopa County jails, regardless of which facility they are in, because the spread of COVID-19 at any facility constitutes a "'substantial risk' that the harm will occur" to them. *Planned Parenthood Arizona, Inc. v. Brnovich*, 172 F. Supp. 3d 1075, 1085 (D. Ariz. 2016) (Logan, J.) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)).

      B.     *Puente Has Standing*

      "Organizations can assert standing on behalf of their own members, . . . or in their own right." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265 (9th Cir. 2020) (citations omitted). Here, Puente has standing both in its own right (organizational standing) *and* standing on behalf of its members (associational standing)—either one of which is sufficient.

      ***Organizational Standing.*** As the Supreme Court has recognized, "concrete and demonstrable injury to [an] organization's activities" is sufficient to confer Article III standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The Ninth Circuit has consistently held that organizations have standing to sue "by showing that the defendant's conduct resulted in a diversion of its resources and frustration of its mission, or caused a substantial loss in organizational funding." *E. Bay Sanctuary Covenant v.*

- 14 -

1   *Barr*, --F.3d--, 2020 WL 3637585, at *8 (9th Cir. July 6, 2020) (quotations and citations

2   omitted). *See also Rodriguez v. City of San Jose*, 930 F.3d 1123, 1135 n.10 (9th Cir. 2019)

3   (recognizing that under current Ninth Circuit precedent, "an organizational plaintiff's

4   expenditure of resources can be sufficient to establish standing"). "To determine whether

5   organizational standing requirements have been satisfied, we conduct the same inquiry as

6   in the case of an individual: Has the plaintiff alleged such a personal stake in the outcome

7   of the controversy as to warrant his invocation of federal-court jurisdiction?" *E. Bay*

8   *Sanctuary Covenant v. Trump*, 950 F.3d at 1265 (quotations and citation omitted).

9           Defendants' contention that Puente only presents an "abstract interest that the

10  Supreme Court rejected as insufficient to confer standing," Doc. 28 at 30, ignores the vast

11  majority of Puente's allegations. Plaintiffs allege that "as a result of Defendants' failures

12  to adequately protect individuals incarcerated at the Maricopa County jails from the

13  dangers of COVID-19, Puente has launched a full-fledged public campaign to support

14  incarcerated people at the Maricopa County jails and raise public awareness about

15  COVID-19 for incarcerated people and their families." Doc. 1 (Complaint) ¶ 18. "This

16  effort has come *at the expense of other programming*, requiring Puente *to divert resources*

17  *to this campaign while scaling down other campaigns*." *Id.* Plaintiffs even provided the

18  Court with an itemized breakdown of the "significant time and resources" Puente has

19  expended, including: "setting up a hotline to monitor conditions inside of the jails and

20  respond to the concerns of incarcerated people and their families, organizing regular

21  protests, creating petitions, drafting letters to public officials, and producing

22  communications materials." *Id.* "Absent Defendants' failure to protect the health of

23  incarcerated persons at the Maricopa County jails, Puente would not need to spend these

24  resources and cut back programming and staff to support incarcerated people during this

25  pandemic." *Id.*

26          When confronted with similar circumstances, other courts *in this district* have held

27  that Puente has the very standing they seek to assert here. In *Puente v. Arpaio*, the court

28  evaluated whether Puente had standing to pursue claims on behalf of constituents who had

1    a credible threat of prosecution. 76 F. Supp. 3d 833, 851 (D. Ariz. 2015), *vacated in part*

2    *and remanded on other grounds*, 821 F.3d 1098, 1108 (9th Cir. 2016). In finding that

3    Puente had direct standing, the Court determined:

> Puente Arizona has established standing under this test. The declaration of
> Carlos Garcia, the executive director of Puente, establishes that Puente is a
> community-based organization with more than two-hundred members, many
> of whom are unauthorized aliens. Doc. 30–4. Puente serves its members
> through English classes, "know-your rights workshops," and other
> educational programs. Mr. Garcia knows many members who have used false
> information to obtain employment and who face prosecution under the
> identity theft laws. Mr. Garcia's declaration shows that enforcement of the
> identity theft laws has injured Puente Arizona in two ways.

*Id.* Moreover, the district court found that "enforcement of the identity theft laws has

injured Puente Arizona[,]" including because "Puente has diverted substantial resources to

respond to the workplace raids through which the MCSO has enforced the identity theft

laws." *Id.* (citation omitted). "These are the kinds of injuries that the Ninth Circuit has

found sufficient to confer direct standing on an organization." *Id.*

       The same reasoning applies with equal force here. Puente's work "includes

programs and advocacy on behalf of detained people across Arizona." Doc. 1

(Complaint). Puente also "launched a full-fledged public campaign to support incarcerated

people at the Maricopa County jails and raise public awareness about COVID-19 for

incarcerated people and their families." *Id.* As a result "Puente has expended significant

time and resources," which has "come at the expense of other programming" and

"require[es] Puente to divert resources[.]" *Id.* Under *Puente v. Arpaio*, Puente clearly has

direct standing.

       Defendants also claim that Plaintiffs failed to allege that Puente "was left with *no*

*choice* but to divert significant resources in response to the alleged constitutional

…violations." Doc. 28 at 31. *First*, there is no doctrinal requirement that Puente be "left

with no choice" between turning off the lights or diverting resources to mitigate the

damage done by Defendants. *Second*, even if this were a requirement, Puente has more

1
2
3
4
5
6
7
8
9
10
11

than demonstrated it has been forced to expend resources to counteract the injury. If it did not, for example, "launch[] a full-fledged public campaign to support incarcerated people at the Maricopa County jails," and "set[] up a hotline to monitor conditions inside of the jails and respond to the concerns of incarcerated people and their families," the community it serves would be less equipped to handle the COVID crisis. And while organizational standing need not involve matters of life-or-death, this one does. Defendants' notion, therefore, that Puente "manufacture[d] its own injury" by creating a public health campaign in the middle of a pandemic fundamentally misunderstands Puente's mission, and the idea that such a campaign is "voluntary" strips that word of all meaning. Doc. 28 at 31.

12
13
14
15
16
17
18
19
20
21

Likewise, Defendants' contention that Puente's mission is not frustrated by Defendants' deliberate indifference is off-base. Puente's "aim [is] to develop, educate, and empower communities, to enhance the quality of life of immigrants, and to advocate on behalf of immigrants," which involves providing "free English classes, media trainings, know-your-rights-workshops, health and wellness training, educational programs for children, and other services to the community." Doc. 1 (Complaint) ¶ 18. Puente simply cannot advance its mission of providing education and resources to better the health and well-being of the community while also ignoring COVID-19's rapid spread inside Maricopa County jails. Providing its members with the resources they need to protect themselves and their families is perfectly consonant with Puente's mission.

22
23
24
25
26
27
28

*Associational Standing*. Puente also has associational standing because of "injury to [its] members." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281 (1986) (citation omitted); *see also Brnovich*, 172 F. Supp. 3d at 1090 (Logan, J.) (collecting cases for proposition and finding plaintiff had standing). "An organization has standing to sue on behalf of its members when 'its members would otherwise have standing to sue in their own right,' and when 'the interests it seeks to protect are germane to the organization's purpose.'" *Sierra Club v. Trump*, 963

- 17 -

1  F.3d 874, 883 (9th Cir. 2020) (quoting *United Food and Commercial Workers Union*

2  *Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996)).

3      Defendants argue that Puente cannot demonstrate standing because none of the

4  individual plaintiffs have stated that they are members of Puente. *See* Doc. 28 at 32. But

5  Defendants cite no authority for their argument. Puente properly alleged that its

6  membership is made up of "hundreds of individuals across Arizona," including "people

7  who have been incarcerated as well as their impacted families." Doc. 1 (Complaint) ¶ 18.

