MGD

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Jason Fenty, et al.,

　　　　　　　　Plaintiff,

v.

Paul Penzone, et al.,

　　　　　　　　Defendants.

No.　CV 20-01192-PHX-SPL (JZB)

**ORDER**

On June 16, 2020, Plaintiffs/Petitioners Jason Fenty, Brian Stepter, Douglas Crough, Edward Reason, Jesus Tequida, Ramon Aveenenti, Anthony Scroggins, Dale Perez, and Tamara Ochoa, who are each confined in a Maricopa County Jail, and the Puente Human Rights Movement (hereafter, "Plaintiffs"), filed a "Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief" (hereafter, "Complaint"). (Doc. 1.)  Pending before the Court is Plaintiffs' Ex Parte Application for Temporary Restraining Order (TRO) (Doc. 14), which the Court has construed as a request for injunctive relief.  Also pending is Defendants/Respondents' (hereafter, "Defendants") Motion to Dismiss filed as part of their Response to Plaintiffs' request for injunctive relief. (Doc. 32.)

**I.　Complaint**

Plaintiffs allege in their Complaint that six of them have underlying medical conditions that make them vulnerable to severe adverse consequences if they contract COVID-19 while in jail and that one Plaintiff has contracted COVID-19 but has received

inadequate medical care.[1]  (Doc. 1.)  Plaintiffs bring this case as a putative class action on behalf of two proposed classes: (1) a Pretrial Class, which includes a Pretrial Medically Vulnerable subclass and a Pretrial Disability subclass; and (2) a Post-Conviction Class, which includes a Post-Conviction Medically Vulnerable subclass and a Post-Conviction Disability subclass.[2]  (*Id.* ¶¶ 22-31.)

Six Plaintiffs—Jason Fenty, Dale Perez, Anthony Scroggins, Brian Stepter, Douglas Crough, and Tamara Ochoa—are pretrial detainees seeking to represent the Pretrial Class and several of them seek to represent the Pretrial Medically Vulnerable subclass, which is defined as all current and future detainees who are 50 years or older and those of any age with conditions that place them at heightened risk of severe illness or death from COVID-19, such as lung disease, heart disease, chronic liver or kidney disease, diabetes, hypertension, compromised immune systems, developmental disability, severe obesity, and moderate to severe asthma.  (*Id.* ¶¶ 23-26.)  In addition, Fenty, Stepter, Crough, and Scroggins also seek to represent the Pretrial Disability subclass because all are over 50 years old and have disabilities that put them at increased risk of serious illness or death if they contract COVID-19.[3]  (*Id.* ¶¶ 25-26.)  Three Plaintiffs—Edward Reason, Jesus Tequida, and Ramon Aventi—are post-conviction prisoners and seek to represent the Post-Conviction Class, with Reason and Tequida seeking to represent both the Post-Conviction Medically Vulnerable subclass and the Post-Conviction Disability subclass.[4]

---

[1] COVID-19, a disease caused by a novel strain of coronavirus (SARS-CoV-2), was declared a global pandemic by the World Health Organization on March 11, 2020.  *See Timeline: WHO's COVID-19 response*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline#! (last accessed Aug. 4, 2020).

[2] Plaintiffs' Motion to Certify Class (Doc. 11) is also pending before the Court and will be addressed in a separate Order.

[3] Fenty is 48 years-old and has stage 2 hypertension, chest pain, PTSD, and adjustment disorder with anxiety.  (Doc. 1 ¶ 9.)  Stepter is 61 years-old and has chronic respiratory problems that require oxygen to clear his lungs and high blood pressure requiring medication.  (*Id.* ¶ 10.)  Crough is 55 years-old and has a heart condition, chronic obstructive pulmonary disease (COPD), hepatitis, and chest pain caused by stable angina. (*Id.* ¶ 11.)  Scroggins is 44 years-old and suffers asthma and schizophrenia.  (*Id.* ¶ 15.)

[4] Reason is 62 years-old and has severe asthma.  (Doc. 1 ¶ 12.)  Tequida is 64 years-old and has high blood pressure, kidney failure, cardiomyopathy, cardiomegaly, heart

(*Id.* ¶¶ 27-30.)   Plaintiff Puente Human Rights Movement ("Puente") is a grassroots nonprofit organization based in Phoenix, Arizona, that has launched a public campaign "to support incarcerated people at the Maricopa County jails and raise public awareness about COVID-19 for incarcerated people and their families." (*Id.* ¶ 18.) Puente seeks declaratory and injunctive relief in this case to protect the rights of people incarcerated in the Maricopa County jails. (*Id.*)

Plaintiffs allege that there has been an explosion of COVID-19 cases in the Maricopa County Jails and Defendants have failed to provide, among other things: adequate COVID-19 testing or screening of newly booked detainees; adequate COVID-19 testing or screening of prisoners with symptoms or those exposed to someone known or suspected of having COVID-19; proper cohorting and quarantine; adequate protections for medically vulnerable and disabled prisoners; adequate social distancing; adequate cleaning, hygiene, and decontamination procedures; adequate personal protective equipment (PPE); and timely and adequate prisoner education about COVID-19 and prevention methods. (*Id.* ¶¶ 63-158.)

Plaintiffs assert the following claims:

- Counts One, Three and Five assert Fourteenth Amendment conditions-of-confinement claims on behalf of Puente and the Pretrial detainees pursuant to 42 U.S.C. § 1983. (*Id.* ¶¶ 159-168, 178-80, 189-194.)

- Count Two asserts an Eighth Amendment conditions of confinement claim on behalf of the Post-Conviction prisoners pursuant to 42 U.S.C. § 1983. (*Id.* ¶¶ 169-177.)

- Count Four seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241 on behalf of Fenty, Stepter, Crough, and Scroggins from the Pretrial Medically Vulnerable subclass for their release or "enlargement." (*Id.* ¶¶ 181-188.)

- Counts Six and Seven assert claims under Title II of the Americans with Disabilities Act (ADA) and Section 504 of the

---

failure, hepatitis, and liver and prostate problems. (*Id.* ¶ 13.)

- 3 -

Rehabilitation Act (RA) on behalf of the Pretrial and Post-Conviction Disability subclasses and Puente.  (*Id.* ¶¶ 195-215.)

Plaintiffs seek declaratory and injunctive relief and/or writs of habeas corpus requiring Maricopa County Jails to release the Pretrial Medically Vulnerable and Disability Subclass members who are incarcerated solely due to their inability to afford a financial condition of release, or whose release Defendants do not object to, and a process for considering the release or enlargement of the remaining members of those subclasses; and injunctive relief "to abate the risk of the spread of COVID-19" and to provide for the release of information regarding the ongoing COVID-19 outbreak at the Maricopa County jails, among other measures.  (*Id.* at 47-50.)

Upon screening, the Court ordered service and required Defendants Maricopa County and Maricopa County Sheriff Paul Penzone, in his official capacity, to answer the Complaint.  (Doc. 5.)

Following screening, Plaintiffs filed their Ex Parte Application for TRO.  (Doc. 14.) In an Order dated July 2, 2020, the Court found that Plaintiffs had not demonstrated that they will suffer irreparable injury before Defendants can be heard in opposition and thus failed to meet their burden of demonstrating they were entitled to immediate ex parte injunctive relief.  (Doc. 15 at 3.)  The Court therefore construed Plaintiff's Ex Parte Application for TRO as a motion for injunctive relief and set an expedited briefing schedule.  (*Id.*)

## II.   Motion to Dismiss

Defendants argue in their Motion to Dismiss that Defendant Penzone should be dismissed; Plaintiff Reason's claims are moot; Plaintiff Puente lacks standing; no Plaintiff has standing to pursue ADA or RA claims at the Towers, Estrella or 1280 Jails; no Plaintiff has standing to pursue constitutional claims at the 1280 Jail; and the Post-Conviction Plaintiffs lack standing to pursue constitutional claims at Towers and Estrella Jails.  (Doc. 28 at 52.)  Defendants also appear to move for dismissal under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs' factual allegations fall short of establishing

punitive intent, deliberate indifference, or reckless disregard, and fail to demonstrate disability-based discrimination. (*Id.*)  And, Defendants argue that Plaintiffs have failed to exhaust their state-court and administrative remedies. (*Id.* at 21-26.)

### A.    Sufficiency of the Allegations

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  In deciding a Rule 12(b)(6) motion, the court takes all allegations of material fact as true and construes them in the light most favorable to the nonmoving party. *Marcus v. Holder*, 574 F.3d 1182, 1184 (9th Cir. 2009).  The court will "presume that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994) (quotation omitted).

A Rule 12(b)(6) motion to dismiss is almost never an appropriate response when the Court has already screened a prisoner complaint pursuant to 28 U.S.C. § 1915A(b) and directed the defendants to respond.  The standard for dismissal under Rule 12(b)(6) is identical to the standard under 28 U.S.C. § 1915A(b) ("fail[ure] to state a claim upon which relief may be granted").  After the Court has screened a prisoner complaint pursuant to § 1915A(b), a Rule 12(b)(6) motion to dismiss should be granted only if the defendants can convince the Court that reconsideration is appropriate.  When the challenged order is not a final judgment or appealable interlocutory order, the Court will grant a motion for reconsideration if:

> (1) There are material differences in fact or law from that presented to the Court and, at the time of the Court's decision, the party moving for reconsideration could not have known of the factual or legal differences through reasonable diligence;
>
> (2) There are new material facts that happened *after* the Court's decision;
>
> (3) There has been a change in the law that was decided or enacted *after* the Court's decision; or

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(4) The movant makes a convincing showing that the Court failed to consider material facts that were presented to the Court before the Court's decision.

No motion for reconsideration shall repeat in any manner any oral or written argument made in support of or in opposition to the original motion.

*Motorola, Inc. v. J.B. Rodgers Mechanical Contractors*, 215 F.R.D. 581, 586 (D. Ariz. 2003).

As noted, the Court screened the Complaint and determined that Plaintiff's allegations sufficiently stated claims for relief against Defendants. (Doc. 5.) Defendants present nothing that warrants reconsideration of the Screening Order. Accordingly, dismissal under Rule 12(b)(6) is not appropriate, and the Court will deny Defendants' Motion to Dismiss on this basis.

