Larry J. Wulkan (Bar No. 021404)
**Zwillinger Wulkan, PLC**
2020 North Central Avenue, Suite 675 |
Phoenix, Arizona 85004
Telephone: (602) 962-0089
Fax: (602) 962-0089
Email: larry.wulkan@zwfirm.com

*Additional counsel listed on following page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Fenty, Brian Stepter, Douglas Crough, Edward Reason, Jesus Tequida, Ramon Avenenti, Anthony Scroggins, Dale Perez, and Tamara Ochoa on behalf of themselves and those similarly situated,<br><br>　　　　　　Plaintiffs-Petitioners,<br><br>Puente Human Rights Movement,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>Sheriff Paul Penzone, in his official capacity, and Maricopa County, a municipal entity,<br><br>　　　　　　Defendants. | No. 2:20-cv-01192-SPL-JZB<br><br>**PLAINTIFF-PETITIONERS' OBJECTIONS TO THE PORTION OF THE MAGISTRATE JUDGE'S ORDER REQUIRING INDIGENT PLAINTIFFS TO PAY THE COUNTY'S DISCOVERY COSTS (Dkt. 126, Aug. 11, 2021)**<br><br>(Oral Argument Requested) |

| | |
|---|---|
| 1 | **SHARI ROSS LAHLOU** (*Admitted Pro Hac Vice*) (shari.lahlou@dechert.com) |
| 2 | **DECHERT LLP** |
| | 1900 K Street, N.W. |
| 3 | Washington, DC 20006 - 1110 |
| | Telephone: (202) 261-3300 |
| 4 | **BRIAN RAPHEL** (*Admitted Pro Hac Vice*) (brian.raphel@dechert.com) |
| 5 | **PAT ANDRIOLA** (*Admitted Pro Hac Vice*) (pat.andriola@dechert.com) |
| | **TIMOTHY LY** (*Admitted Pro Hac Vice*) (timothy.ly@dechert.com) |
| 6 | **DECHERT LLP** |
| 7 | Three Bryant Park, 1095 Avenue of the Americas |
| | New York, NY 10036 |
| 8 | Telephone: (212) 698-3500 |
| | **BENJAMIN M. SADUN** (*Admitted Pro Hac Vice*) (benjamin.sadun@dechert.com) |
| 9 | **ALLISON OZUROVICH** (*Admitted Pro Hac Vice*) (allie.ozurovich@dechert.com) |
| 10 | **DECHERT LLP** |
| | 633 West 5th Street, Suite 4900 |
| 11 | Los Angeles, CA 90071 |
| | Telephone: (213) 808-5700 |
| 12 | **JARED G. KEENAN** (SBN 027068) (jkeenan@acluaz.org) |
| 13 | **ACLU FOUNDATION OF ARIZONA** |
| | P.O. Box 17148 |
| 14 | Phoenix, AZ 85011 |
| | Telephone: (602) 650-1854 |
| 15 | **OLGA AKSELROD** (*Admitted Pro Hac Vice*) (oakselrod@aclu.org) |
| 16 | **AMERICAN CIVIL LIBERTIES UNION FOUNDATION** |
| | 125 Broad Street, 18th Floor |
| 17 | New York, NY 10014 |
| | Telephone: (212) 549-2569 |
| 18 | **CORENE KENDRICK** (*Admitted Pro Hac Vice*) (ckendrick@aclu.org) |
| | **KYLE VIRGIEN** (*Admitted Pro Hac Vice*) (kvirgien@aclu.org) |
| 19 | **AMERICAN CIVIL LIBERTIES UNION FOUNDATION** |
| 20 | 39 Drumm St. |
| | San Francisco, CA 94111 |
| 21 | Telephone: (202) 393-4930 |

Plaintiffs have not objected to the magistrate judge's previous orders and will continue to only object to orders in extraordinary circumstances. The magistrate judge issued an order that, in part, required the parties to split the costs of certain discovery. Dkt. 126 at 2. This narrow portion of the order seriously misapplied the law and will have unintended consequences for the public interest and civil rights litigation generally.