8  Because of the transient nature of prison populations, pinpointing a specific Puente

9  member among the prospective class is a task not required by Ninth Circuit precedent.

10  Instead, the question is whether Puente members "would otherwise have standing to sue in

11  their own right" and if their interests "are germane to the organization's purpose.'" *Sierra*

12  *Club*, 963 F.3d at 883.

13      Puente also has associational standing because its members have family members

14  in the jails. Doc. 1 (Complaint) ¶ 18. Family members and next-of-kin can of course bring

15  habeas proceedings on behalf of incarcerated people under "next-friend" standing. *See*

16  *Coal. of Clergy, Lawyers, & Professors v. Bush*, 310 F.3d 1153, 1157 (9th Cir. 2002)

17  (acknowledging that "federal courts ha[ve] long recognized that under appropriate

18  circumstances, habeas petitions could be brought by third parties, such as family members

19  or agents, on behalf of a prisoner"); *see also Massie ex rel. Kroll v. Woodford*, 244 F.3d

20  1192, 1194 (9th Cir. 2001).

21      Finally, Defendants' argument that Puente cannot sue on behalf of its members

22  because it needs to "show its individual members would not need to participate in the

23  litigation," Doc. 28 at 33, ignores well-settled law. When "parties are seeking injunctive

24  and declaratory relief, individual participation . . . is unnecessary." *Brnovich*, 172 F. Supp.

25  at 1090 (Logan, J.). *See also Freedom From Religion Found. v. Weber*, 628 F. App'x 952,

26  953 (9th Cir. 2015) (when parties request "declaratory and injunctive relief, not money

27  damages," then standing does "not necessitate individual member participation") (citation

28  omitted). Because Plaintiffs here seek declaratory and injunctive relief to remedy

- 18 -

1

2

Defendants' constitutional violations, individual member participation is not required.

3

### III.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY ANY EXHAUSTION DOCTRINE

4

   A.   *Administrative Remedies Are Satisfied Or Otherwise Unavailable*

5

Defendants argue that Plaintiffs failed to exhaust their administrative remedies

6

before filing suit. Doc. 28 at 22-23. As a threshold matter, because the Prison Litigation

7

Reform Act (PLRA) only applies to "prisoners," it is inapplicable to Puente. *See* 42

8

U.S.C. § 1997e. As to the individual Plaintiffs, Plaintiffs Perez and Stepter have fully

9

exhausted their claims and to the extent they and others have not, the PLRA "does not

10

require exhaustion when circumstances render administrative remedies 'effectively

11

unavailable.'" *Sapp v. Kimbrell*, 623 F.3d 813, 822 (9th Cir. 2010) (citation omitted);

12

*Ross v. Blake*, 136 S. Ct. 1850, 1859-60 (2016) (holding that the PLRA only requires

13

exhaustion of remedies that are "capable of use to obtain relief"); 42 U.S.C. § 1997e(a)

14

(requiring exhaustion only of "administrative remedies [that] are available").

15

   1.   *Plaintiffs Perez and Stepter Have Exhausted Their Claims, So All Plaintiffs Are Exhausted.*

16

17

Under the doctrine of vicarious exhaustion, if the Court finds that a single Plaintiff

18

has either exhausted his remedies, or that administrative remedies are unavailable, such a

19

finding would apply to all Plaintiffs in the applicable classes. *See e.g.*, *Chandler v.*

20

*Crosby*, 379 F.3d 1278 (11th Cir. 2004); *Gates v. Cook*, 376 F.3d 323, 329-30 (5th Cir.

21

2004); *Barfield v. Cook*, 2019 WL 3562021, at *8 (D. Conn. Aug. 6, 2019); *Lewis v.*

22

*Washington*, 265 F. Supp. 2d 939, 942 (N.D. Ill. 2003) ("To require each inmate with the

23

same grievance to exhaust their administrative remedies would be wasteful, and as long as

24

prison officials have received a single complaint addressing each claim in a class action,

25

they have the opportunity to resolve disputes internally and to limit judicial intervention in

26

the management of prisons."). Here, Plaintiff Perez received a response from an External

27

Referee on July 5. Ex. 5 (Perez Supp. Decl.) ¶ 5-6. The External Referee stated: "MCSO

28

has limited ability to release inmates from custody, Towers is following public health

- 19 -

guidelines, the allegations in [his] grievances were unfounded, and a formal hearing was not required." *Id.* ¶ 16. Likewise, Plaintiff Stepter's external grievance was denied on July 2, 2020, stating that MCSO cannot release people and the jail is adhering to CDC guidelines. Ex. 8 (Stepter Supp. Decl.) ¶ 17. Because Plaintiffs Perez and Stepter have exhausted their administrative remedies, all Plaintiffs are deemed to have exhausted those remedies.

> 2. *Defendants' Refusal to Process Grievances, Disregard of Formal Grievance Policy, and Improper Screening Render Administrative Remedies Unavailable*

But even if Perez and Stepter had not exhausted their remedies, the rest of Plaintiffs nevertheless have standing because the administrative remedies were not available to them. Defendants have the burden to prove administrative remedies exist as part of their affirmative defense. *See Albino v. Baca*, 747, F.3d 1162, 1172 (9th Cir. 2014) (holding that "the ultimate burden of proof remains with the defendant[s]" to "prove that there was an available administrative remedy"). Because Defendants ignore the "procedur[al] . . . dead end[s]" that Plaintiffs have encountered in filing their administrative grievances, they have failed to meet their burden. *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). Indeed, the Ninth Circuit has deemed administrative remedies unavailable in a wide variety of situations, including when prison officials: (i) "fail to process a prisoner's grievance," *Andres v. Marshall*, 867 F.3d 1076, 1078-79 (9th Cir. 2017); (ii) improperly screen a grievance, *Sapp*, 623 F.3d at 823; (iii) incorrectly instruct an incarcerated person about the grievance process, *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010); (iv) threaten to retaliate against a prisoner for filing a grievance, *McBride v. Lopez*, 807 F.3d 982 (9th Cir. 2015); (v) indefinitely delay in responding to a grievance, "particularly a time-sensitive one," *Brown v. Valoff*, 422 F.3d 926, 943 n.18 (9th Cir. 2005); or (vi) fail to adhere to the written grievance policy, *see, e.g.*, *Beltran-Ojeda v. Doe*, No. CV 12-1287-PHX-DGC, 2013 WL 6059242, at *6 (D. Ariz. Nov. 18, 2013) (holding that a plaintiff's failure to exhaust the grievance procedure was excused partly because Maricopa County "jail officials did not abide by their own internal

CORE/3502877.0004/160760201.1

1    regulations."). Each of these conditions exist here.

2            For example, Defendants claim that Plaintiffs Tequida and Ochoa did not properly

3    appeal their grievances. Doc. 28 at 23 n.9; Doc. 30 (Williams Decl.) ¶¶ 38-39, 46-47. But

4    in both instances, guards failed to provide each plaintiff a written denial or the yellow

5    carbon copy of the grievance needed for the next step of the appeal process. Ex. 10

6    (Tequida Supp. Decl.) ¶ 15; Ex. 4 (Ochoa Supp. Decl.) ¶ 14. This violates MCSO's

7    internal guidelines that (i) "detention personnel shall indicate . . . what action was taken;

8    sign his name, serial number, and note the date and time of the action," and (ii) a prisoner

9    "be given the yellow copy of the *Inmate Grievance Form*."[7] Doc. 30-1 at MCSO-

10   FENTY000003. Because any failure on the part of either Tequida or Ochoa to submit the

11   required yellow slip as part of their respective appeals arose because of MCSO

12   personnel's failure to adhere to its written policy, the appeals were unavailable.[8] *See*

13   *Beltran-Ojeda v. Doe*, 2013 WL 6059242, at *6.