## B.    Exhaustion under the PLRA

Under the PLRA, a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934–35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The "failure to exhaust is an affirmative defense under the PLRA, . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007). In a limited number of cases, the failure to exhaust may be clear from the face of the complaint; however, "such cases will be rare because a plaintiff is not required to say anything about exhaustion in his complaint." *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014); *see Jones v. Bock*, 549 U.S. 199, 216 (2007) (failure to exhaust is an affirmative defense and a prisoner is not required to plead or demonstrate exhaustion in the complaint). In the rare case where failure to exhaust is clear from the

face of the complaint, the defendant may move to dismiss under Rule 12(b)(6).  *Albino*, 747 F.3d at 1169.  To properly be considered on a Rule 12(b)(6) motion, the nonexhaustion defense must raise no disputed issues of fact.  *See Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (affirmative defense may be raised by motion to dismiss only if "the defense raises no disputed issues of fact").  Typically, to show that a prisoner has failed to exhaust remedies, a defendant will have to present probative evidence on a motion for summary judgment under Rule 56.  *Albino*, 747 F.3d at 1169.

Here, the Court cannot conclude from the face of the Complaint that administrative remedies were made available to Plaintiffs and that they failed to exhaust those remedies. In support of their Motion, Defendants have included several grievances Plaintiffs filed while in MCSO custody, a copy of the MCSO Rules and Regulations for Inmates, a copy of the MCSO Inmate Grievance Procedure, and a signed declaration from MCSO Commander/Executive Lieutenant B. Williams attesting to MCSO's grievance procedures and Plaintiffs' grievance histories.  (Doc. 30.)  Defendants argue that these exhibits show that Plaintiffs did not fully exhaust their claims prior to filing their Complaint.  But if the Court considers these documents, which are not incorporated by the Complaint, it is going beyond the face of the Complaint to determine whether Plaintiffs properly exhausted their claims.  This is not permitted on a Rule 12(b)(6) motion for non-exhaustion.  *See Albino*, 747 F.3d at 1169.  At this early stage of the litigation, the Court declines to convert Defendants' Motion to Dismiss into a summary judgment motion.

For the above reasons, this is not one of "those rare cases where a failure to exhaust is clear from the face of the complaint."  *Id*.  Accordingly, Defendants' Motion to Dismiss based on failure to exhaust will be denied.  Defendants may renew their exhaustion argument in a properly supported summary judgment motion.

### C.    Defendant Penzone

Defendants argue that Penzone should be dismissed because the official capacity claims against him are duplicative of the policy or practice claims against Maricopa County.  (Doc. 28 at 36.)  Plaintiffs respond that to the extent the County is acknowledging

that it is a proper Defendant for Plaintiffs' municipal liability claims, they agree that the Court may dismiss Penzone as a Defendant for the conditions of confinement claims but that Penzone is a necessary party for Plaintiff's habeas claim, which Defendants conceded in their Response.  (Doc. 42 at 4, citing Doc. 32 at 2 n.2 ("The proper Respondent for purposes of Petitioners' Habeas Petition is Sheriff Penzone . . . .").)

Based on these averments, the Court will dismiss Penzone as to Plaintiff's Eighth and Fourteenth Amendment conditions-of-confinement claims only.

### D.    Plaintiff Reason

Defendants argue that Plaintiff Reason's claims are moot because he was released from custody on July 11, 2020.  (Doc. 28 at 36.)  Plaintiffs agree that Reason's individual claims are moot, but argue that has no effect on the viability of his claims for the class as a whole, on any other Plaintiff individually, or as a class representative.  (Doc. 42 at 3 n.1.)

The Court will deny Defendants' motion to dismiss Reason at this time because the Court has not yet ruled on the motion for class certification and "mooting the putative class representative's claims will not necessarily moot the class action."  *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011).

### E.    Plaintiff Puente

Defendants argue that Puente lacks standing in its own right as an organization because it does not claim it was deprived of any personal right guaranteed by the Fourteenth and Eighth Amendments and the ADA/RA with respect to jail conditions and that prudential limitations bar Puente's ability to directly sue in their own right for the alleged injuries of third parties.  (Doc. 28 at 32.)  Defendants also contend that Puente cannot establish direct standing because it has failed to show that the conditions of confinement and alleged ADA/RA discrimination impaired its organizational purpose, that its primary purpose is promoting the healthcare of inmates or other confinement conditions in jails or accommodating inmates with disabilities, and because Puente cannot manufacture its own injuries.  (*Id*. at 33-34.)

Plaintiffs respond that Puente has both organizational and associational standing. (Doc. 42 at 7.)  Plaintiffs assert that Puente has organizational standing based on its allegations that Puente diverted resources away from other programming in order to raise public awareness about COVID-19 in Maricopa County jails, that its mission involves educating, advocating for, and empowering immigrants, including those who are incarcerated, and that the immigrant community it serves is impacted by the spread of COVID-19 in the Maricopa County jails.  (*Id.* at 8.)  Plaintiffs also argue that Puente has associational standing based on its allegations that some of Puente's members have family who are incarcerated in the Maricopa County jails and the family members can bring habeas claims.

A "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—" is sufficient to confer direct (i.e., organizational) standing on an organization.  *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982).  "[A]n organization may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the [effects of the particular law] in question."  *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir.2002)).  An organization cannot, however, "manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all.  It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem."  *Valle del Sol v. Whiting,* 732 F.3d 1006, 1018 (9th Cir. 2013) (citation and internal quotation omitted).

In this case, the Complaint alleges that Puente's membership is made up of "hundreds of individuals across Arizona, including undocumented and mixed status immigrant households, [and] people who have been incarcerated as well as their impacted families, and youth members."  (Doc. 1 ¶ 18.)  In addition to developing, educating, and empowering immigrant communities, Puente also conducts programs and advocacy on

behalf of detained people across Arizona.  (*Id.*)  Plaintiffs allege that "[a]s a result of Defendants' failure to adequately protect individuals incarcerated at the Maricopa County jails from the dangers of COVID-19, Puente has launched a full-fledged public campaign to support incarcerated people at the Maricopa County jails and raise public awareness about COVID-19 for incarcerated people and their families." (*Id.*)  To do so, Puente alleges that "[t]his effort has come at the expense of other programming, requiring Puente to divert resources to this campaign while scaling down other campaigns," including by "setting up a hotline to monitor conditions inside of the jails and respond to the concerns of incarcerated people and their families, organizing regular protests, creating petitions, drafting letters to public officials, and producing communications materials." (*Id.*)

These allegations are sufficient to support that Puente has suffered injury in fact such that Puente has standing in its own right.  *See E. Bay Sanctuary Covenant v. Barr*, 950 F.3d 1242, 1265 (9th Cir. 2020) ("We have read *Havens* to hold that an organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose.")

Accordingly, the Court will deny Defendants' motion to dismiss Puente for lack of standing.

**F.     Standing Regarding Conditions at Towers, Estrella or 1280 Jails**

Defendants argue that the Pretrial Plaintiffs lack standing to challenge the conditions at the 1280 Jail because no Pretrial Plaintiff is incarcerated at the 1280 Jail and the Post-Conviction Plaintiffs lack standing to challenge the conditions at the Towers and Estrella Jails because no Post-Conviction Plaintiffs are incarcerated in those jails.  (Doc. 28 at 31-32.)  Defendants therefore argue that the ADA/RA claims should be dismissed with respect to the conditions at all three jails, the Fourteenth Amendment claims should be dismissed with respect to the 1280 Jail, and the Eighth Amendment claims should be dismissed with respect to the Towers and Estrella Jails.  (*Id.* at 32.)

Plaintiffs respond that Defendants have failed to account for the fact that detention officers and incarcerated persons move between the jails.  (Doc. 42 at 5.)  Plaintiffs cite to

the Declarations of Fenty, Avenenti, Boykins, Lewis, Ochoa, Perez, Stepter, who describe the fluidity of their housing and contacts with detainees/prisoners from other jails.  For example, Plaintiff Fenty describes being moved from the Towers Jail to medical isolation at the Fourth Avenue Jail and that, during the transport, people were picked up from the Lower Buckeye and 1280 Jails for nightly cleaning shifts at the Fourth Avenue Jail.  (*Id*.) Plaintiff Avenenti was also moved from Towers Jail to the Fourth Avenue Jail where he was in medical isolation with people from the 1280 and the Lower Buckeye Jails.  (*Id*.) Plaintiff Boykins was held in a crowded waiting room at a courthouse with people from other facilities and no ability to remain six feet away from anybody.  (*Id*.)  Plaintiff Ochoa describes people housed at Estrella Jail being taken to the Fourth Avenue Jail for rebooking and then returned the following day to Estrella Jail.  (*Id*.)  Plaintiff Perez explains that meals at the Towers Jail are served by trustees from the 1280 Jail.  (*Id*.)  Plaintiff Stepter describes being transported in a crowded van from the Towers Jail to the Lower Buckeye Jail in mid-May, dropping off some prisoners at the Durango Jail, and that none of the prisoners had masks or their temperatures checked and some were coughing.  (*Id*. at 5-6.)

Plaintiffs also argue that whether Plaintiffs in certain classes are housed at a particular jail is immaterial because Plaintiffs are alleging statutory and constitutional violations and injury across all facilities.  (*Id*. at 6.)  And they contend that Defendants confuse standing and class certification, and that an alleged dissimilarity between the claims of named and unnamed plaintiffs is not a question of standing, but of class certification.  (*Id*. at 6-7.)

In this case, Plaintiffs' claims are not about the specific facilities where each is housed, but about Defendants' policies and practices with respect to COVID-19 at all Maricopa County jails.  Moreover, because of the high turnover at the jails and the movement between jail facilities, it would be unreasonable to limit Plaintiffs' claims to a specific facility when all facilities are subject to the same policies and practices.  Finally, to the extent Defendants are arguing that the named Plaintiffs are not proper class representatives, they may make that argument in their Response to Plaintiffs' Motion for

Class Certification.  Accordingly, the Court will deny Defendants' Motion to Dismiss on this basis.

### G.    Exhaustion of State Court Remedies

#### 1.    Post-Conviction Plaintiffs

Defendants argue that Post-Conviction Plaintiffs Reason, Tequida, and Avenenti may only bring a habeas action pursuant to 28 U.S.C. § 2254, not § 2241, and that a § 2254 petition may not be granted unless it appears that the applicant "has exhausted the remedies available in the courts of the State."  (Doc. 28 at 21 (quoting 28 U.S.C. §§ 2254(b)(1)(A), and 2254 (c)).)

Only Count Four of the Complaint seeks a writ of habeas corpus and that is pursuant to 28 U.S.C. § 2241 on behalf of Pretrial Plaintiffs Fenty, Stepter, Crough, and Scroggins from the Pretrial Medically Vulnerable subclass.  (Doc. 1 ¶¶ 181-188.)  Because Plaintiffs are not seeking habeas relief on behalf of the Post-Conviction Plaintiffs, Defendants' argument is without merit and the Court will deny the motion to dismiss on this basis.