## I. INTRODUCTION

The COVID-19 pandemic has impacted places of incarceration in a particularly devastating way. Incarcerated Americans are over three times more likely to have been infected over the course of the pandemic than the average American. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, New York Times (Apr. 10, 2021), www.nytimes.com/interactive/2021/04/10/us/covid-prison-outbreak.html. In facilities whose responses to the pandemic have been particularly egregious, class-action plaintiffs have bravely stepped up to file suit, risking retaliation and intrusive discovery to protect their fellow incarcerated people from the worst of the pandemic's ravages. Some have achieved important protections through litigation. *E.g.*, *Roman v. Wolf*, No. ED CV 20-00768 TJH, 2020 WL 6107069, at *4 (C.D. Cal. Oct. 15, 2020) (requiring, among other measures, releases to decrease a facility's population to a level where social distancing is possible); *Maney v. Brown*, No. 6:20-CV-00570-SB, 2021 WL 354384, at *17 (D. Or. Feb. 2, 2021) (requiring the state to offer vaccines to everyone in its custody). Others did not prevail in court, but nonetheless achieved important policy changes by shining a spotlight on unsafe conditions. As the Fifth Circuit noted in overturning a judgment following a trial: "We are firmly convinced that this litigation . . . played a role in motivating the prison officials into action and saved countless lives." *Valentine v. Collier*, 993 F.3d 270, 289 (5th Cir. 2021).

Plaintiffs are several indigent incarcerated people and a small non-profit. They, like so many others who have challenged facilities' unsafe handling of the pandemic, took on the burdens of bringing a suit with the sole goal of protecting their incarcerated community. They seek no monetary damages. The magistrate judge issued a discovery

order that, among other things, penalized Plaintiffs for that selfless act by shifting a discovery cost from Maricopa County onto them. Dkt. 126 at 2. Although the dollar value ($700) seemed to the magistrate judge like a "low cost," Ex. B at 6:19, it is a serious imposition on an indigent, incarcerated person or small non-profit. For example, one named Plaintiff was only incarcerated in the first place because he could not afford a $500 bond, and even the named Plaintiffs lucky enough to have a job in jail or prison make just 25 cents per hour, meaning that this $700 cost could take years to pay. To shift a discovery cost from a well-financed government entity to indigent civil-rights plaintiffs is—in the words of another court considering the issue—"outrageous." *John B. v. Goetz*, 879 F. Supp. 2d 787, 887 (M.D. Tenn. 2010). The portion of the magistrate judge's order that shifted costs is contrary to law and would have a chilling effect upon other indigent civil rights plaintiffs, and the Court must set it aside.

## II. PROCEDURAL BACKGROUND

The parties conducted documentary discovery in this case in two portions. First, they produced non-electronic documents. Then, the parties began to negotiate over email production (or "ESI"). After these negotiations broke down, the magistrate judge granted Plaintiffs' request that Plaintiffs be permitted to provide search terms that would result in a production of 8,000-10,000 email documents, and Defendants be required to produce them, making "best efforts to deduplicate emails." Ex. A at 16:3-13; Dkt. 111 at 1-2.

Plaintiffs worked with Defendants to provide search terms. Defendants, however, refused to fully de-duplicate the emails for production by performing a process termed "threading," which removes emails whose content is fully duplicated in other emails belonging to the same chain. For example, if one person sends an email to a second person, who replies and then forwards that reply to a third person, the forwarded email will contain duplicate versions of the original email and reply. In that case, threading would remove the original email and reply as duplicative. Plaintiffs raised Defendants' refusal to fully de-duplicate to the magistrate judge, who enforced his original order by ordering Defendants to perform threading. Dkt. 126 at 1; Ex. B at 13:23-14:2. However,

1  the magistrate judge also ordered relief that neither party had sought or briefed: "the
2  parties shall evenly split the cost of threading the responsive emails (estimated to be
3  $1400)." Dkt. 126 at 2. Plaintiffs requested the opportunity to brief cost-shifting, but the
4  magistrate judge rejected that request. *Id.* at 6:2-7:3.