14           Similarly, Defendants claim that Plaintiffs Scroggins and Ochoa failed to appeal

15   their grievance in a timely fashion. Doc. 30 (Williams Decl.) ¶¶ 38-39, 42-43. But both

16   Plaintiffs repeatedly asked for an Institutional Grievance Appeal form—in Scroggins'

17   case, almost 20 times—and jail staff delayed providing the appeal form or never provided

18   it at all.[9] Ex. 4 (Ochoa Supp. Decl.) ¶ 13; Ex. 7 (Scroggins Supp. Decl.) ¶ 16. Indeed, one

19   guard admitted to Ochoa that the reason for withholding the appeal forms was because

20   Estrella Jail was experiencing a backlog of inmate grievances. Ex. 4 (Ochoa Supp. Decl.)

21   ¶ 13. The failure to provide the requisite forms in a timely fashion (and sometimes, out of

22

23   [7] When Mr. Tequida first tried to hand his COVID-19 related grievance to a guard, the
     guard refused to sign or resolve the grievance. Ex. 10 (Tequida Supp. Decl.) ¶¶ 14-22.
24   This violated the requirement that Maricopa County jails' personnel attempt "to resolve
     all detention grievances . . . at the lowest possible level." Doc. 30-1 at MCSO-
25   FENTY000002. It also was an improper refusal to process Tequida's grievance. *Andres*,
     867 F.3d at 1078-79.

26   [8] Moreover, MCSO has allowed Tequida and Ochoa to proceed with their grievance, so
     the process has not yet ended, and Plaintiffs have continued to fulfill their requirements
27   under the grievance process.

28   [9] Plaintiff Scroggins also never received notice of his denial. Ex. 7 (Scroggins Supp.
     Decl.) ¶ 17.

order) violated MCSO Policy DJ-3 and impeded Plaintiffs Ochoa and Scroggins' efforts to exhaust their grievances.

Finally, at least one plaintiff has an intellectual disability that limits his ability to read and write, and several plaintiffs have expressed fear of retaliation for filing COVID-related grievances. Ex. 7 (Scroggins Supp. Decl.) ¶¶ 6, 18; Ex. 10 (Tequida Supp. Decl.) ¶ 22. In the Ninth Circuit, administrative remedies are rendered unavailable where either illiteracy or fear of retaliation are an obstacle to a prisoner fully exhausting his grievance. *See McBride*, 807 F.3d at 987 (holding that "the threat of retaliation for reporting an incident can render the prison grievance process effectively unavailable and thereby excuse a prisoner's failure to exhaust administrative remedies."); *Beltran-Ojeda*, 2013 WL 6059242, *10 (holding that plaintiff's failure to exhaust was excused where jail staff failed to make reasonable efforts to assist a prisoner who possessed a limited ability to read and write).

In sum, MCSO staff's actions consistently stymied Plaintiffs' reasonable and repeated efforts at fully exhausting their grievances and violated the jails' internal grievance procedure. Accordingly, Defendants rendered exhaustion unavailable. *Nunez*, 591 F.3d at 1224 (rendering exhaustion unavailable where the plaintiff "took reasonable and appropriate steps to exhaust his . . . claim and was precluded from exhausting, not through his own fault but by the Warden's mistake.").

### 3.    *Defendants' Lack An Emergency Grievance Procedure, Thereby Rendering Administrative Remedies Unavailable*

Courts have also found that when "a prisoner has been placed in imminent danger of serious physical injury by an act that violates his constitutional rights, administrative remedies that offer no possible relief in time to prevent the imminent danger from becoming an actual harm can't be thought available." *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010) (citations omitted); *id.* at 1174 ("If it takes two weeks to exhaust a complaint that the complainant is in danger of being killed tomorrow, there is no 'possibility of some relief' and so nothing for the prisoner to exhaust."). The lack of an

CORE/3502877.0004/160760201.1

expedited grievance procedure for responding to emergencies is sufficient for a court to find that an administrative remedy is unavailable. *See id.* at 1174-75; *McPherson v. Lamont*, 2020 WL 2198279, at *10 (D. Conn. May 6, 2020) (holding that administrative remedies were unavailable because the correctional facility lacked an emergency grievance process to quickly address COVID-19 related complaints); *Brown v. Valoff*, 422 F.3d 926, 943 n.18 (9th Cir. 2005) ("Delay in responding to a grievance, particularly a time-sensitive one, may demonstrate that no administrative process is in fact available."); *Karas v. Marciano*, 2017 WL 6816858, at *4 (C.D. Cal. Nov. 13, 2017), *report and recommendation adopted*, 2017 WL 6819460 (C.D. Cal. Dec. 29, 2017) ("When a prisoner submits a [grievance] but never receives a response thereto, the administrative remedies are 'rendered effectively unavailable by defendants' actions.'") (citation omitted).

Given how rapidly COVID-19 has already infected the population at the Maricopa County jails—1,274 confirmed cases of COVID-19, with 115 active cases in custody, and the number doubling in just one month—the need for an expedited procedure to address emergency COVID-19 grievances is painfully obvious.[10] Despite this, Defendants offer *no* emergency procedure. All the Prisoner Handbook states is: "If your complaint or grievance is of an emergency nature . . . the on duty [sic] shift supervisor will be advised and appropriate action will be taken." Doc. 30-1 at MCSO-FENTY000031. It does not require expedited action, outline the steps the jail will take to address emergency grievances, or place jail staff under any deadline to resolve emergencies. In other words, to the extent the jail offers up an "emergency procedure," it is in name only.

Policy DJ-3 is likewise lacking a substantive emergency protocol. At most, Policy DJ-3 offers up the vague assertion that "detention personnel shall take immediate action"

---

[10] Carissa Planalp, *Detention Officers Concerned About COVID-19 Risk in Maricopa County Jails*, 3TV/CBS 5 (July 20, 2020), https://cutt.ly/Na0nt3Z; COVID-19 in County Jails: COVID-19 Testing and Results, MARICOPA COUNTY DEPARTMENT OF CORRECTIONAL HEALTH SERVICES (accessed July 27, 2020), https://www.maricopa.gov/5574/COVID-19-in-County-Jails.

1   with respect to a grievance of an emergency nature. *Id.* at MCSO-FENTY000002. It offers

2   neither recourse for a prisoner to challenge the determination of whether a grievance is an

3   emergency, nor deadlines or steps for resolving the emergency.