#### 2.    Pretrial Plaintiffs

Defendants argue that while the Pretrial Plaintiffs may seek habeas relief under 28 U.S.C. § 2241, they did not exhaust their state-court remedies prior to filing their request for habeas relief in this Court, which bars their petition.  (Doc. 28 at 22.)  They argue that while pretrial detainees may seek to modify their release conditions, none of the Pretrial Plaintiffs in this action have exhausted their claims through this state-court remedy.  (*Id.* (citing Arizona Rule of Criminal Procedure 7.2 and Ariz. Rev. Stat. § 13-3967).)  Defendants further argue that none of the narrow exceptions to the *Younger* abstention doctrine apply here and this Court must therefore abstain from interfering with the Pretrial Plaintiffs pending criminal proceedings in state court.  (*Id.* at 23-24.)

Plaintiffs respond that courts have discretion to waive compliance with the exhaustion process when administrative remedies would be inadequate, futile, or pursuit of those remedies would cause irreparable injury.  (Doc. 40 at 31-32 (citing *Ward v. Chavez*, 678 F.3d 1042, 1045 (9th Cir. 2012).))  Plaintiffs argue that any delay in judicial

review would clearly result in irreparable injury to the medically vulnerable prisoners who are at high risk of serious illness or death should they contract COVID-19 in the jails where cases are rising exponentially.  (*Id.* (citing *McPherson v. Lamont*, 2020 WL 2198279, at *7 (D. Conn. May 6, 2020).))

Challenges to pretrial incarceration may be properly brought pursuant to 28 U.S.C. § 2241.  *McNeeley v. Blanas*, 336 F.3d 822, 824 n.1 (9th Cir. 2003).  Section 2241(c)(3) provides that "the writ of habeas corpus [extends to persons who are] . . . in custody in violation of the Constitution or laws or treaties of the United States . . . ."  "As an exercise of judicial restraint, however, federal courts elect not to entertain habeas corpus challenges to state court proceedings until habeas petitioners have exhausted state avenues for raising [a] federal claim."  *Carden v. Montana*, 626 F.2d 82, 83 (9th Cir. 1980).  Nevertheless, "[t]his exhaustion requirement is subject to waiver in § 2241 cases because it is not a 'jurisdictional prerequisite.'"  *Ward*, 678 F.3d at 1045 (quoting *Castro-Cortez v. INS*, 239 F.3d 1036, 1047); *see also Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017) ("The exhaustion requirement is prudential, rather than jurisdictional, for habeas claims.").  And, exhaustion can be waived "if pursuing those [administrative] remedies would be futile."  *Ward*, 678 F.3d at 1045 (quoting *Fraley v. U.S. Bureau of Prisons*, 1 F.3d 924, 925 (9th Cir. 1998)).  The court may require prudential exhaustion when:

> (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review.

*Hernandez*, 872 F.3d at 988 (quoting *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007) (citations omitted).)

In this case, exhaustion under § 2241 is not necessary because the constitutional claims Plaintiffs present do not require development of an administrative record, waiver of exhaustion in this extraordinary circumstance of a pandemic would not encourage future habeas petitioners to bypass the administrative scheme, and administrative review of

Plaintiffs' claims would be futile because of the length of time it would take to complete the process in the state courts.

While the abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971) ordinarily prevents a federal court in most circumstances from directly interfering with ongoing criminal proceedings in state court, a federal court may entertain a pretrial habeas corpus petition in certain "extraordinary circumstances where irreparable injury can be shown." *Carden*, 626 F.2d at 84 (quoting *Perez v. Ledesma*, 401 U.S. 82, 85 (1971)).

In this case, the Court finds that the pandemic and the possibility of irreparable harm to the medically vulnerable Pretrial Plaintiffs who are at high risk of contracting and dying from COVID-19 is an extraordinary circumstance potentially warranting this Court's intervention. Accordingly, the Court will deny Defendants' Motion to Dismiss on this basis.

## III.    Motion for Preliminary Injunction

### A.    COVID-19

Because of the rapidly changing nature of the COVID-19 pandemic, the Court will set forth what is currently known about the situation. As of August 6, 2020, 4,870,367 individuals have been confirmed as positive for COVID-19 in the United States, of which 159,864 have died.[5]  In Arizona, 182,203 confirmed positive cases have been identified, of which 3,932 have died.[6]  As of August 6, 2020, 1,420 positive cases have been identified in Maricopa County Jails out of 6,046 tests, with 322 cases awaiting results, one hospitalization, and no reported deaths.[7]

The United States Department of Health and Human Services Centers for Disease Control and Prevention ("CDC") reports that individuals who contract and transmit COVID-19 experience symptoms that range from negligible, with some individuals

---

[5] *Coronavirus Resource Center*: *COVID-19 Dashboard*, Johns Hopkins Univ. & Med., https://coronavirus.jhu.edu (last accessed Aug. 6, 2020).

[6] *Id.*

[7] Maricopa County, *COVID- 19 In County Jails* https://www.maricopa.gov/5574/COVID-19-in-County-Jails (last accessed Aug. 3, 2020).  When Plaintiffs filed their motion on June 30, 2020, there were 565 positive cases identified.  (Doc. 14 at 9.)

remaining entirely asymptomatic, to mild, such as fever, coughing, headache, and difficulty breathing, to severe, including acute respiratory distress, severe pneumonia, septic shock, and multi-organ failure, or even death.[8]  The risk of suffering severe illness or death from COVID-19 increases with age with older adults at greatest risk.[9]  In addition, individuals of any age with underlying medical conditions including cancer, chronic obstructive pulmonary disease, an immunocompromised state, obesity, a serious heart condition such as heart failure, coronary artery disease, or cardiomyopathies, sickle cell disease, and Type II diabetes mellitus are at an increased risk for severe illness, and individuals with other conditions such as moderate to severe asthma, hypertension, liver disease, pulmonary fibrosis, Type 1 diabetes mellitus, cerebrovascular disease, neurologic conditions such as dementia, pregnancy, and smoking may be at an increased risk for severe illness from COVID-19.[10]

While the CDC is still learning how the virus spreads, "COVID-19 is thought to spread mainly through close contact from person-to-person," through respiratory droplets produced when an infected person coughs, sneezes, or talks, and some people without symptoms may be able to spread the virus.[11]  Symptoms may appear 2 to 14 days after exposure to the virus.[12]  There is currently no vaccine to prevent COVID-19, and the CDC recommends that to avoid exposure and transmission, the public should maintain a physical

---

[8] CDC *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last accessed July 31, 2020).

[9] CDC *Coronavirus Disease 2019 (COVID- 19), Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last accessed July 31, 2020).

[10] CDC *People With Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical- conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed June 1, 2020).

[11] CDC, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last accessed July 31, 2020).

[12] CDC, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last accessed July 31, 2020).

distance of at least six feet from others, cover the nose and mouth with a mask, frequently wash hands with soap and water for at least 20 seconds or use hand sanitizer, and disinfect frequently touched surfaces daily.[13]  High-risk individuals should take additional "special precautions," such as continued active treatment of their underlying medical conditions, obtaining vaccinations against other diseases like influenza and pneumococcal illness, staying home, and remaining away from others as much as possible.[14]

### B.   Detention Facility COVID-19 Guidance

The CDC's "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" ("CDC Guidance"),[15] updated as of July 14, 2020, provides guidance to healthcare and non-healthcare administrators in correctional and detention facilities "to assist in preparing for potential introduction, spread, and mitigation of SARS-CoV-2 (the virus that causes Coronavirus Disease 2019, or COVID-19) in their facilities." (CDC Guidance at 1.)  The guidance reports there is a heightened risk of transmission of COVID-19 to and among individuals within correctional and detention facilities due to, among other things, the number of sources which can introduce them into a facility's population, including facility staff, visitors, contractors, vendors, legal representatives, court staff, new detainees, and high turnover; the congregate environment in which detainees "live, work, eat, study, and participate in activities"; and limited medical isolation options, hygiene supplies, and dissemination of accurate information among detainees.  (*Id*. at 2.)

The guidance states that "[a]lthough social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19."  (CDC Guidance at 6.)   It recommends

---

[13] CDC *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed July 31, 2020).

[14] CDC *People at Increased Risk*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed July 31, 2020).

[15] CDC *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed Aug. 3, 2020).

implementing social distancing strategies to increase the physical space between detained persons, "ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic," maintaining at least 6 feet between bunks, minimizing the number of individuals housed in the same room, staggering meal times and rearranging seating to increase space between individuals, providing meals inside housing units or cells, choosing recreation spaces where individuals can spread out and staggering time in those spaces; limiting the size of group activities and increasing space between individuals during group activities.  (*Id.* at 6, 16-17.)  It further recommends that facilities should house quarantined individuals who have had close contact with a COVID-19 case, or individuals in medical isolation who are suspected or confirmed positive with COVID-19, in order of preference, separately in single cells or as a cohort, although "[c]ohorting should only be practiced if there are no other available options."  (*Id.* at 24- 15-20.)[16]  "If cohorting is unavoidable, [facilities should] make all possible accommodations to reduce exposure risk for the increased-risk individuals." (*Id.* at 31.)  The guidance cautions that facilities should ensure that medical isolation for COVID-19 "is distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice."  (*Id.* at 24.)

CDC Guidance also recommends that facilities implement intensified cleaning and disinfecting procedures and provide education on, and reinforcement of, hygiene practices. (CDC Guidance at 14-15.)  Facilities should, among other things, provide adequate supplies to support intensified cleaning and disinfection practices, clean and disinfect surfaces that are frequently touched several times a day, and have a plan to rapidly restock supplies.  (*Id.* at 14.) Facilities should encourage all staff and incarcerated/detained persons to wear a cloth face covering as much as possible, with education on their purpose and use, continually restock hygiene supplies throughout the facility, provide detainees and staff no-cost access to soap, running water, hand drying machines or disposable paper towels, tissues, cloth face coverings, and alcohol-based hand sanitizer with at least 60% alcohol

---

[16] "Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group."  (CDC Guidance at 4.)

where security restrictions allow.  (*Id*. at 15.)  The guidance underscores that because the virus can be transmitted from contagious, yet asymptomatic individuals who are present within the facilities, "[g]ood hygiene practices, vigilant symptoms screening, wearing cloth face coverings (if able), and social distancing are critical in preventing further transmission." (*Id*. at 12.)