## III. LEGAL BACKGROUND

### A. Standard of Review

A party may object to a non-dispositive pretrial order of a magistrate judge. Fed. R. Civ. P. 72. The Court "must … modify or set aside any part of the order that is clearly erroneous or is contrary to law." *Id.* Under the "contrary to law" standard, district judges independently review purely legal determinations by a magistrate judge. *See*, *e.g.*, *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 91 (3d. Cir. 1992); *Med. Im. Cntrs. of Am., Inc. v. Lichtenstein*, 917 F. Supp. 717, 719 (S.D. Cal. 1996). The district court should exercise its independent judgment with respect to a magistrate judge's legal conclusions. *Gandee v. Glaser*, 785 F. Supp. 684, 686 (S.D. Ohio 1992), *aff'd* 19 F.3d 1432 (6th Cir. 1994).

### B. Cost-Shifting

Cost-shifting in discovery is rare because: "The presumption is that the responding party must bear the expense of complying with discovery requests." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978); *see also* Fed. R. Civ. P. (2015 Advisory Comm. Note to Rule 26(c)(1)(B)) ("[A] responding party ordinarily bears the costs of responding."). In this circuit, a responding party can overcome this presumption only by satisfying the test set out in the "seminal" opinion of *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 321 (S.D.N.Y. 2003) ("*Zubulake I*"). *U.S. ex rel. Guardiola v. Renown Health*, No. 3:12-CV-00295-LRH, 2015 WL 5056726, at *2 (D. Nev. Aug. 25, 2015); *see also Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2017 WL 7520603, at *7 (D. Ariz. Dec. 19, 2017) (applying *Zubulake* analysis to find that detention center could not shift discovery costs onto civil rights plaintiffs).

Under this framework, courts first consider the threshold question whether they may properly consider cost-shifting as an option. This is because "courts may order cost-

shifting in one, limited circumstance: the ESI is reasonably inaccessible due to undue burden or undue cost, but the requesting party nevertheless renders it discoverable under the relevant factors." *Guardiola*, 2015 WL 5056726, at *10 (collecting cases). If cost-shifting is not an option, then the analysis ends. *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 284 (S.D.N.Y. 2003) ("*Zubulake II*") ("When a discovery request seeks accessible data—for example, active on-line or near-line data—it is typically inappropriate to consider cost-shifting.").

If the court determines it may consider cost-shifting as an option, it looks to the seven factors set forth in *Zubulake I* and applied in *Zubulake II*, listed from most to least important: "(1) the extent to which the request is specifically tailored to discover relevant information; (2) the availability of such information from other sources; (3) the total cost of production, compared to the amount in controversy; (4) the total cost of production, compared to the resources available to each party; (5) the relative ability of each party to control costs and its incentive to do so; (6) the importance of the issues at stake in the litigation; and (7) the relative benefits to the parties of obtaining the information." *Guardiola*, 2015 WL 5056726, at *10 (citing *Zubulake I*, 217 F.R.D. at 324).

## IV. ARGUMENT

The cost-shifting order was contrary to law at both steps of the *Zubulake* test.

### A. Cost-Shifting Is Not Available Because the Evidence at Issue Is Accessible

The magistrate judge erred at the outset by not considering whether the evidence at issue is accessible—the threshold determination that dictates whether he could consider imposing cost-shifting. *Guardiola*, 2015 WL 5056726, at *9. Accessible data generally includes data that is "active, online," "near-line," and "offline storage/archives," while inaccessible data generally includes "backup tapes" and "erased, fragmented or damaged data." *Zubulake I*, 217 F.R.D. at 319-20. The *Zubulake* court explained the relevance of this distinction: when data is "accessible," the responding party "can respond to [the] request [for production] cheaply and quickly," so "it would be wholly inappropriate to even consider cost-shifting." *Id.* at 320. For inaccessible data, in contrast, the responding

4

1 party would "have to engage in [a] costly and time-consuming process" to even obtain
2 access to the data, so it is "appropriate to *consider* cost shifting." *Id.* (emphasis in
3 original). Here, the data was readily accessible from Defendants' active email system.
4 Defendants have never contended it is inaccessible and have never sought to shift the cost
5 of threading. Ex. C at 1-2. In fact, Defendants have already searched the email data,
6 showing that accessibility poses no issue. *Id.* The magistrate judge considered cost-
7 shifting without even attempting this threshold determination of unavailability. He did so
8 on a record that cannot support unavailability. This was "contrary to law," and his order
9 of cost-sharing should be set aside on this basis alone. Fed. R. Civ. P. 72(a).