4       Indeed, the standard grievance process outlined in Policy DJ-3 allows for upwards

5   of *125 days* before a grievance is fully exhausted. *Id.* at MCSO-FENTY000011-12. Given

6   that confirmed COVID-19 cases have multiplied more than 30,000 percent in just 60 days,

7   a typical 125-day exhaustion period (even if some are lucky enough to move faster) is

8   patently unreasonable, and the lack of an expedited procedure clearly makes Defendants'

9   administrative remedies unavailable in the face of the pandemic. *See McPherson*, 2020

10  WL 2198279, at *10 ("Although Defendants' point that not every grievance will require

11  105 business days to resolve is well taken, the imminent health threat that COVID-19

12  creates has rendered DOC's administrative process inadequate to the task of handling

13  Plaintiffs' urgent complaints regarding their health.").

14          4.    *The PLRA Does Not Apply To The Medically Vulnerable Pretrial*
                  *Subclass Seeking Habeas Relief*
15
16      The PLRA does not apply to Plaintiffs' 28 U.S.C. § 2241 habeas petition for the

17  medically vulnerable pre-trial plaintiffs. *See Ward v. Chavez*, 2009 WL 2753024, at *5

18  (D. Ariz. Aug. 27, 2009) (holding that the mandatory PLRA exhaustion requirement does

19  not apply to a § 2241 habeas corpus petition), *overruled on other grounds by Ward v.*

20  *Chavez*, 678 F.3d 1042 (9th Cir. 2012); Ex. 17 (*Torres v. Milusnic*, Case No. 2:20-cv-

21  4450-CBM-PVC, Doc. 45 (C.D. Cal. July 14, 2020)) ("Having found Petitioners assert a

22  proper habeas claim pursuant to § 2241 challenging the fact of their confinement, the

23  PLRA's limitations regarding prison release orders do not apply here."); *Wilson v.*

24  *Williams*, 961 F.3d 829, 839 (6th Cir. 2020) ("Because petitioners' claims are properly

25  brought under § 2241, the BOP's argument that the claims are foreclosed by the PLRA

26  fails. The PLRA does not apply in habeas proceedings.") (citing 18 U.S.C. § 3626(g)(2)).

27  Accordingly, there is no mandatory exhaustion requirement that would interfere with the

28  Court's jurisdiction over the claim for habeas relief. With respect to the remaining claims,

- 24 -

1   exhaustion is not required because administrative remedies are unavailable, as explained

2   above.

3          5.      *Prudential Exhaustion of the Habeas Claim Is Inapplicable*

4          For habeas claims, an "exhaustion requirement is prudential, rather than

5   jurisdictional." *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017); *Brown v. Rison*,

6   895 F.2d 533, 535 (9th Cir. 1990). Courts have discretion to waive compliance with the

7   exhaustion process when administrative remedies would be inadequate, futile, or pursuit

8   of them would cause irreparable injury. *Aleknagik Natives, Ltd. v. Andrus*, 648 F.2d 496,

9   499 (9th Cir. 1980); *Liang v. Ashcroft*, 370 F.3d 994, 1001-01 (9th Cir. 2004); *see also*

10  *Hernandez*, 872 F.3d at 988.

11         Here, any delay in judicial review would clearly result in irreparable injury.

12  Medically vulnerable prisoners are at high risk of serious illness or death should they

13  contract COVID-19, and they do not have the luxury of time; they need immediate relief.

14  *See McPherson*, 2020 WL 219827 at *7 ("Given the reality of the disease . . . the Court

15  concludes that exhaustion of state remedies would be futile, because, under current

16  conditions, Plaintiffs are at substantial risk of contracting the disease prior to completing

17  the exhaustion process."). The number of COVID-19 cases in the Maricopa County jails

18  continues to rise exponentially, which in itself demonstrates the abysmal inadequacy of

19  Defendants' COVID-19 measures.

20         Moreover, there are no administrative remedies—emergency or otherwise—

21  available to Plaintiffs that would result in the relief they seek. As confirmed by

22  Defendants' responses to Plaintiffs' grievances, there is no agency mechanism through

23  which the medically vulnerable plaintiffs can seek release, or even systematic reforms

24  short of release that could lead to an ability to socially distance and protect themselves

25  against the virus. As discussed above, the grievance processes Defendants describe are

26  fundamentally and woefully incapable of providing the quick and emergent relief

27  Plaintiffs seek. *See supra* Section II. Accordingly, because any attempts at exhaustion

28

- 25 -

1   would thus be futile, prudential exhaustion requirements are inapplicable in this case. *See*

2   *Ward*, 678 F.3d at 1045 (exhaustion may be waived if administrative remedies would be

3   futile).

4           B.      *Plaintiffs Are Not Required to Exhaust State Court Remedies to Pursue*
                    *§2241       Habeas Relief*
5

6           Defendants argue that Plaintiffs' request for habeas relief should be denied because

7   they have not fully exhausted state court remedies and, further, that the Court should

8   abstain from hearing their habeas claim. Given the emergent nature of this action,

9   consistent with Ninth Circuit authority, this Court should consider Plaintiffs' habeas claim

10  because of the harms inherent with delays associated with the process of going through

11  state court procedures.

12          At the outset, Defendants' arguments about post-conviction Plaintiffs are

13  misplaced. Plaintiffs currently seek habeas relief *only* on behalf of members of the pretrial

14  medically vulnerable subclass. *See* Doc. 1 (Complaint) at 41:12. Thus, Plaintiffs' habeas

15  claim is governed by 28 U.S.C. § 2241, which gives "the district courts" the power to

16  grant a writ of habeas corpus where a prisoner is not in custody pursuant to a court

17  judgment. 28 U.S.C. § 2241(a), (c).

18          While under certain circumstances, the Ninth Circuit has held that "as a prudential

19  matter" people seeking habeas relief should "exhaust available judicial and administrative

20  remedies before seeking relief under § 2241," *Castro-Cortez v. I.N.S.*, 239 F.3d 1037,

21  1047 (9th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548

22  U.S. 30 (2006) (citations omitted),[11] it has never held that exhaustion is always required

23  _____

24  [11] That usually means "state prisoners must give the state courts one full opportunity to
    resolve any constitutional issues by invoking one complete round of the State's
    established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

25  Where the case does not carry a capital or life sentence, one complete round of Arizona's
    review process is satisfied by the review of an Arizona appellate court and does not

26  require review by the Arizona Supreme Court. *Kyzar v. Ryan*, 780 F.3d 940, 947 (9th Cir.
    2015); *see also Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999). In order to fairly

27  present the constitutional claims for purposes of exhaustion, an individual must describe
    the operative facts and specific federal legal theory to the state appellate court. *Lyons v.*

28  *Crawford*, 232 F.3d 666, 669 (9th Cir. 2000), *amended on other grounds*, 247 F.3d 904

- 26 -

1   under § 2241. And in *White v. Lambert*, 370 F.3d 1002, 1008 (9th Cir. 2004), the Ninth

2   Circuit expressly recognized § 2241 does not *require* exhaustion: "If we were to allow

3   White to proceed under 28 U.S.C. § 2241, he would not be subject to . . . state court

4   exhaustion requirements." That makes sense because exhaustion is not jurisdictional; it is

5   instead a matter of comity. Courts "have discretion to waive [this] prudential

6   requirement." *Laing v. Ashcroft*, 370 F.3d 994, 998 (9th Cir. 2004); *Lindquist v. Gardner*,

7   770 F.2d 876, 877 (9th Cir. 1985). They should do so when state court judicial remedies

8   are inadequate or futile, or where irreparable injury would result from going through the

9   process. *Acevedo-Carranza v. Ashcroft*, 371 F.3d 539, 541-42, n.3 (9th Cir. 2004). When

10  exhaustion "only create[s] an unnecessary impediment to the prompt determination of an

11  individuals' rights[,]" it is futile. *Sweet v. Cupp*, 640 F.2d 233, 236 (9th Cir. 1981). Here,

12  Plaintiffs' rights are unnecessarily impeded by lengthy state court proceedings. This is

13  particularly true when the subclass of Plaintiffs seeking habeas relief, all of whom are

14  medically vulnerable, face irreparable harm and a risk of death from COVID-19, which

15  increases with every passing moment of confinement. Ex. 11 (Cohen Supp. Decl.) ¶ 3.