### C.    MCSO Facilities

There are five jails in the Maricopa County Jail System: Fourth Avenue, Estrella (housing only female detainees/prisoners), Lower Buckeye, Towers, and 1280.  (Doc. 28 at 6, citing Roska Decl. (Doc. 29 at 1-30) ¶ 6, 10, 16.)[17]  As of July 15, 2020, MCSO had 4,598 detainees/prisoners, which is 52.4% of the total design capacity of the Maricopa County Jail system.   (*Id*. at 9, citing Roska Decl. ¶ 8.)  All but the Towers Jail have a combination of dormitories and cells; the Towers Jail has only cells.  (*See id*. at 6-9, citing Roska Decl. ¶¶ 7, 10-12, 14-16.)

Due to the pandemic, the MCSO worked with the Maricopa County Attorney's Office to reduce the jail population and has reduced the average daily bookings from 250 daily bookings in January 2020 to 100 to 150 bookings per day as of July 16, 2020.  (*Id*. at 9, citing Roska Decl. ¶ 9.)  MCSO employs 1,744 Detention Officers, 214 Sergeants, 61 Lieutenants, and 14 Captains.  (Roska Decl. ¶ 21.)  As of July 15, 2020, 101 Detention Officers had tested positive for COVID-19.  (*Id*.)

### D.    MCSO's Response to COVID-19 Pandemic

On June 30, 2020, Plaintiffs filed their motion for injunctive relief, which is supported by Declarations from the named Plaintiffs and Plaintiffs' expert, Dr. Robert Cohen, M.D. (Doc. 8, Exs. 1-15), regarding alleged deficiencies in MCSO's response to the pandemic.  Defendants responded with Declarations from B. Roska, G. Phillips, M.D., the Medical Director of the Maricopa County Correctional Health Services (CHS) (Doc.

---

[17] B. Roska is currently Executive Chief of Custody of the MCSO.  (Doc. 29 at 1 ¶ 2.)

31 at 1-34), and B. Williams, Commander/Executive Lieutenant of ancillary and institutional services (Doc. 30 at 1-14.)

### 1.     MCSO and CHS Management Plan for COVID-19

At the start of the pandemic, MCSO stopped jail access for volunteer and supplemental services, suspended in-person visitations, with the exception of attorney visits, has followed court directives that allow detainees/prisoners to make court appearances telephonically, and has contacted private suppliers to obtain additional PPE and cleaning supplies.  (Doc. 28 at 10, citing Roska Decl. ¶¶ 24, 26.)  CHS also created a Management Plan for COVID-19 in early March 2020, which is continuously revised to reflect the CDC's most updated guidelines, and Defendants assert that MCSO and CHS operate in compliance with CDC's Interim Guidance for correctional and detention facilities.  (*Id*. at 10-11, citing Roska Decl. ¶¶ 29, 85-87; Phillips Decl. ¶¶ 19-20, 179-187.)

In March 2020, MCSO developed and implemented a Supplemental Screening Form for intake that allows CHS staff to immediately identify and isolate detainees with symptoms or those considered at risk for COVID-19.  (*Id*. at 13, citing Phillips Decl. ¶ 55.) CHS screens all new intakes for symptoms of COVID-19 using a verbal screening process and the Supplemental Screening Form, they screen all new intakes for other medical conditions based on the patient's self-report for problems such as hypertension, diabetes, thyroid disease, cancer, lung problems, and heart disease, and they obtain the patient's temperature and vital signs, including blood pressure, pulse rate, respiratory rate, and oxygenation level.  (*Id*., citing Phillips Decl. ¶ 56.)

The Management Plan also has a verbal screening process to screen detainees/prisoners for COVID-19 symptoms; those at risk of having COVID-19 are identified as Persons Under Investigation ("PUI").  (*Id*. at 14, citing Phillips Decl. ¶¶ 57-58.)  A PUI is someone who exhibits symptoms such as fever at 100.4 or above, lower respiratory illness such as cough or shortness of breath, or close contact with a laboratory-confirmed COVID-19 individual within 14 days of onset.  (*Id*.)  Detainees/prisoners with a chronic disease or other significant health conditions or disabilities "receive ongoing

multidisciplinary care aligned with management-based standards, including those recommended by the CDC." (*Id.*, citing Phillips Decl. ¶¶ 59-64.)  CHS staff are required to wear surgical masks and gloves during intake screening, and wash their hands, sanitize workstations, and change gloves between every encounter. (*Id.*, citing Phillips Decl. ¶ 65.)

## 2.    Intake Process and Cohorting

In March 2020, MCSO began cohorting new arrivals to protect against asymptomatic carriers infecting the established population. (*Id.* at 14-15, citing Roska Decl. ¶¶ 37-38; Phillips Decl. ¶¶ 103-104.)  They remain in Cohort Housing for 14 days from admission, unless they present with symptoms of possible COVID-19, in which case isolation/testing protocols are employed. (*Id.* at 15, citing Phillips Decl. ¶¶ 104-106.) MCSO staff are to report to CHS when they observe symptomatic detainees/prisoners. (*Id.*)

Plaintiffs assert that new intakes to the jails are only isolated and tested for COVID-19 if they exhibit certain symptoms or report direct contact with someone who is COVID-19 positive and that other newly booked individuals simply go through the booking procedures and a court appearance while being held in holding tanks of 10 to 20 people where there is no ability to socially distance and where masks are the exception. (Ex. 17 (Doc. 14 at 17, citing MCSO SOP J-02-023; Perez Dec. ¶¶ 30-31.)  New intakes who are not tested are not always placed in a 14-day cohort and some new intakes are placed directly into the general population. (*Id.*, citing Ex. 19 (letter from Penzone to Keenan); Dupont Decl. ¶ 15; Ochoa Decl. ¶ 7; Scroggins Decl. ¶ 7; Avenenti Decl. ¶ 6.)  Without universal testing of all new intakes, the cohorting process is insufficient because individuals who are asymptomatic or pre-symptomatic can unknowingly infect other people or staff. (*Id.*, citing Cohen Decl. ¶¶ 92-93.)  And, some people already in jail are rebooked on new charges and taken to the Fourth Avenue booking facility, where they spend around 24 hours in a holding cell with new intakes, and then return back to their original dorm, which undermines any benefit of the 14-day cohorting. (*Id.* at 17, citing Dupont Decl. ¶ 15; Ochoa Decl. ¶ 7; Player Decl. ¶ 17.)

On July 27, 2020, Defendants submitted a Supplemental Declaration from Dr. Phillips who states that beginning July 27, 2020, MCSO would begin mass testing of all detainees/prisoners for COVID-19 over a five-week period.  (Doc. 36-1 at 4 ¶¶ 23-25.) After all five MCSO jails are tested, new arrivals, who will continue to be placed in Cohort Housing and monitored for 14 days, will be tested twice for COVID-19 on days 5 and 14.  (*Id*. at 4 ¶ 26.)  Dr. Cohen responds that waiting until all the other jails are tested "poses an unreasonable danger of allowing for weeks of transmission of the virus inside the cohorted pods and the introduction of COVID-19 to the general population if they are transferred after cohorting to the general population without first being tested," especially since there have been 100-150 new bookings daily over the past few months.  (Doc. 41-1 at 82 ¶ 24.)

### 3.    Testing

Prior to MCSO's announcement of mass COVID-19 testing, Plaintiffs state that testing was not happening consistently, even for people housed in pods that were quarantined due to direct contact with a person who tested positive for COVID-19 or recreating with units in which someone tested positive.  (Doc. 14 at 9, citing Boykins Decl. ¶¶ 7-12; Player Decl. ¶ 4; Perez Decl. ¶ 9.)  Also, when individuals have informed staff they were suffering from symptoms of COVID-19, or that they were exposed to individuals with COVID-19 or symptoms, they were not tested.  (*Id*. at 10, citing Boykins Decl. ¶ 6; Fenty Decl. ¶¶ 5-6; Ochoa Decl. ¶ 5; Perez Decl. ¶ 5, 9; Reason Decl. ¶¶ 5-6; Dupont Decl. ¶ 4; Tequida Decl. ¶ 8; Scroggins Decl. ¶ 6; Stepter Decl. ¶ 7.)

Universal testing, particularly of all new intakes, is required to identify those who are infected and to institute timely initial isolation, medical monitoring, and treatment for those who test positive.  (*Id*., citing Cohen Decl. (¶¶ 67, 72.)  In his Supplemental Declaration, Dr. Phillips asserts that the recently implemented widespread testing over a five-week period would begin in week one with the Estrella Jail, move to the Towers Jail in week two, the 1280 Jail in week three, the Fourth Avenue Jail in week four, and the Lower Buckeye Jail in week five.  (Phillips Suppl. Decl. (Doc. 36) ¶¶ 19, 23-25.)  Dr. Cohen responds that the decision to broaden testing is a positive step, but given the existing

outbreak, the five-week delay will allow the virus to spread rampantly in the remaining facilities, and there is no explanation why the testing will take five weeks or any indication that testing of the medically vulnerable detainees/prisoners will be prioritized.  (Cohen Suppl. Decl. (Doc. 41-1 at 82) ¶ 23.)  In a third Declaration, Dr. Phillips states that CDC Interim Consideration for SARS-CoV-2 Testing in Correctional and Detention Facilities does not require mass testing for COVI-19 among incarcerated populations, but rather recommends testing for individuals with sigs of symptoms of COVID-19 or asymptomatic individuals who have come into close contact with COVID-19 infection.  (Doc. 49 ¶ 13.)  Therefore, the current mass testing by MCSO and CHS exceeds the CDC's recommendations.  (*Id.*)

### 4.    Isolation and Quarantine

If a detainee/prisoner screens as affirmative for possible COVID-19 infection, they are immediately isolated in a private room, placed on "droplet precautions, contact precautions, and standard precautions, only essential healthcare personnel may enter the room to evaluate or care for the patients, and they must wear PPE, including a surgical mask, gown, gloves, face shield and/or eye protection.  (Doc. 28 at 15, citing Phillips Decl. ¶¶ 70-71.)  Those suspected of having COVID-19 are evaluated by a healthcare provider, and if they have objective findings of cough, shortness of breath, or other signs of acute illness, they are prioritized for COVID-19 testing, which is done using the nasopharyngeal swab test, and results are usually received within two to five days.  (*Id.*, citing Phillips Decl. ¶¶ 71, 74.)  Other patients with symptoms of acute illness are considered for testing based on guidelines from the CDC, and detainees/prisoners requesting COVID-19 testing are assessed by a nurse and if symptoms warrant, a healthcare provider determines whether COVID-19 testing is indicated.  (*Id.*, citing Phillips Decl.  ¶¶ 72-73.)  Patients designated as PUI or who test positive for COVID-19 are transferred to Medical Observation Housing.  (*Id.*, citing Phillips Decl. ¶ 75.)  Medical co-pays are waived for COVID-19 testing so as not to discourage detainees/prisoners from disclosing symptoms.  (*Id.*, citing Phillips Decl. ¶ 82; Roska Decl. ¶ 32.)