**B. An Application of the *Zubulake* Factors Shows Cost-Sharing Is Improper**

All *Zubulake* factors weigh against cost-sharing, some very strongly. The magistrate judge did not consider these factors, and had he considered them, he would have found them to bar cost-sharing. His order was further "contrary to law" for this reason, and it should be set aside. *Id.*

1. The Extent to Which the Request Is Specifically Tailored to Discover Relevant Information

Plaintiffs' requests for ESI are specifically tailored to discover relevant information. In an earlier hearing, Plaintiffs proposed a framework to target a limited set of especially relevant ESI, and the magistrate judge implemented that proposal. Dkt. 111 at 1-2. Under this framework, Plaintiffs proposed search terms that would result in a production of 8,000-10,000 documents (after de-duplication). Ex. A at 16:3-13; 20:19-21:5. Defendants agreed at the hearing that this approach was "reasonable." *Id.* at 21:6-8. Plaintiffs complied with this order, and Defendants agree that the parties currently "are on track to produce between 8,500 and 10,000 documents." Ex. B at 14:24-25. The threading that is at the center of this dispute further tailors the request to remove duplicate emails that both parties would otherwise need to waste time reviewing. Plaintiffs' targeted email searches weigh against cost-sharing. *See*, *e.g.*, *Juster Acquisition Co., LLC v. N. Hudson Sewerage Auth.*, No. CIV.A. 12-3427 JLL, 2013 WL 541972, at *4 (D.N.J. Feb. 11, 2013) (finding this factor to weigh against cost-shifting because the "requested

5

searches are reasonable").

### 2. The Availability of Such Information from Other Sources

Plaintiffs and Defendants have collaborated in this case to ensure that email evidence is drawn from whatever source is most readily accessible. Defendants have never contended that there is any other source for the information in the email data at issue here. This factor thus weighs against cost-shifting.

### 3. The Total Cost of Production, Compared to the Amount in Controversy

Unlike in *Zubulake* and most cases applying its test, Plaintiffs seek no monetary damages and solely seek Defendants' compliance with their constitutional obligations. Another court, in determining the "amount in controversy" for purposes of this *Zubulake* factor in a class action seeking no monetary relief, looked to the total governmental expenditures on the program subject to potential injunctive relief. *John B.*, 879 F. Supp. 2d at 887. Here, the annual budget of the Maricopa County Sheriff's office is upwards of $400 million. Maricopa County Sheriff's Office, *MCSO at a Glance*, www.mcso.org/about-us/mcso-at-a-glance.[1] This amount vastly outstrips the $1,400 discovery cost at issue here. Although the magistrate judge erred by failing to consider this factor, he expressly stated: "[T]his is a significant case. There are a lot of allegations, large. So I don't think that this [is an] undue burden for either party and the cost of the threading is low." Ex. B at 17:4-7. This factor thus weighs against cost-shifting.

### 4. The Total Cost of Production, Compared to the Resources Available to Each Party

This factor weighs so heavily against cost-shifting that it is essentially dispositive. The resources available to each party in this case are wildly imbalanced. Courts regularly find in cases where one party's resources "dwarf" the other that this factor weighs against

---

[1] Even cases that do not involve significant monetary expenditures can still implicate societal concerns that are weighty enough to outweigh even large discovery expenses. *See* Fed. R. Civ. P. 26 (Committee Notes on Rules – 2015 Amendment) (recognizing that there is some "litigation that seeks relatively small amounts of money, or no money at all, but that seeks to vindicate vitally important personal or public values"). This litigation certainly implicates significant societal concerns as Plaintiffs seek to stop the spread of a deadly pandemic in the Jail and beyond. However, because the discovery cost involved is so minuscule relative to the government's expenditures on the jail, the Court need not assess the value of these important societal interests.

cost-sharing. *E.g.*, *Guardiola*, 2015 WL 5056726, at *11 (quotation omitted). Here, shifting costs onto indigent incarcerated people and a small non-profit simply because they decided to selflessly pursue important civil-rights claims would be unconscionable and would generate serious policy concerns.