16        The Supreme Court's holding in *Younger*, from which the exhaustion doctrine is

17  derived, does not compel a different result. The decision to invoke *Younger* abstention

18  turns on whether the state proceedings provide a meaningful opportunity to raise

19  constitutional claims. *Moore v. Sims,* 442 U.S. 415, 430 (1979). The Court has recognized

20  that there must be exceptions to *Younger* abstention when there is irreparable injury that is

21  both great and immediate or where another extraordinary circumstance is shown. *Younger*

22  *v. Harris*, 401 U.S. 37, 45-46 (1971); *Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 621

23  (9th Cir. 2003). COVID-19 presents such an irreparable harm because of the

24  unprecedented and extraordinary risks it poses to the medically vulnerable who have a

25  high risk of contracting and dying from the disease. Ex. 11 (Cohen Supp. Decl.) ¶ 3.

26        In any event, courts have held that *Younger* does not apply when, like here, there is

27  _____

28  (9th Cir. 2001).

- 27 -

1    no pending state court proceeding and the underlying question before the Court is whether

2    the Plaintiffs have exhausted their state court remedies. *See Mays v. Dart*, 2020 WL

3    1812381, at *7 (N.D. Ill. Apr. 9, 2020). Because Plaintiffs are not challenging their

4    underlying charges, but are rather seeking release so that they can be safe pending

5    resolution of their state court claims, the question is about exhaustion, and not the

6    underlying state court proceeding. So *Younger* does not apply.

7           Finally, while Defendants suggest that Plaintiffs may have filed motions to modify

8    release conditions pursuant to Arizona Rule of Criminal Procedure 7.2 and A.R.S. § 13-

9    3967, this is not on point. Neither of these statutes expressly provide that people may

10   modify their release conditions on the basis of medical vulnerability, nor do these statutes

11   contemplate people raising specific constitutional violations as a basis to modify their

12   release conditions. Nor do they contemplate class-wide relief. Indeed, A.R.S. § 13-3967

13   lists categories of information that must be taken into account when determining whether

14   and how to release an incarcerated person, however, none of these categories capture the

15   basis of the claims raised in this lawsuit. Accordingly, these bail statutes do not entitle

16   Plaintiffs to a meaningful opportunity to present their state claims and exhaust state

17   remedies.

18   **IV.   PLAINTIFFS' CONSTITUTIONAL AND STATUTORY RIGHTS ARE**

19         **BEING VIOLATED**

20         *A.    Plaintiffs' Fourteenth Amendment Rights Are Being Violated*

21           Defendants claim that their "legitimate non-punitive interest in the effective

22   management of the[] jails" excuses their many failures. Doc. 28 at 34. First, Defendants'

23   failure to ensure safe conditions is plainly sufficient to establish unconstitutional

24   punishment. *See Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (holding a punitive

25   condition exists where "the challenged restrictions serve an alternative, non-punitive

26   purpose but are nonetheless excessive in relation to the alternative purposes, . . . or are

27   employed to achieve objectives that could be accomplished in so many alternative and

28   less harsh methods.") (citations and quotation marks omitted).

- 28 -

1        In any event, there is no need to balance Plaintiffs' unconstitutional punishment

2   with the government's interest. No matter the legitimate interests Defendants have in the

3   effective management of their jails, they do not have an interest in operating facilities that

4   violate public health guidelines and place their incarcerated population at serious risk of

5   substantial harm. Notably, Defendants fail to explain how altering conditions to meet

6   public health guidelines would detract from their interest in effectively managing the

7   conditions at the jails. Changes in the conditions at the jails combined with the release of a

8   subset of members of the Medically Vulnerable and Disability Subclasses would help to

9   ensure the presence of incarcerated persons at trial. These changes would help to

10  minimize the risk to the Pretrial Subclass of contracting COVID-19, thereby increasing

11  the likelihood that they would be healthy and able to attend trial. *See* Doc. 14 (Motion) at

12  19. They would also reduce the risks of Defendants' own staff growing so ill that they

13  cannot carry out their duties, thereby compromising security and safety at the jail

14  facilities.

15       Defendants' arguments as to deliberate indifference fare no better. Defendants first

16  claim that omissions are insufficient to give rise to deliberate indifference. This ignores

17  the long line of Ninth Circuit precedent deeming inaction to constitute deliberate

18  indifference. *See, e.g., Edmo v. Corizon, Inc*., 935 F.3d 757, 793-95, n. 43 (9th Cir. 2019)

19  (upholding deliberate indifference finding despite evidence of "extensive treatment over a

20  period of years" because "it stopped short of what was medically necessary"). Indeed, "it

21  is enough that the official acted or failed to act despite [the official's] knowledge of a

22  substantial risk of serious harm." *Farmer v. Grennan*, 511 U.S. 825, 842 (1994) (citation

23  omitted). Here, Defendants do not dispute that they are aware of the severe risks

24  associated with COVID-19, as evidenced by their own policies, however inadequate those

25  policies may be. Thus, their failure to act here constitutes deliberate indifference.

26       Defendants next argue that there must be an intentional decision ***for purposes of***

27  ***punishment***. Doc. 28 at 36. Yet that is not the standard for assessing objective

28  reasonableness. By Defendants' own admission, Plaintiffs need only show: (1) an

- 29 -

1   intentional decision about conditions of confinement; (2) which puts Plaintiffs at

2   substantial risk of suffering serious harm; (3) with Defendants not taking "reasonable

3   available measures to abate that risk, even though a reasonable officer in the

4   circumstances would have appreciated the high degree of risk involved—making the

5   consequences of the defendant's conduct obvious"; and (4) by "not taking such measures

6   the defendant caused the plaintiff's injuries." *Castro v. Cty. of Los Angeles*, 833 F.3d

7   1060, 1071 (9th Cir. 2016) (footnote omitted).

8         Plaintiffs have demonstrated every element. *First*, in failing to take measures

9   consistent with public health guidelines, Defendants have made an intentional decision

10  regarding Plaintiffs' conditions of confinement. *Second*, Plaintiffs are at a substantial risk

11  of suffering serious harm. By the time that Plaintiffs filed their application for a temporary

12  restraining order, 565 persons at the Maricopa County jails tested positive for COVID-19.

13  Doc. 28 at 6. Just weeks later that number has escalated to 1,274.[12] *Third*, Defendants

14  have not taken reasonably available measures to abate this risk. As set forth in Plaintiffs'

15  application, there are a myriad of measures that Defendants should take in abating the

16  risks of COVID-19 in the Maricopa County jails. Doc. 14 at 23-24. For example,

17  Defendants could immediately release persons identified in this motion, but they have

18  failed to do so. *Finally*, Defendants' failure to take these measures is causing irreparable

19  harm. For instance, Plaintiff Ochoa has since tested positive for COVID-19 since the

20  filing of the motion. Ex. 4 (Ochoa Suppl. Decl.) ¶ 4. Thus, Plaintiffs are likely to succeed

21  on the merits of their deliberate indifference claim under the Fourteenth Amendment.

22        Defendants argue that, to the extent they are not complying with their written

23  policies (which are inadequate in their own right), these instances are isolated and

24  sporadic. Doc. 28 at 36-37. But in the Ninth Circuit, even when an allegedly adequate

25  written policy is in place, a party's actual practices can nevertheless create

26

---

27  [12] *See* COVID-19 in County Jails: COVID-19 Testing and Results, MARICOPA COUNTY
    DEPARTMENT OF CORRECTIONAL HEALTH SERVICES (accessed July 29, 2020),
28  https://www.maricopa.gov/5574/COVID-19-in-County-Jails.

CORE/3502877.0004/160760201.1

unconstitutional conditions of confinement. *See Orantes-Hernandez v. Holder*, 321 Fed.