Detainees/prisoners who display symptoms of COVID-19, meet PUI criteria, are confirmed positive, were in close contact with an individual with COVID-19, or who previously recovered from and present with symptoms of COVID-19 are housed in medical isolation in a designated Medical Observation Unit ("MOU").  (*Id*. at 15-16, citing Roska Decl. ¶¶ 32, 36; Phillips Decl. ¶ 76.)  MOUs are cell design, not dormitory style, and a detainee/prisoner who meets PUI criteria, is housed alone so as not to expose others, and those who test positive may be housed in the same cell.  (*Id*. at 16, citing Phillips Decl. ¶¶ 77-78.)  Those who have tested positive are housed in the MOU until 10 days have elapsed since the positive test and at least 72 hours have passed since the resolution of fever and improvement of respiratory symptoms.  (*Id.*, citing Phillips Decl. ¶ 84.)  Detainees/prisoners in MOUs are on restricted movement status, which means they must stay within their housing unit, except in case of a medical emergency or release from custody, and they are not permitted to go to court.  (*Id*, citing Phillips Decl. ¶ 92.)

CHS staff assess MOU patients daily, including temperature checks, and if a MOU patient is at higher risk for COVID-19 complications, they can be housed in the Infirmary, where they receive 24-hour nursing care and frequent assessments.  (*Id.*, citing Phillips Decl. ¶¶ 82, 85-86; Roska Decl. ¶ 34.)  A patient is deemed "higher risk" if they are over 60 years-old, have diabetes, heart or lung problems, or other conditions "that can lead to immunocompromise."  (*Id*. at 16-17, citing Roska Decl. ¶ 34; Phillips Decl. ¶ 85.)  Those who test negative for COVID-19 may be released from MOU to general population if at least 72 hours have passed since the resolution of fever and improvement of respiratory symptoms.  (*Id*. at 17, citing Phillips Decl. ¶¶ 98-99.)  Medical Observation cells and common areas in a Cohort are fully sanitized between occupants.  (*Id*. at 18, citing Phillips Decl. ¶ 51.)

When a detainee/prisoner tests positive for COVID-19, their housing unit is placed on 14-day quarantine status, and beginning June 1, 2020, mass COVID-19 testing of detainees/prisoners in quarantine status began.  (*Id*. at 17, citing Roska Decl. ¶ 39; Phillips Decl. ¶¶ 111-113.)  Quarantine status detainees/prisoners are also offered COVID-19

testing on the next business day after someone in their unit tests positive and on or after day 14 of the quarantine. (*Id*.) Those in quarantine are on movement restriction, which prohibits their movement outside of the housing unit, including for court dates, except in case of emergency or release from custody. (*Id*., citing Phillips Decl. ¶ 119.)

Despite these measures, Defendants have not taken other protective measures to ensure infected people are not infecting others in quarantine, which is necessary because COVID-19 testing has a false negative rate as high as 29%. (Doc. 14 at 15, citing Cohen Decl. ¶ 77.) Medical staff generally do not visit quarantined pods to check for symptoms of COVID-19 in order to remove symptomatic people from the pod and, when they do visit, they are not taking basic precautions such as changing gloves between each person they examine and sterilizing oral thermometers between uses. (*Id*., citing Boykins Decl. ¶¶ 8-9; Player Decl. ¶ 5.) Dr. Phillips disputes these assertions, stating that CHS staff do sanitize medical equipment and change their gloves in between seeing patients, but that there is no need to change gloves when distributing medications to patients because they do not directly touch the medications. (Doc. 49 ¶ 24.) Plaintiffs also contend there is inadequate social distancing in quarantined units, no specific cleaning procedures or PPE for quarantined units, and no steps are taken to ensure cells and bed spaces are cleaned after a confirmed or suspected COVID-19 person is removed from the unit. (Doc. 14 at 15, citing Boykins Decl. ¶¶ 7-8, 19-24, 28; Player Decl. ¶¶ 7, 12-13, 16.)

Because those removed from housing units due to confirmed or suspected COVID-19 are sent to punitive conditions akin to disciplinary segregation (known as "the hole") without proper medical care, detainees/prisoners are deterred from reporting symptoms, which means symptomatic people will potentially remain in general population units. (*Id*., citing Boykins Decl. ¶ 5; Lewis Decl. ¶ 4; Suggs Decl. ¶¶ 6-9; Cohen Decl. ¶ 116.) The only difference between the punitive isolation units where people testing positive are sent and punitive segregation units is that COVID-19 positive people are placed in cells together. (*Id*., citing Lewis Decl. ¶ 19.) Those who have tested positive are sent to isolation units and left in filthy cells 24 hours a day except for shower time (once every three days

for one person and once a week for another) and video visits, all their property is taken, they are denied access to commissary, and they are left to wear the same clothes, despite being sick with the virus.  (*Id.* at 16, citing Lewis Decl. ¶ 19; Avenenti Decl. ¶ 14.) Williams disputes these assertions, stating that undergarments are normally exchanged at least twice a week but, to limit movement, two items are delivered at the same time each week; he also states that there was a problem at the Lower Buckeye Jail between July 1-15 when patients in the MOU were unable to use the commissary, but that issue has been resolved.  (Doc. 50 ¶¶ 6, 12.)  Dr. Phillips disputes that medical isolation housing units are punitive in nature and asserts that medical isolation is widely used in the medical community to reduce the risk of transmissions of COVID-19, and that detainees/prisoners in medical isolation have their tablets for entertainment and reading materials and they have access to commissary purchases.  (Doc. 49 ¶ 19.)

Dr. Cohen asserts that patients with known or suspected COVID-19 require close clinical monitoring of their condition twice daily to assess whether they are clinically deteriorating and need more assertive treatment.  (Doc. 14 at 16, citing Cohen Decl. ¶¶ 16, 111.)  According to Plaintiffs, those who test positive for COVID-19 receive inadequate medical care, and staff, who are not necessarily medically trained, only visit once a day for a symptoms and temperature check, but do not normally check oxygen intake, and it can take up to three and a half days to get basic medicine such as Tylenol.  (*Id.*, citing Cohen Decl. ¶ 113; Avenenti Decl. ¶¶ 8-13; Lewis Decl. ¶¶ 19, 20, 22.)  Dr. Phillips disputes that those who test positive receive inadequate medical care, asserting that pulse oximetry is only necessary where the patient exhibits symptoms such as difficulty breathing and shortness of breath, in which case, CHS staff will check a full set of vital signs, including pulse oximetry.  (Doc. 49 ¶ 21.)  Dr. Phillips states that Plaintiff Avenenti did test positive for COVID-19 and was moved to medical observation on June 7, 2020, where he was seen daily by CHS staff, received regular temperature checks, which ranged from 97.6 to 98.2 degrees, his blood pressure was taken four times and was normal each time, and he has recovered from COVID-19 and was moved back to general population on June 17, 2020.

(*Id.* ¶ 22.)  Plaintiff Crough is housed in the Infirmary and his four blood pressure checks in mid-July were all normal except one, when it was slightly low, and his oxygen levels were in the normal range.  (*Id.* ¶ 23).  Plaintiff Ochoa, who tested positive for COVID-19, had normal temperatures when checked 8 times between July 10 and July 17, 220, and she was discharged from medical observation on July 17, 2020 after being symptom-free for 72 hours.  (*Id.* ¶ 28.)

Plaintiffs contend that the medically vulnerable are also not receiving sufficient medical monitoring, even though they face higher hospitalization and death rates.  (Doc. 14 at 16-17, citing Cohen Decl. ¶ 88; Lewis Decl. ¶ 20.)  Defendants have failed to waive fees when detainees/prisoners seek care or diagnosis for COVID-19 symptoms, which also deters people from reporting symptoms and for the jails to identify people infected with COVID-19.  (*Id.* at 17, n.23, citing Suggs Decl. ¶ 10; Fenty Decl ¶ 5; Reason Decl. ¶ 5.)  Dr. Phillips asserts that Plaintiff Fenty was erroneously charged on June 25 and June 26, 2020 for medical care and that those charges have now been reversed and that Plaintiff Ochoa may have also been erroneously charged and those charges may be reversed once verified.  (Doc. 49 ¶¶ 26, 28.)

Plaintiffs also dispute that the medical observation cells receive full sanitation between occupants, with some Plaintiffs observing that the floors of those cells were covered in dust and trash upon their arrival, including orange peels, milk cartons, and other trash, and that some Plaintiffs were given no means of cleaning the cell.  (Doc. 40 at 19, citing Fenty Suppl. Decl. ¶ 6; Suggs Decl. ¶ 7; Avenenti Decl. ¶ 8; Lewis Decl. ¶ 19.)  Dr. Phillips states in a supplemental Declaration that the allegation that the medical tank is not sanitized between uses is false.  (Doc. 49 ¶ 30.)

### 5.     Social Distancing

Despite the reduction in the jail population since the start of the pandemic, Plaintiffs contend that there is no policy for social distancing and that social distancing "has not been noticeably implemented," with some individuals sleeping in units that are nearly full, and in cells with two or three people and in dorms with dozens of other people on beds that are

inches apart.  (Doc. 14 at 11-12, citing Boykins Decl. ¶¶ 14-16; Crough Decl. ¶¶ 13-14; Fenty Decl. ¶¶ 8; Ochoa Decl. ¶¶ 7-8; Scroggins Decl. ¶¶ 7-8; Stepter Decl. ¶ 8; Suggs Decl. ¶ 12; Tequida Decl. ¶ 11.)  Some units are increasingly on lockdown, which means individuals are confined to their sleeping areas without social distancing, common areas such as dining rooms and recreation spaces are not operated with social distancing, and mealtimes are not staggered, so individuals are frequently standing close together in lines and sitting elbow-to-elbow.  (*Id.*, citing Boykins Decl. ¶¶ 15-18, Player Decl. ¶¶ 8-9; Lewis Decl. ¶¶ 6, 8-9; Dupont Decl. ¶¶ 6-7; Fenty Decl. ¶¶ 9-11; Ochoa Decl. ¶¶ 9-12; Perez Decl. ¶¶ 11,16-18, 20; Reason Decl. ¶¶ 7-10; Scroggins Decl. ¶¶ 8-10; Tequida Decl. ¶¶ 13-15; Suggs Decl. ¶¶ 11-15.)