Defendant Maricopa County is a municipal entity with an annual budget of $3.4 billion. Maricopa County, *FY 2022 Adopted Budget*, 3, www.maricopa.gov/ ArchiveCenter/ViewFile/Item/5266. The $1,400 discovery expense at issue represents only 0.00004% of this budget, which poses no burden on Defendants. *Nehad v. Browder*, No. 15-CV-1386 WQH NLS, 2016 WL 3769807, at *4 (S.D. Cal. July 15, 2016) (finding this factor to weigh against shifting costs from municipal defendants when "the cost of production may only amount to about .0004% of Defendants' $3.2 billion budget"—10 times greater than the percentage here). In fact, counsel for Defendants "agree[d]" that "it is not a high cost" for Defendants. Ex. B at 10:2-3.

In contrast, the $1,400 cost that the magistrate judge split represents an enormous financial burden for Plaintiffs.[2] For example, Mr. Crough was incarcerated in the Jail for months because he was unable to pay a $500 bond. Crough Decl., ¶ 2. That Mr. Crough was unable to afford $500, even when it would buy his freedom, shows that this $700 assessment is a burden he cannot bear. Mr. Scroggins, too, has no income and cannot afford his bond. Scroggins Decl., ¶¶ 2-3. Mr. Crough and Mr. Reason are now incarcerated in state prison, where they work for 25 cents per hour—Mr. Crough as a

---

[2] The inquiry focuses on the burden that this cost poses on Plaintiffs themselves—not their counsel. *Fleisher v. Phoenix Life Ins. Co.*, No. 11 CIV. 8405 CM JCF, 2012 WL 6732905, at *4 (S.D.N.Y. Dec. 27, 2012). The text of the relevant Rule requires the Court to consider the "parties' resources" and never mentions other sources of funding such as counsel. Fed. R. Civ. P. 26(b)(1). There is simply no legal authority to shift costs onto counsel in these circumstances. When the Rules contemplate that costs may be imposed on counsel, they say so explicitly. *See* Fed. R. Civ. P. 37 (5)(A) (describing sanctions on the "attorney advising th[e] conduct" at issue). And even Rule 37 does "not contemplate[] that expenses will be imposed upon the attorney merely because the party is indigent." Fed. R. Civ. P. 37 (Advisory Committee's Note to 1970 Amendments). This rule makes sense: "if the assets of counsel were to be taken into consideration, the ability of clients to engage an attorney of their choice would likely be hampered." *Fleisher*, 2012 WL 6732905, at *4. This consideration is particularly important in cases such as this one, where counsel include firms donating *pro bono* services. Cost-shifting in such cases would impose a disincentive against providing indigent clients with *pro bono* services.