App'x 625, 628 (9th Cir. 2009) ("The government's insistence that the existence of its

forms and policies alone obviates the need for the injunction misses the point. *Orantes I,*

*II, and III* make it clear that the injunction seeks to remedy the government's actual

practices, not just its policies on paper."); *Parsons v. Ryan*, 289 F.R.D. 513, 520-21 (D.

Ariz. 2013) ("Defendants' oft-repeated contention that Plaintiffs' allegations are

inconsistent with [Arizona Department of Corrections] policies misunderstands the

substance of Plaintiffs' claims. Plaintiffs' claim is that despite ADC stated policies, the

actual provision of health care in its prison complexes suffers from systemic deficiencies

that rise to the level of deliberate indifference." (emphasis in original)), *aff'd*, 754 F.3d

657 (9th Cir. 2014); *Unknown Parties v. Johnson*, 163 F. Supp. 3d 630, 637-40 (D. Ariz.

2016) (recognizing that detained immigrants' claims regarding conditions of confinement

could "result from Defendants' stated policies or from their alleged failure to create or

adhere to those policies"); *Jones v. City & Cnty. of San Francisco*, 976 F.Supp. 896, 908-

909 (N.D. Cal. 1997) ("In determining whether to find deliberate indifference in this

case, the Court cannot restrict its examination to whether defendants made substantial

efforts to improve safety, thereby excluding any consideration of whether the

improvements have actually left inmates reasonably safe from fire. If the Court took such

a narrow view, the protections of the Fourteenth Amendment would become arbitrary and

have little relationship to the inmates' current conditions of confinement.").

Defendants sidestep this argument, stating instead that there is no pattern or

practice of unconstitutional confinement. But they ignore the consistency with which

Plaintiffs are experiencing Defendants' failure to implement the policies. Plaintiffs are

incarcerated across each of Maricopa County's five jails. Yet their experiences with

Maricopa County's staff is near identical. Each Plaintiff has been forced to live in

crowded jail cells or dorms without social distancing, attend meals herded together in

large groups, use common areas that are not sanitized, clean their cells with limited

cleaning supplies and no gloves (and, in some instances, lack cleaning supplies for their

1   cells altogether), and use PPE over and over again that is far from sanitary. The regularity

2   with which each of the Plaintiffs has experienced Defendants' departures from their own

3   written policies evinces a "persistent and widespread" custom and practice to warrant

4   *Monell* liability. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quotation marks and

5   citations omitted). That there is a widespread outbreak of COVID-19 cases at the

6   Maricopa County jails is only further evidence of this practice.

7          B.   *Defendants are Violating Plaintiffs' Eighth Amendment Rights*

8          Defendants concede COVID-19 is an extremely serious threat to both prisoners and

9   staff. *See,* Doc. 28 at 6-17; Doc. 34 (Phillips Decl.) ¶¶ 6, 11-13. Sadly, COVID-19 has

10  already claimed the life of at least one MCSO officer—likely two.[13] Yet the risk of

11  COVID-19 is higher for prisoners, as detention officers purportedly receive enhanced

12  cleaning of their staff work areas and vehicles, education, and PPE, none of which is true

13  for prisoners. Doc. 29 (Roska Decl.) ¶¶ 33, 47, 65, 68.

14         Defendants hide behind the subjective component of the Eighth Amendment

15  deliberate indifference standard to justify their inaction. But "an Eighth Amendment

16  claimant need not show that a prison official acted or failed to act believing that harm

17  actually would befall an inmate." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Plaintiffs

18  must merely show that Defendants "ignore[d] a condition of confinement that is sure or

19  very likely to cause serious illness and needless suffering" even if "the complaining

20  inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33

21  (1993).

22         Here, Plaintiffs satisfy the test. Defendants' actions in the face of COVID-19

23  exhibit quintessential subjective deliberate indifference. On the one hand, having enacted

24  a policy meant to target the spread of COVID-19 in the Maricopa County jails,

25  Defendants cannot dispute that they are aware "of a condition of confinement that is sure

26

27  [13] https://www.azfamily.com/news/two-maricopa-county-sheriff-officers-have-died-one-tested-positive-for-covid-19-family-says/article_312bc792-bfde-11ea-94c4-0b6be0e82180.html.

28

- 32 -

1   or very likely to cause serious illness and needless suffering." But on the other hand,

2   having failed to take meaningful actions that are consistent with the provisions of the

3   policy, Defendants have "ignored" these grave conditions.

4       C.      *Defendants are Violating Plaintiffs' ADA and Rehabilitation Act Rights*

5       Defendants' cursory challenge to Plaintiffs' claims under the Americans with

6   Disabilities Act (ADA) and Section 504 of the Rehabilitation Act ("Section 504") is

7   unavailing. Defendants' misunderstanding of their obligations under disability rights laws

8   underscores their failure to comply with its affirmative obligations to avoid deadly

9   disability discrimination.

10      Defendants' chief challenge to Plaintiffs' disability claims is the assertion that in

11  order to show discrimination "by reason of" disability, Plaintiffs must prove intentional,

12  subjective discrimination based on disability. *See* Doc. 28 at 40-41. The Ninth Circuit

13  squarely rejected this argument in *McGary v. City of Portland,* 386 F.3d 1259, 1265-66

14  (9th Cir. 2004). "A plaintiff need not allege either disparate treatment or disparate impact

15  in order to state a reasonable accommodation claim." *Id.* A defendant's failure to provide

16  reasonable accommodations is sufficient to demonstrate discrimination "by reason of

17  disability." *Id.*; *see also id.* at 1266-67 (noting that "the crux of a reasonable

18  accommodation claim is a facially neutral requirement that is consistently enforced" and

19  concluding that the "district court's suggestion that *un* equal treatment is required to state

20  a reasonable accommodation claim eviscerates this fundamental purpose of the ADA");

21  *Ahlman v. Barnes*, WL 2754938, at *12 (C.D. Cal., May 26, 2020); *Olmstead v. Zimring*,

22  527 U.S. 581, 598 (1999); *Cooley v. City of Los Angeles*, 2019 WL 3766554, at *5 (C.D.

23  Cal. Aug. 5, 2019); *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002).

24      The Disability Subclass members are not simply challenging the adequacy of the

25  treatment that they are receiving. Rather, they are seeking reasonable modifications to

26  enjoy equal access to the Maricopa County jails' services, programs, and activities,

27  including medical care, meals, and rehabilitative programming. *See* Doc. 1 (Complaint) ¶

28  203. By forcing Disability Subclass members to make an impossible choice between

- 33 -

1    either receiving medical care through pill call and facing an unacceptable risk of serious

2    illness or death through COVID-19 exposure; or foregoing necessary medical treatment to

3    limit COVID-19 risk, the jails are failing to make necessary modifications to avoid

4    disability discrimination.

5         Defendants are failing to meet their "affirmative obligations" to ensure equal

6    access and nondiscrimination for people with disabilities, obligations which include

7    making reasonable modifications and ensuring that the jails' methods of administration

8    are nondiscriminatory. 28 C.F.R. §§ 35.130(a), (b)(7)(i), (b)(2)(i)-(ii); *see also Fraihat v.*

9    *U.S. Immigration and Customs Enforcement*, 2020 WL 1932570, at *26 (C.D. Cal. Apr.

10   20, 2020); *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 266, 269 (D.D.C. 2015).