Defendants have food delivered by incarcerated persons who travel pod to pod, thereby increasing the risk of spreading the virus, and sometimes multiple people may touch the same food as it is transferred.  (*Id.* at 12, citing Boykins Decl. ¶ 17; Player Decl. ¶ 8; Ochoa Decl. ¶ 9; Perez Decl. ¶ 17; Scroggins Decl. ¶ 9; Tequida Decl. ¶ 14.)  During recreation, multiple units sometimes use the same facility at the same time, and when receiving medications, detainees/prisoners must line up side by side.  (*Id.*, citing Boykins Decl. ¶ 18; Player Decl. ¶¶ 5, 8; Dupont Decl. ¶ 6; Lewis Decl. ¶ 8; Fenty Decl. ¶ 10; Perez Decl. ¶ 19; Scroggins Decl. ¶ 9; Stepter Decl. ¶¶ 10, 12; Avenenti Decl. ¶ 20.)

Defendants respond that detainees/prisoners are encouraged to practice social distancing and are educated on the importance of trying to maintain at least a six-foot distance from others, if possible, and MCSO has taken measures to reduce its population to allow detainees/prisoners to socially distance.  (Doc. 28 at 20, citing Roska Decl. ¶ 76.) The day room areas in all the jails are large and allow ample space to socially distance and no one is forced to remain within six feet of another person, even when lining up for meals, medication, to use a telephone or watch television.   (*Id.*, citing Roska Decl. ¶ 79.) Detainees/prisoners are often voluntarily less than six-feet apart and are reminded that they should not do so by detention officers.  (*Id.*)  Detainees/prisoners are not triple celled and although some cells have bunks stacked three high, these cells are only occupied by one or

two detainees/prisoners.  (*Id.*, citing Roska Decl. ¶ 80.)  According to Defendants, "[t]he solid metal beds provide an adequate barrier to allow inmates to sleep in the bunks without the risk of infecting one another, in the event one of the inmates has the virus."  (*Id.*)

COVID-19 education is provided to detainees/prisoners in English and Spanish via the inmate tablet system, which those in the general population have access to, and they receive one-on-one counseling during medical and mental-health checks, which can include education on social distancing, proper hygiene, and mask use.  (*Id.* at 11, citing Phillips Decl. ¶¶ 28-30.)  Education materials are also posted throughout the facility and in all housing units regarding COVID-19 symptoms, what to do if you become sick, hand washing, sanitation and cleanliness, mask use, and steps to reduce exposure.  (*Id.*, citing Roska Decl. ¶ 75.)

Plaintiffs reply that as to COVID-19 education, detainees/prisoners have only recently been given access to materials that provide information about COVID-19 symptoms and precautions via the inmate tablet system, but that information does not mention social distancing, and the tablet system is inadequate for people who are illiterate or not adept at technology.  (Doc. 40 at 10, citing Doc. 29-1 at 40.)  Plaintiffs assert in their original and supplemental Declarations that, contrary to Defendants' assertions, they are not given frequent verbal communications from detention officers or during medical visits about the need to wear masks and remain socially distant.  (Perez Suppl. Decl. ¶ 12; Tequida Suppl. Decl. ¶ 13; Ochoa Suppl. Decl. ¶¶ 2-3; Fenty Suppl. Decl. ¶¶ 20-21; Stepter Suppl. Decl. ¶¶ 13-14; Avenenti Suppl. Decl. ¶ 10; Boykins Decl. ¶ 27; Player Decl. ¶ 14; Avenenti Decl. ¶ 4; Fenty Decl. ¶ 20; Crough Decl. ¶ 25; Ochoa Decl. ¶ 18; Perez Decl. ¶¶ 14, 27; Scroggins Decl. ¶ 19; Stepter Decl. ¶ 18; Tequida Decl. ¶ 24.)

Plaintiffs also dispute that they are able to socially distance either in their cells or dorms or in the common areas, stating, for example, that the day rooms have tables and chairs that are bolted to the ground and allow only about a foot between seats, that the bunks are bolted down and close to each other or touching, making it impossible to sleep six feet apart, that detainees/prisoners wait in line for food right next to each other and

because the tables and chairs are bolted down, they are close together when eating, and detention officers do not instruct prisoners to stay six feet apart.  (Doc. 14 at 11-12 and Doc. 40 at 12-13, 17-18, citing Boykins Decl. ¶¶ 14-15; Dupont Decl. ¶ 5; Ochoa Decl. ¶ 8; Lewis Decl. ¶ 8; Fenty Suppl. Decl. ¶ 11; Stepter Suppl. Decl. ¶¶ 7-8; Avenenti Suppl. Decl. ¶ 4.)  Plaintiffs contend that "[t]he fact that the bunk beds are made of metal does nothing to mitigate the fact that cellmates are in constant close proximity with each other, touch the same common surfaces as each other, and breath the same air in the exceptionally limited common areas of each cell, including while sleeping."  (Doc. 40 at 13, citing Cohen Suppl. Decl. ¶ 40.)

### 6.       Sanitation Procedures

The Maricopa County jails rely on incarcerated persons to clean facilities and the post-COVID-19 cleaning routine is nearly identical to the pre-COVID-19 cleaning routine and, in general, jail staff do not ensure that cleaning is done at all, much less safely and adequately to kill the virus.  (Doc. 14 at 13, citing Boykins Decl. ¶¶ 20-21; Player Decl. ¶ 11; Avenenti Decl. ¶ 18; Lewis Decl. ¶ 11; Dupont Decl. ¶ 8; Fenty Decl. ¶ 13; Perez Decl. ¶¶ 22-23; Reason Decl. ¶ 7; Scroggins Decl. ¶ 15; Stepter Decl. ¶ 15; Tequida Decl. ¶ 17; Suggs Decl. ¶ 17; Ochoa Decl. ¶¶ 11-13.)  Twice a day, Defendants provide entire housing units with one bottle of watered-down disinfectant and glass cleaner and possibly another substance to clean the common surfaces and individual cells, but the supplies often run out and staff often refuse to provide additional supplies.  (*Id.*, citing Boykins Decl. ¶ 21; Player Decl. ¶¶ 9, 11; Lewis Decl. ¶ 11; Fenty Decl. ¶ 13; Perez Decl. ¶ 22; Scroggins Decl. ¶¶ 14-15; Stepter Decl. ¶ 15; Tequida Decl. ¶ 18; Suggs Decl. ¶ 18; Avenenti Decl. ¶ 18; Dupont Decl. ¶ 8; Perez Decl. ¶ 22.)  Williams disputes that the cleaning supplies provided to detainees/prisoners are inadequate, and asserts that MCSO keeps inventory of cleaning solutions in concentrated form, which is mixed with water according to the manufacturer's instructions.  (Doc. 50 ¶ 17.)

Defendants do not usually provide detainees/prisoners with gloves or sufficient protective equipment for cleaning, even when tasked with cleaning cells where infected

1     persons or persons quarantined at intake were located.  (Doc. 14 at 13, citing Fenty Decl.
2     ¶ 13; Stepter Decl. ¶ 16; Boykins Decl. ¶¶ 7-8; Player Decl. ¶ 4; Avenenti Decl. ¶ 5; Lewis
3     Decl. ¶ 10; Reason Decl. ¶ 13.)  Detainees/prisoners share numerous high-touch surfaces
4     such as telephones, tablets, tables, chairs, and railings, and Defendants have not
5     implemented any system to ensure they are property cleaned; some people wrap socks or
6     a towel around phones to protect themselves from COVID-19.  (*Id.*, citing Crough Decl. ¶
7     16; Fenty Decl. ¶¶ 11, 13; Ochoa Decl. ¶¶ 10, 12; Perez Decl. ¶¶ 17-19; Stepter Decl. ¶¶
8     11, 15; Boykins Decl. ¶ 25; Suggs Decl. ¶ 22.)  Dr. Phillips asserts in a supplemental
9     Declaration that the CDC's Interim Guidance does not require that detainees/prisoners
10    receive gloves and that there is hot water and soap available for washing hands at any time,
11    which is the most effective means to kill COVID-19.  (Doc. 49 ¶ 25.)

12         Defendants assert that MCSO has implemented enhanced sanitation procedures,
13    using OSHA-approved Waxie 764 Lemon Quat Disinfectant Cleaner and Triad-III
14    Disinfectant, which are effective at disinfecting hard surfaces and destroying such viruses
15    as MRSA, HBV, HIV, and Hepatitis B & C, as well as the SARS-COV-2 family of viruses.
16    (Doc. 28 at 17-18, citing Roska Decl. ¶¶ 42, 44-45.)  In a March 26, 2020 Briefing Notes
17    Report on the enhanced sanitation procedures, MCSO staff were directed to implement
18    extra cleaning of vehicles, work areas, high-touch areas in the offices, briefing rooms, and
19    break rooms, and to use Triad-III cleaner for surfaces.  (*Id.* at 18, citing Roska Decl. ¶¶ 46-
20    49; Phillips Decl. ¶¶ 48-51.)  Vehicles used to transport detainees/prisoners are to be
21    cleaned with Triad cleaner between runs, and MCSO has dedicated certain vehicles to
22    transport those who have tested positive for COVID-19 to eliminate the possibility of
23    infection when transporting detainees/prisoners who are not positive.  (*Id.*, citing Roska
24    Decl. ¶ 56.)

25         MCSO internal housekeeping staff have increased sanitization protocols since the
26    end of March 2020, concentrating on sanitizing high touch surfaces such as door handles,
27    knobs, handrails, intercoms, push buttons, tables, and showers.  (*Id.*, citing Roska Decl.
28    ¶ 50.)  MCSO has purchased Ryobi sprayers and pump sprayers for use with Triad III

cleaner to sanitize mattresses, holding cells, and living spaces.  (*Id.*, citing Roska Decl. ¶ 51.)  All housing units have their own cleaning supplies "for easy access by staff and detainees/prisoners to clean common areas and cells."  (*Id.*)

CHS staff are to disinfect surfaces when indicated in patient care areas and in between patient contacts.  (*Id.*)  CHS has also developed a standard operating procedure for Cleaning/Disinfection of Unit Surfaces and Non-Disposable Instrument Equipment, which is designed to minimize incidents of communicable disease transmission among patients and staff.  (*Id.*, citing Phillips Decl. ¶ 51.)