7

1 porter cleaning bathrooms and Mr. Reason in the kitchen. Crough Decl., ¶ 5; Reason
2 Decl., ¶ 3. At these rates, it would take someone years of work (at 4 hours per day, 7 days
3 per week) to pay the $700 fee that the magistrate judge assessed, even assuming these
4 Plaintiffs were able to devote their entire earnings to paying the fee. *See* Crough Decl., ¶
5 5. And they cannot. They rely on what meager earnings they have—or the generosity of
6 family and friends—to buy soap, toothpaste, calls with their family, and other basic
7 necessities. Stepter Decl., ¶¶ 2-3. And upon release, many will need to pay exorbitant
8 fines and fees. Mr. Crough, for example, was ordered to pay $2,700 as part of his sentence,
9 has a "gate fee" taken out of his earnings by the prison, and will need to pay community
10 supervision fees upon release. Crough Decl., ¶¶ 4-5. Another court has recognized these
11 financial strains, noting that "it would be manifestly unjust to award costs or attorney's
12 fees against" an indigent incarcerated plaintiff because he "would suffer great and severe
13 hardship, presumably for the rest of his life, if he could not provide for himself through
14 his prison wages at least some modicum of simple life comforts." *Shapiro v. Rynek*, 250
15 F. Supp. 3d 775, 780–81 (D. Colo. 2017) (also noting "the negative impact an award of
16 costs and fees against a prisoner . . . might have on public interest work and the [pro bono]
17 program in general"). And the Supreme Court has recognized that a $250-500 discovery
18 cost can be so prohibitive to an indigent, incarcerated litigant that it violates due process.
19 *Little v. Streater*, 452 U.S. 1, 14 n.10, 16-17 (1981).
20    Puente Human Rights Movement ("Puente") is also a Plaintiff. Puente, too, is ill-
21 equipped to pay the County's litigation costs. It stretches its $1.2 million budget to fund
22 a wide array of programs—including advocacy and educational programs, a food bank,
23 free legal services, and COVID vaccine education. Renteria Decl., ¶¶ 2-4. Some of
24 Puente's funding is earmarked for specific purposes and could not be used to pay
25 litigation costs. *Id.* at ¶ 2. If Puente were to pay litigation costs from its general funds, it
26 could do so only by diverting funding from its other crucial programming. *Id.* at ¶ 5.
27    It is "outrageous" to expect these Plaintiffs to pay the government's costs. *John*
28 *B.*, 879 F. Supp. 2d at 887 ("As to the parties' resources, the class consists of 550,000

1  children whose economic resources are non-existent. For the Defendants to argue that
2  Plaintiffs should pay the costs of production is outrageous."); *see also McPherson v. Fla.*
3  *Dep't of Corr.*, No. 4:19CV156-MW/CAS, 2019 WL 11271430, at *3 (N.D. Fla. Oct. 9,
4  2019) (finding "there can be no dispute that the 'relative resources' factor favors
5  [incarcerated] Plaintiff over [a prison]" and denying cost-shifting).

6        Serious policy considerations cause this factor to weigh even more strongly against
7  cost-shifting. The court in *Rowe Ent., Inc. v. William Morris Agency, Inc.*, a frequently
8  cited case that led to the *Zubulake* standard, worried that placing the burden of discovery
9  on the requesting party "places a price on justice that will not always be acceptable: it
10 would result in the abandonment of meritorious claims by litigants too poor to pay for
11 necessary discovery." 205 F.R.D. 421, 429 (S.D.N.Y. 2002). Nowhere is this worry
12 weightier than in civil-rights cases, where the worst violations are often borne by those
13 with the fewest available resources to challenge those violations. Congress recognized
14 this imbalance, for example, when it established fee-shifting in favor of civil-rights
15 plaintiffs to "ensure 'effective access to the judicial process' for persons with civil rights
16 grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (quoting H.R. Rep. No. 94–
17 1558, p. 1 (1976)). The magistrate judge's fee-shifting order ignores this crucial
18 consideration and could chill future plaintiffs considering civil-rights challenges. *See*
19 *Stanley v. Univ. of S. California*, 178 F.3d 1069, 1080 (9th Cir. 1999) (reversing an award
20 of costs because "the imposition of such high costs on losing civil rights plaintiffs of
21 modest means may chill civil rights litigation in this area").[3]

22       5. <u>The Relative Ability of Each Party to Control Costs and Its Incentive to Do So</u>
23       This factor weighs against cost-shifting because Defendants could control both
24 parties' discovery expenditures by efficiently de-duplicating the documents at issue.
25 Defendants sought to review a larger, duplicative set of documents than the magistrate
26 judge ordered, which would have required more attorney time. Plaintiffs' counsel, too,

---

[3] The magistrate judge appears to have recognized this problem, stating that his ruling "is a one-off" that will not have precedential value. Ex. B at 6:10-19. But that disclaimer will not prevent a chilling effect on future plaintiffs.

9

would have needed to spend more time reviewing the larger, duplicative production.

6. <u>The Importance of the Issues at Stake in the Litigation</u>

This factor weighs strongly against cost-sharing. The *Zubulake I* court explained

> the importance of the issues at stake in the litigation is a critical consideration, even if it is one that will rarely be invoked. . . . [I]f a case has the potential for broad public impact, then public policy weighs heavily in favor of permitting extensive discovery. Cases of this ilk might include . . . so-called "impact" or social reform litigation. . . .