11        Defendants' reliance on *Turner v. Safely*, 482 U.S. 78 (1987) is unavailing. The

12   Supreme Court opinions effectively overruled *Turner's* application to ADA and

13   Rehabilitation Act claims. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210

14   (1998) ("The text of the ADA provides no basis for distinguishing these programs,

15   services, and activities from those provided by public entities that are not prisons.");

16   *Johnson v. California*, 543 U.S. 499 (2005) (refusing to analyze incarcerated plaintiffs'

17   claims of racial discrimination under *Turner*).

18        Even if *Turner* applied, it does not create a broad cover for any and all disability

19   discrimination as Defendants assert, and all four *Turner* factors favor Plaintiffs. First,

20   there is no "valid rational connection" between a policy of putting disabled incarcerated

21   people at heightened risk of severe illness or death and any legitimate governmental

22   interest. Second, there are no alternate means for disabled incarcerated people to exercise

23   their right to avoid severe illness or death while locked in the jails, except for the jails to

24   make reasonable modifications as requested. Third, the impact of the requested

25   modifications would be to make the jails *safer* for others in the jails. Moreover,

26   Defendants' cursory claim that providing the requested modifications would "undoubtedly

27   result in financial and administrative burdens" does not approach the showing they must

28   make to raise a defense of undue financial burden. A statement that a modification "would

- 34 -

1    undoubtedly" be a burden, without any factual support, and without the detailed written

2    analysis required by the regulations, is meritless. *See* 28 C.F.R. § 35.164 ("where

3    personnel of the public entity believe that the proposed action would … result in undue

4    financial or administrative burden, *a public entity has the burden* of proving that

5    compliance with this subpart would result in such … burdens. The decision that

6    compliance would result in such … burdens must be made *by the head of the public entity*

7    or his or her designee *after considering all resources* available for use in the funding and

8    operation of the service, program, or activity, *and must be accompanied by a written*

9    *statement of the reasons for reaching that conclusion.*"). Further, the jails release people

10   every day. A requested modification that an entity already undertakes or purports to

11   undertake cannot fundamentally alter that entity. *Cf. Henrietta D. v. Bloomberg*, 331 F.3d

12   261, 281 (2d Cir. 2003) ("[t]he reasonableness of the modifications that plaintiffs seek …

13   is evidenced by the fact that virtually all are modifications that defendants have long

14   purported … to provide") (quoting *Henrietta D. v. Giuliani*, 119 F. Supp. 2d, 181, 208

15   n.17 (E.D.N.Y. 2000)). Fourth, the jails' apparent policy of refusing to provide

16   modifications for people with disabilities to avoid severe illness or death and to participate

17   equally in the jails' programs is plainly an "exaggerated" response to the necessities of

18   running a jail– indeed this policy is entirely untethered to any governmental interest or

19   concern.

20   **V.     PLAINTIFFS ARE SUFFERING IRREPARABLE HARM**

21           Defendants dismiss Plaintiffs' evidence of irreparable harm, arguing that it is not a

22   question of whether COVID-19 is dangerous, but "whether Plaintiffs have shown they

23   will suffer irreparable injuries even after accounting for the measures" at the Maricopa

24   County jails. Doc. 22 at 47 (citing *Valentine v. Collier*, 956 F.3d 797, 804 (5th Cir.

25   2020)). Plaintiffs agree. Even accounting for measures that *might* be taken at the Maricopa

26   County jails, there is no safe means to incarcerate medically vulnerable people in

27   congregate detention facilities during the COVID-19 pandemic, and the Medically

28   Vulnerable and Disability Subclasses have clearly shown that they are at a heightened risk

of serious illness or even death as a result. Doc. 12 (Cohen Decl.) ¶¶ 4, 6-14, 88; Ex. 11 (Cohen Supp. Decl.) ¶ 3. But in addition, Defendants' facially inadequate "measures", coupled with a failure to implement them, puts all Plaintiffs at an even greater risk of contracting COVID-19. Plaintiffs presented the declaration of Dr. Robert Cohen, a medical doctor with over thirty years of expertise in the care of incarcerated persons. Doc. 12 (Cohen Decl.) ¶ 1. He opined that "there are several issues specific to the Maricopa County jails that contribute to an excessive risk of harm associated with COVID-19." *Id.* ¶ 33. These conditions include: (1) insufficient testing of incarcerated persons, *id.* ¶¶ 19-25, (2) insufficient efforts to mitigate the risks to the medically vulnerable, *id.* ¶¶ 26-33, (3) inadequate protections, screening and social distancing during booking, *id.* ¶¶ 34-36, (4) inadequate social distancing at the jails, *id.* ¶¶ 37-44, (5) inadequate procedures for quarantining possible cases and treating positive cases, *id.* ¶¶ 44-49, (6) failure to make personal protective equipment, cleaning supplies, and sanitization available, *id.* ¶¶ 50-54, and (7) to provide adequate information and education. *Id.* ¶ 56. The conditions currently plaguing the Maricopa County jails create a heightened—and perhaps unmitigated—risk of contracting COVID-19. Critically, Defendants do not refute, let alone mention, Dr. Cohen's declaration. Thus, it is undisputed that Plaintiffs will continue to experience irreparable harm on Defendants' watch.

Seeming to recognize this fact, Defendants pivot, stating that Plaintiffs "only generally assert[] that everyone is at risk of infection unless they are granted relief." Doc. 28 at 47. But for some, the irreparable harm has already materialized. To include but one example, at the time that Plaintiffs filed their motion, Plaintiff Ochoa stated that she was "scared of contracting COVID-19 because if someone had the virus here, it would spread to everyone due to the crowded conditions and lack of precautions taken by the jail." Doc. 8-1 (Ochoa Decl.) ¶ 2. Since filing the motion, Ms. Ochoa's worst fears have come true: she—and the majority of her dorm—tested positive for COVID-19 and is currently housed in a unit for incarcerated people who tested positive for COVID-19. Ex. 4 (Ochoa Supp. Decl) ¶ 4. This is not surprising given the rapid spread of COVID-19 across the

- 36 -

1    jails. On June 16, 2020, the day Plaintiffs filed the complaint, there were 313 COVID-19

2    positive persons at the jails. Doc. 1 (Complaint) at 1. Within weeks, when Plaintiffs filed

3    their temporary restraining order, that number jumped to 565. Doc. 14 at 1. Now that

4    number is 1,274.[14] Thus, whether generalized or specific, Plaintiffs have clearly

5    established irreparable harm as a result of Defendants' practices.

6    **VI.    THE BALANCE OF THE EQUITIES ARE IN PLAINTIFFS' FAVOR**

7            With respect to the balance of the equities, Defendants' argument amounts to

8    nothing more than courts should never intervene in jail administration. But courts across

9    the country have recognized the need for judicial action to release certain medically-

10   vulnerable persons in light of the rate at which COVID-19 has infected incarcerated

11   populations. *See, e.g.*, Ex. 16 (*Martinez-Brooks v. Carvjal*, No. 3:20-cv-00569-MPS (D.

12   Conn. May 12, 2020), Doc. 30 (granting TRO which authorized a process to allow for

13   release and/or enlargement of incarcerated persons)); Ex. 17 (*Torres v. Milusnic*, No. CV

14   20-4450-CBM-PVC(x) (C.D. Cal. July 14, 2020), Doc. 45 (granting preliminary

15   injunction to allow for compassionate release of certain incarcerated persons)). Courts

16   have also required detention facilities to change their COVID-19 policies to be consistent

17   with recommendations from public health experts. *See, e.g.*, *Urdaneta v. Keeton*, 2020

18   WL 2319980 (D. Ariz. May 11, 2020); Doc. 8-1 (Exhibit 23, *Mendoza v. Barr*, No CV-

19   20-00514-PHX-SPL (MTM) (D. Ariz. June 16, 2020)). The situation at the Maricopa

20   County jails is dire. And because Defendants have failed to take adequate steps to protect

21   their incarcerated population, the balance of the equities favor judicial action.