Plaintiffs reply that there is a marked difference in sanitation practices for staff and those incarcerated, noting that the only parts of the jails subject to janitorial cleaning are places exclusive to staff use and that janitorial staff are required to wear masks and gloves, that cleaning schedules only pertain to staff areas and vehicles, not areas used by the incarcerated, and that the incarcerated "are left to fend for themselves and are required to clean common areas—even areas recently vacated by people suspected or known to have had COVID-19—with limited disinfectant, no gloves, and without other basic cleaning supplies."  (Doc. 40 at 9-10, citing Perez Suppl. Decl. ¶ 11; Tequida Supp. Decl. ¶ 11; Ochoa Suppl. Decl. ¶ 8; Fenty Suppl. Decl. ¶¶ 5, 15, 16; Stepter Suppl. Decl. ¶ 8; Avenenti Suppl. Decl. ¶ 10; Suggs Suppl. Decl. ¶ 3.)  Williams responds that cleaning supplies are for the use of both staff and detainees/prisoners at each facility.  (Doc. 50 ¶ 16.)

### 7.    Personal Hygiene and Masks

Defendants do not generally provide individuals with personal hygiene products such as paper towels or hand sanitizer, and detainees/prisoners are forced to use the bathing towel they are given once a week to wipe down surfaces and dry their hands.  (Doc. 14 at 14, citing Boykins Decl. ¶ 23; Ochoa Decl. ¶¶ 12-15; Player Decl. ¶ 11; Lewis Decl. ¶¶ 11-12; Perez Decl. ¶¶ 23-24; Scroggins Decl. ¶ 15; Tequida Decl. ¶¶ 18-20; Suggs Decl. ¶ 20.)  Williams responds that towels are normally exchanged at least three times a week, but to limit movement at the facilities, three clean towels are delivered at once each week.  (Doc. 50 ¶ 6.)   Williams also asserts that cleaning rags are always available for

1    detainees/prisoners in the facility's cleaning supplies, and that a cleaning towel for personal

2    use is exchanged once a week, and that an individual may request to exchange a towel in

3    between deliveries.  (*Id.*)  No incarcerated person is required to wear a mask, but those who

4    do want masks generally only receive one or two disposable paper masks over a period of

5    months, even if housed in a unit that has been quarantined due to exposure to COVID-19

6    and even if the mask is lost, soiled or broken.  (Doc. 14 at 14, citing Boykins Decl. ¶ 24;

7    Player Decl. ¶ 12; Avenenti Decl. ¶ 19; Lewis Decl. ¶ 13; Fenty Decl. ¶ 14; Ochoa Decl. ¶

8    16; Perez Decl. ¶ 25; Scroggins Decl. ¶ 17; Stepter Decl. ¶ 16; Tequida Decl. ¶ 22; Suggs

9    Decl. ¶ 21.)

10           According to Defendants, detainees/prisoners have access to soap and personal

11   hygiene products for personal use to mitigate the spread of COVID-19 and other infectious

12   diseases.  (Doc. 28 at 18, citing Phillips Decl. ¶ 53.)  MCSO does not provide alcohol-

13   based hand sanitizer for the incarcerated because it can be used as an accelerant or to make

14   alcohol-based liquids for consumption, which could lead to intoxication and possibly

15   serious injury to staff or detainees/prisoners.  (*Id.* at 19, citing Roska Decl. ¶ 54.)

16           Beginning in late March, all detainees/prisoners were issued surgical masks without

17   cost, they are advised on the most effective ways to ensure the mask stays clean, and if a

18   mask is lost or damaged, the detainee/prisoner "simply need[s] to ask, and they will receive

19   one."  (*Id.* at 19, citing Roska Decl. ¶¶ 58, 60, 69.)  Detainees/prisoners at the Fourth

20   Avenue Jail receive a new surgical mask every Saturday morning.  (*Id.* at 20, citing Roska

21   Decl. ¶ 59.)  Detainees/prisoners receive instructions in English and Spanish to wear their

22   masks whenever possible and to always wear them to court, medical or anytime they are

23   outside the housing unit.  (*Id.*, citing Roska Decl. ¶ 60.)  Detainees/prisoners who work in

24   food preparation are provided gloves and masks.  (*Id.*, citing Roska Decl. ¶ 62.)

25           Plaintiffs dispute that they can simply ask for a new mask when needed and assert

26   that requests for new masks are typically rejected.  (Doc. 40 at 16-17, citing Boykins Decl.

27   ¶ 24; Crough Decl. ¶¶ 20-21; Fenty Suppl. Decl. ¶ 13; Crough Suppl. Decl. ¶ 7.)

28   . . . .

1

### 8. Staff Instructions

Staff who work at the jails travel to and from their homes and communities for work and are at risk of contracting the virus and transmitting it to those incarcerated or others who work in the jails, but there is no policy to test all staff or check for symptoms when staff enter the facility.  (Doc. 14 at 19, citing Cohen Decl. ¶ 73.)  Staff are merely instructed to stay home if sick with fever, cough, or difficulty breathing and to contact their healthcare provider.   (*Id*., citing MCSO Press Release dated June 15, 2020, *COVID-19 FAQ*.) Asymptomatic carriers who are not identified can spread the virus, especially since staff do not consistently wear masks or wear their masks below the chin, which defeats the purpose of the masks, and staff do not change gloves between inspecting detainees/prisoners.  (*Id*., citing Boykins Dec. ¶ 26; Player Decl. ¶ 13; Avenenti Decl. ¶ 20; Lewis Decl. ¶ 14; Dupont Decl. ¶ 11; Ochoa Decl. ¶ 17; Perez Decl. ¶ 26; Scroggins Decl. ¶¶ 11, 18; Suggs Dec. ¶ 23; Fenty ¶ 10; Reason ¶ 16; Tequida ¶ 23.)

Defendants assert that beginning in March 2020, MCSO began educating staff about COVID-19—issuing two detailed memos on March 18 and March 26—and informing staff how the virus is spread, common symptoms, how to protect oneself from exposure, appropriate PPE to use when around individuals with suspected or confirmed COVID-19, how to respond to detainees/prisoners with symptoms, disinfection and transportation protocols, and PPE requirements.  (Doc. 28 at 11, citing Roska Decl. ¶¶ 67, 69.)  When staff arrive at their assigned facility, they are screened with a series of questions or a health situation report which they must respond to when logging onto a computer at the beginning of the shift.  (*Id*. at 12, citing Roska Decl. ¶ 72.)

All CHS staff must sign an Attestation declaring that if they are sick or have symptoms such as difficulty breathing, cough, or fever over 100.4 degrees, they will immediately notify their direct supervisor and staff, self-quarantine, and seek medical attention.  (*Id*., citing Phillips Decl. ¶ 30.)  CHS staff who test positive for COVID-19 must self-quarantine for 10 days and be symptom free for 72 hours before they can return to work.  (*Id*., citing Phillips Decl. ¶ 32.)  CHS Infection Control notifies employees if they

potentially came into contact with someone who tested positive. (*Id.*, citing Phillips Decl. ¶¶ 33-34.) As of May 2020, all CHS staff are required to wear masks while on duty, appropriate PPE when required, and practice proper hygiene, and they receive email communications several times a week with daily updates on COVID-19 statistics within the jail population, possible exposures, COVID-19 precautions, and mask use. (*Id.*, citing Phillips Decl. ¶¶ 36-37, 42-44.)

Detention officers have been issued N95 masks, along with a washable mask filter, and, as of June 29, 2020, they are instructed to wear the mask at all times while inside the common areas of jail or any place that interaction with detainees/prisoners may take place and while transporting detainees/prisoners. (*Id.*, citing Roska Decl. ¶¶ 33, 64-65.) All shift briefings that were conducted in-person prior to March 2020 have been changed to an email or telephone briefing when necessary. (*Id.*, citing Roska Decl. ¶ 73.) During transport, MCSO staff are required to wear a mask, gown, gloves, and face shield, and if a detainee/prisoner awaiting transport complains of fever, cough, shortness of breath or other symptoms of acute illness, MCSO staff are to contact the CHS facility nurse manager, who may contact an on-duty CHS healthcare provider, if needed. (*Id.*, citing Phillips Decl. ¶¶ 67-68.) If there is a high suspicion of a possible COVID-19 infection, CHS staff advise MCSO staff to provide the detainee/prisoner with a surgical mask during transport. (*Id.*, citing Phillips Decl. ¶ 68.) Upon arrival, CHS staff are notified and instruct MCSO personnel on where the detainee/prisoner's evaluation will take place. (*Id.*)

Plaintiffs reply that there is a significant gap between the policies designed to protect staff versus those designed to protect the incarcerated, such as the N95 masks with machine washable inserts that staff receive and are required to wear in jail common areas whereas incarcerated people are not required to wear any masks, much less N95 masks, even in common areas, and are only instructed to wear thin, surgical paper masks in limited situations like attending court, receiving medical care, or leaving their housing unit. (Doc. 40 at 2.) Moreover, the masks given to incarcerated people are intended only for a single use and should be replaced daily to be effective. (*Id.* at 8, citing Cohen Decl. ¶¶ 119-120;

Cohen Suppl. Decl. ¶ 51.)  Even an internal MCSO memo to staff states that "[d]isposable face masks can only be used once." (*Id*. at 8-9, citing Doc. 28 at 17; Doc. 29-1 at 18.)  And Defendants' evidence shows that only detainees/prisoners at the Fourth Avenue Jail are given new masks each week.  (*Id*. at 8.)  Plaintiffs assert that medical staff and detention officers still routinely fail to wear masks or wear them improperly.  (*Id*. at 15-16, citing Fenty Suppl. Decl. ¶ 13; Perez Suppl. Decl. ¶ 6; Suggs Suppl. Decl. ¶ 5; Avenenti Suppl. Decl. ¶ 7.)

### E.   Injunctive Relief Standard

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right").  A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Under this serious questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

Regardless of which standard applies, the movant "has the burden of proof on each element of the test." *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).  Further, there is a heightened burden where a plaintiff seeks a

mandatory preliminary injunction, which should not be granted "unless the facts and law clearly favor the plaintiff." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986) (citation omitted).

The Prison Litigation Reform Act imposes additional requirements on prisoner litigants who seek preliminary injunctive relief against prison officials and requires that any injunctive relief be narrowly drawn and the least intrusive means necessary to correct the harm.  18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

## F.   Discussion

Plaintiffs assert claims challenging their conditions of confinement under the Eighth and Fourteenth Amendments.  To succeed under either amendment, Plaintiffs must establish "deliberate indifference" on the part of Defendants.  *Farmer v. Brennan*, 511 U.S. 825, 846, (1994) (Eighth Amendment); *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466, 2473–74 (2015) (Fourteenth Amendment).  "Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions.  It entails something more than negligence but is satisfied by something less than acts or omission for the very purpose of causing harm or with knowledge that harm will result."  *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013).