217 F.R.D. at 321. This case—raising public-health issues of life-or-death importance—is exactly the type of impact case that the *Zubulake* court envisioned for this rare but "critical" factor. *See Hawa v. Coatesville Area Sch. Dist.*, No. CV 15-4828, 2017 WL 1021026, at *2 (E.D. Pa. Mar. 16, 2017) (rejecting cost-shifting because the case involved retaliation claims against a public entity that were of importance to the public).

7. <u>The Relative Benefits to the Parties of Obtaining the Information</u>

This factor also weighs against cost-shifting. The *Zubulake I* court explained that this factor generally supports cost-shifting, but "in the unusual case where production will also provide a tangible or strategic benefit to the responding party, that fact may weigh against shifting costs." 217 F.R.D. at 323. In keeping with the rule that courts may consider cost-shifting only for costs of restoring inaccessible data, the *Zubulake I* court assumed that the benefit corresponding to the cost would take the form of "obtaining [] information" that otherwise would not have been accessible. *Id.* at 316. This benefit does not apply here because threading is not the type of cost that can be shifted. *See supra* at 4-5. But if the Court would apply this factor to this inappropriate circumstance, this factor would address the benefits to the parties of threading. Threading benefits Defendants as well as Plaintiffs. *See supra* at 9-10. This factor thus weighs against cost-shifting.

**V. CONCLUSION**

The magistrate judge erred at both steps of the *Zubulake* analysis: the data at issue was accessible and cannot be subject to cost-shifting, and all seven *Zubulake* factors weigh against cost-shifting, some very strongly. The Court therefore must set aside the portion of the magistrate judge's order requiring cost-shifting as contrary to law.

10

RESPECTFULLY SUBMITTED this 25th day of August, 2021.

          **AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

By:   */s/ Kyle Virgien*
      Kyle Virgien

**KYLE VIRGIEN** (*Admitted Pro Hac Vice*) (kvirgien@aclu.org)
**CORENE KENDRICK** (*Admitted Pro Hac Vice*) (ckendrick@aclu.org)
39 Drumm St.
San Francisco, CA 94111
Telephone: (202) 393-4930

**OLGA AKSELROD** (*Admitted Pro Hac Vice*) (oakselrod@aclu.org)
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10014
Telephone: (212) 549-2569

**LARRY J. WULKAN** (SBN 021404) (larry.wulkan@zwfirm.com)
**ZWILLIGER WULKAN, PLLC**
2020 North Central Avenue, Suite 675 |
Phoenix, Arizona 85004

**SHARI ROSS LAHLOU** (*Admitted Pro Hac Vice*) (shari.lahlou@dechert.com)
**DECHERT LLP**
1900 K Street, N.W.
Washington, DC 20006 - 1110
Telephone: (202) 261-3300

**BRIAN RAPHEL** (*Admitted Pro Hac Vice*) (brian.raphel@dechert.com)
**PAT ANDRIOLA** (*Admitted Pro Hac Vice*) (pat.andriola@dechert.com)
**TIMOTHY LY** (*Admitted Pro Hac Vice*) (timothy.ly@dechert.com)
**DECHERT LLP**
Three Bryant Park, 1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BENJAMIN M. SADUN** (*Admitted Pro Hac Vice*) (benjamin.sadun@dechert.com)
**ALLISON OZUROVICH** (*Admitted Pro Hac Vice*) (allie.ozurovich@dechert.com)
**DECHERT LLP**
633 West 5th Street, Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5700

**JARED G. KEENAN** (SBN 027068)
(jkeenan@acluaz.org)
**ACLU FOUNDATION OF ARIZONA**
P.O. Box 17148
Phoenix, AZ 85011
Telephone: (602) 650-1854

*Attorneys for Plaintiffs-Petitioners*

# CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2021, I caused the foregoing document to be filed electronically with the Clerk of the Court through ECF, and served the counsel of record via the Court's CM/ECF System.

*/s/ Timothy Ly*