22   **VII.   THE COURT HAS AUTHORITY TO ORDER RELEASE**

23           Defendants claim "the Court does not have authority to issue a release order"

24   because Petitioners are challenging the conditions of their confinement. Doc. 28 at 24-25.

25   Defendants are wrong. First, 28 U.S.C. § 2241(c)(3) expressly empowers the Court to

26

27   ───────────────
     [14] *See* COVID-19 in County Jails: COVID-19 Testing and Results, MARICOPA COUNTY
     DEPARTMENT OF CORRECTIONAL HEALTH SERVICES (accessed July 29, 2020),
28   https://www.maricopa.gov/5574/COVID-19-in-County-Jails.

                                      - 37 -

1   order the release of people who are held "in violation of the Constitution or laws or

2   treaties of the United States." 28 U.S.C. § 2241(c)(3). So "[t]he fact that Petitioners'

3   claims require consideration of detention conditions does not necessarily preclude habeas

4   corpus review." *Urdaneta v. Keeton*, 2020 WL 2319980, at *6. In any event, whatever

5   change in conditions Defendants may undertake, there is no set of conditions that would

6   allow members of the Medically Vulnerable and Disability Subclasses to be housed safely

7   at the jails, thereby violating their constitutional rights. "Because Petitioners contend there

8   are not set of conditions of confinement that could be constitutional," "Petitioners

9   challenge the fact of their confinement." Ex. 17 (*Torres v. Milusnic*, No. CV 20-4450-

10  CBM-PVC(x) (C.D. Cal. July 14, 2020)) Doc. 45 at 14; *see also Wilson v. Williams*, 961

11  F.3d at 837-838 (petitioners' claims were properly brought under § 2241 where they

12  alleged there are no conditions of confinement sufficient to prevent irreparable

13  constitutional); *Martinez-Brooks v. Easter*, --F. Supp. 3d--, No. 3:20-cv-00569, 2020 WL

14  2405350, at *16 (D. Conn. May 12, 2020) (petitioners' claim was a proper habeas claim

15  because they "contend[ed] that the fact of their confinement in prison itself amounts to an

16  Eighth Amendment violation under these circumstances, and nothing short of an order

17  ending their confinement . . . will alleviate that violation.") (footnote omitted); *Malam v.

18  Adducci*, --F. Supp. 3d--, No. 20-10829, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5,

19  2020) (noting "where a petitioner claims no set of conditions would be sufficient to

20  protect her constitutional rights, her claim should be construed as challenging the fact, not

21  conditions, of her confinement and is therefore cognizable in habeas").

22          In addition, Defendants do not address that Plaintiffs may be released, or their

23  custody may be enlarged, under section 1983 where the unconstitutional conditions do not

24  relate to "overcrowding". Members of the Medically Vulnerable Subclasses are

25  incarcerated in conditions that expose them to an unacceptable risk of harm from COVID-

26  19 infection, and "the courts have a responsibility to remedy the resulting Eighth

27  Amendment violation." *See Brown v. Plata*, 563 U.S. 493, 511 (2011) (citation omitted).

28  The only remedy that will cure the violation for these subclasses is release or enlargement.

- 38 -

1    Accordingly, the Court should order the immediate release of the medically

2    vulnerable and disabled who are incarcerated merely due to their inability to pay a

3    financial condition of release. Moreover, the Court should order the parties to engage in a

4    process to identify and release additional members of the Medically Vulnerable and

5    Disability Subclasses followed by a hearing to evaluate the deprivation of the individual's

6    federal rights and the risk that release and/or enlargement would pose to others, as set

7    forth in Plaintiffs' proposed order. *See* Doc. 14-1 (Proposed Order).

8    **VIII.   <u>CONCLUSION</u>**

9    This is a matter of life and death. Swift relief is needed.

10   ///

11   ///

12   ///

1   DATED: July 30, 2020                                Respectfully submitted,

2                                                       **STINSON LLP**

3                                                       */s/ Larry Wulkan*
                                                         Larry J. Wulkan (021404)
4                                                       **STINSON LLP**
                                                         Firm Identification Number 00462400
5                                                        1850 North Central Avenue, Suite 2100
                                                         Phoenix, Arizona 85004-4584
6                                                        Telephone: (602) 279-1600
                                                         Fax: (602) 240-6925
7                                                        Email: larry.wulkan@stinson.com

8                                                       **ETHAN J. SANDERS\*** (MO 71151)
                                                        (ethan.sanders@stinson.com)
9                                                       **STINSON LLP**
                                                        1201 Walnut Street, Suite 2900
10                                                      Kansas City, MO 64106
11                                                      Telephone: (816) 691-2628

12                                                      **SHARI ROSS LAHLOU** (*Admitted Pro*
                                                        *Hac Vice*) (shari.lahlou@dechert.com)
13                                                      **DECHERT LLP**
14                                                      1900 K Street, N.W.
                                                        Washington, DC 20006 - 1110
15                                                      Telephone: (202) 261-3300

16
                                                        **PAT ANDRIOLA** (*Admitted Pro Hac*
17                                                      *Vice*) (pat.andriola@dechert.com)
                                                        **TIMOTHY LY\*** (NY SBN 5478540)
18                                                      (timothy.ly@dechert.com)
19                                                      **DECHERT LLP**
                                                        Three Bryant Park, 1095 Avenue of the
20                                                      Americas
                                                        New York, NY 10036
21                                                      Telephone: (212) 698-3500
22
                                                        **BENJAMIN M. SADUN** (*Admitted Pro*
23                                                      *Hac Vice*) (benjamin.sadun@dechert.com)
                                                        **ALLISON OZUROVICH** (*Admitted Pro*
24                                                      *Hac Vice*) (allie.ozurovich@dechert.com)
                                                        **DECHERT LLP**
25                                                      633 West 5th Street, Suite 4900
26                                                      Los Angeles, CA 90071
                                                        Telephone: (213) 808-5700
27

28

CORE/3502877.0004/160760201.1

**JARED G. KEENAN** (SBN 027068)
(jkeenan@acluaz.org)
**CASEY ARELLANO** (SBN 031242)
(carellano@acluaz.org)
**ACLU FOUNDATION OF ARIZONA**
P.O. Box 17148
Phoenix, AZ 85011
Telephone: (602) 650-1854

**OLGA AKSELROD** (*Admitted Pro Hac
Vice*) (oakselrod@aclu.org)
**ERIC BALABAN** (*Admitted Pro Hac
Vice*) (ebalaban@aclu.org)
**ZOE BRENNAN-KROHN** (*Admitted
Pro Hac Vice*) (ZBrennan-
Krohn@aclu.org)
**HUGH HANDEYSIDE** (*Admitted Pro
Hac Vice*) (hhandeyside@aclu.org)
**CLARA SPERA** (*Admitted Pro Hac
Vice*) (cspera@aclu.org)
**SOMIL TRIVEDI** (*Admitted Pro Hac
Vice*) (strivedi@aclu.org)
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10014
Telephone: (212) 549-2569

915 15th St. NW, 7th Floor
Washington, DC 20005
Telephone: (202) 393-4930

39 Drumm Street
San Francisco CA 94111
Telephone: (415) 343-0769

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2020, I caused the foregoing document to be filed electronically with the Clerk of the Court through ECF, and served the counsel of record via the Court's CM/ECF System.


*/s/ Cynthia Fischer*                                    

CORE/3502877.0004/160760201.1