To succeed on their Eighth Amendment claim, Plaintiffs need to prove both objective and subjective deliberate indifference.  *Farmer*, 511 U.S. at 842.  Their Fourteenth Amendment claim, however, requires only that they prove objective deliberate indifference.  *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018)

### 1.   Objective Deliberate Indifference

To satisfy the objective prong, Plaintiffs must show an "objectively intolerable risk of harm."  *Farmer*, 511 U.S. at 842.  The Ninth Circuit has established a four-part test to determine objective deliberate indifference:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering

1
2
3
4

> serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

5
6
7
8
9
10
11
12

*Gordon*, 888 F.3d at 1125. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Id.* (quoting *Kingsley*, 135 S.Ct. at 2473; *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id.* (quoting *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986). Therefore, a plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

13
14
15
16
17
18
19

      The available evidence shows that the conditions in the jails present a risk of serious harm. At the time Plaintiffs filed their motion on June 30, 2020, there were 565 positive COVID-19 cases in the MCSO jails, but as of August 6, 2020, that number had risen to 1,420 positive cases. It is also undisputed that certain Plaintiffs have underlying mental and physical conditions and age that put them at higher risk of contracting COVID-19 and at increased risk of severe illness or death if they become infected. The parties dispute, however, whether Defendants have taken reasonable measures to abate that risk.

20
21
22
23
24
25
26
27
28

      There is no dispute that Defendants have taken certain measures to abate the risk, which now includes universal testing, limiting access to the jails, reducing the jail population, instituting enhanced sanitation protocols, particularly in areas accessible only to staff, issuing masks to detainees/prisoners, and providing education on COVID-19. Plaintiffs dispute that those measures are uniformly followed or sufficient or comply with CDC standards. However, some of Defendants' measures, such as universal testing, go beyond what the CDC recommends. As such, Plaintiffs have not established, at this stage, that Defendants' measures are objectively unreasonable. Moreover, there are disputed issues of material fact as to the reasonableness of the measures implemented by MCSO

and whether those measures have been consistently carried out that preclude the Court from issuing a preliminary injunction, particularly since Defendants' measures to respond to COVID-19 appear to be evolving.  *See Mayview Corp. v. Rodstein*, 480 F.2d 714, 719 (9th Cir. 1973) (finding a preliminary injunction to be improper "[b]ecause of the disputed facts" and that "the matter should proceed to trial on the merits"); *see also Torres v. Milusnic*, No.: CV 20-4450-CBM-PVC(x), 2020 WL 4197285, at *13 (C.D. Cal. July 14, 2020) ("The disputed facts as to the safety measures implemented at Lompoc precludes the Court from issuing a temporary restraining order at this stage requiring Respondents to implement the specific safety measures to combat COVID-19 requested by Petitioners."); *Martinez-Brooks*, No. 3:20-cv-00569, 2020 WL 2405350, at *29 (D. Conn. May 12, 2020) (denying request for temporary restraining order because "factual disputes preclude [the court] from concluding at this stage that the Warden's implementation of measures to protect against the spread of COVID-19 exhibits deliberate indifference to the serious risks posed by the virus, and thus that the Petitioners are likely to succeed on the merits of this portion of their claim").

### 2.      Subjective Deliberate Indifference

To succeed on their Eighth Amendment claim with regards to the Post-Conviction Plaintiffs, Plaintiffs must prove subjective deliberate indifference.  The subjective prong requires "more than ordinary lack of due care for the prisoner' s interest or safety." *Farmer*, 511 U.S. at 835 (quotation omitted).  To prove deliberate indifference, a plaintiff must show that the official knew of and disregarded an excessive risk to inmate safety. *Id.* at 837.

The spread of COVID-19 within the MCSO jails does not equate to subjective deliberate indifference to the safety of its detainees/prisoners.  Courts across the country have struggled with the necessary showing for subjective deliberate indifference in light of COVID-19 in correctional facilities. *See, e.g., Torres*, 2020 WL 4197285, at *14 (citing *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (finding "while the harm imposed by COVID-19 on inmates at Elkton ultimately [is] not averted, the BOP has responded

reasonably to the risk and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights," noting evidence that the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, providing masks, and engaging in efforts to expand testing "demonstrate the opposite of a disregard of a serious health risk") (internal quotations and citations omitted); *Valentine v. Collier*, 956 F.3d 797, 802-03 (5th Cir. 2020) (prison officials showed likelihood of success on appeal of preliminary injunction issued by district court requiring the officials to immediately implement more preventive measures to combat COVID-19 in Texas state prison, reasoning the plaintiffs lacked evidence of the defendants' "subjective deliberate indifference" to the substantial risk of serious harm of COVID-19 and noting "[t]o the contrary, the evidence shows that [Texas Department of Criminal Justice] has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus"); *Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020) (finding that the district court incorrectly collapsed the subjective and objective components of the deliberate indifference inquiry for plaintiffs' Eighth Amendment claim and likely erred because (1) resultant harm does not establish a liable state of mind for deliberate indifference but the district court "treated the increase in COVID-19 infections as proof that the defendants deliberately disregarded an intolerable risk"; and (2) "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence'").

Defendants in this case are aware of the risks posed by COVID-19 as evidenced by the Declarations of Williams, Roska and Phillips. However, the evidence presented by Plaintiffs does not satisfy the subjective prong of Plaintiffs' Eighth Amendment claim by showing that the measures Defendants have taken, or not taken, to protect prisoners from COVID-19 were in conscious or reckless disregard of the safety and health of the detainees/prisoners, even if some do eventually contract COVID-19. *See Farmer*, 511 U.S. at 844 (the fact that "the harm ultimately was not averted" does not demonstrate deliberate

indifference); *Swain*, 958 F.3d at 1089.  Accordingly, the record does not support that Defendants are likely to succeed on the merits of their Eighth Amendment claim or that there are serious questions going to the merits of that claim.

Because Plaintiffs have failed to show a likelihood of success of merits on either the Eighth or Fourteenth Amendment claims, the Court need not consider the remaining *Winter* elements.  *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015) (citations omitted).

### 3. ADA/RA

Plaintiffs also assert claims and the ADA/RA on behalf of the Pretrial and Post-Conviction Disability subclasses and Puente.  To prove a public program or service violates Title II of the ADA, a plaintiff must show: (1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.  *See* 42 U.S.C. § 12132; *Does 1-5 v. Chandler*, 83 F.3d 1150, 1154-55 (9th Cir. 1996).  Under Section 504 of the Rehabilitation Act, a plaintiff must show: (1) he is an "individual with a disability"; (2) he is "otherwise qualified" to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability*;* and (4) the program receives federal financial assistance.  *See* 29 U.S.C. § 794; *Bonner v. Lewis,* 857 F.2d 559, 562-63 (9th Cir. 1988); *Doherty v. Southern College of Optometry,* 862 F.2d 570, 573 (6th Cir. 1988).  Because the ADA has a broader scope, the Ninth Circuit analyzes both Acts under an ADA standard.  *See Armstrong v. Davis*, 275 F.3d 849, 862 (9th Cir. 2001); *Zuckle v. Regents of the University of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act.  Thus, courts have applied the same analysis to claims brought under both statutes.") (internal citations omitted).  The plaintiff in a Title II case bears the initial burden "of producing evidence that a reasonable accommodation was possible."  *Vinson v. Thomas* , 288 F.3d 1145, 1154 (9th Cir. 2002).

1    The burden then shifts to the public entity to show "that the requested accommodation was

2    not reasonable." *Id.*

3          Plaintiffs argue in their Motion that the disability subclasses are vulnerable to severe

4    illness or death if they contract COVID-19 and that Defendants have failed to take steps to

5    protect this vulnerable group to prevent their infection, thereby denying them "an equal

6    opportunity to benefit from the jails' services, including recreational 'activities,' medical

7    'services,' and education and vocational 'programs.'"  (Doc. 14 at 34, quoting *Penn. Dep't*

8    *of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998).)  Plaintiffs cite to Tequida's Declaration

9    where he states that he stays in his cell during the day and does not get in line to receive

10   his medications or meals because there is no social distancing in the lines.  (*Id*. at 35, citing

11   Tequida Decl. ¶ 13.)

12         Defendants argue that although some of the Plaintiffs' medical conditions appear to

13   qualify as disabilities under the ADA/RA, Plaintiffs fail to allege sufficient facts showing

14   that they were discriminated against because of those conditions.  (Doc. 28 at 44.)  Plaintiffs

15   respond that that they do not need to prove intentional, subjective discrimination based on

16   disability, but that a defendant's failure to provide reasonable accommodations is sufficient

17   to demonstrate discrimination "by reason of disability."  (Doc. 40 at 39, quoting *McGary*

18   *v. City of Portland*, 386 F.3d 1259, 1265-66 (9th Cir. 2004).)  Plaintiffs are correct that the

19   Ninth Circuit, in *McGary*, found that the lower court erred in requiring that the defendants

20   act "by reason of" the plaintiff's disability and held that "facially neutral policies may

21   violate the ADA when such policies unduly burden disabled persons, even when such

22   policies are consistently enforced."  *McGary*, 386 F.3d at 1265.

23         Nevertheless, Plaintiffs have failed to show that being at a higher risk of contracting

24   COVID-19 equates to a barrier of access to services.  The cited affidavit that one Plaintiff

25   does not want to leave his cell for fear of contracting the virus is insufficient to support that

26   the subclasses are categorically inhibited.

27

28

Accordingly, Plaintiffs have failed to show a likelihood of success or serious questions going to the merits on their ADA/RA claim and the Court need not consider the remaining *Winter* elements.  *Garcia.,* 786 F.3d at 740.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Plaintiff's Ex Parte Application for Temporary Restraining Order (Doc. 14), which the Court construes as a Motion for Preliminary Injunction, and Defendants' Motion to Dismiss (Doc. 32).

(2)     Defendants' Motion to Dismiss (Doc. 32) is **granted to the extent** that the Fourth and Eighth Amendment claims against Defendant Penzone are dismissed.  The Motion is **denied** in all other respects.

(3)     Plaintiff's Motion for Preliminary Injunction (Doc. 14) is **denied**.

Dated this 14th day of August, 2020.

Honorable Steven P. Logan
United States District Judge